**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

FLORIDA VIRTUAL SCHOOL,

      Plaintiff,

v.                                Case No:   6:20-cv-2354-GAP-EJK

K12, INC. and K12 FLORIDA, LLC,

      Defendants

---

**ORDER**

This cause came before the Court for consideration on Defendants' Motion for Summary Judgment (Doc. 139) and Motion to Strike the Expert Report and Testimony of Jeffrey A. Stec (Doc. 170), and Plaintiff's Responses in Opposition (Docs. 171, 181).[1] An evidentiary hearing was held on June 15, 2023. (*See* Doc. 223).

## I.   Background

Plaintiff Florida Virtual School [2] ("Plaintiff") initially brought suit on December 22, 2020, against Defendants K12, Inc. and K12 Florida, LLC, dba Stride,

---

[1] The Court has combined its analysis of Defendants' Motion to Strike the Expert Report of Jeffrey A. Stec and Defendants' Motion for Summary Judgment as applied to the Count V false advertising claim because the issues are intrinsically related. *See generally* Fed. R. Civ. P. 56(f). An order on the remainder of the parties' cross-motions for summary judgment will be forthcoming.

[2] Plaintiff is an agency of the Florida state government, formed under Fla. Stat. § 1002.37.

Inc.[3], ("Defendants") for trademark infringement, unfair competition, and false advertising, in addition to breach of a 2015 Settlement Agreement (the "Settlement Agreement") resolving prior litigation between the parties. Doc. 1. The dispute revolves around Defendants' alleged improper use of certain marks registered to the Plaintiff in 2010 and 2017. *Id.*, ¶¶ 41-46; *see also* Doc. 1-1 at 1-19. The parties are competitors in the online educational services market. Doc. 155, ¶ 17.

Count V of Plaintiff's Complaint alleges that Defendants' advertising is false and misleading. Doc. 1, ¶¶ 53-60. Like many other businesses, Defendants distinguish themselves on their website, in part, by comparing their programs and services with those of their competitors. *See id.* However, Plaintiff alleges that they do so by inviting visitors to their website to use a misleading comparative checklist of features and services (the "Checklist"). *See id.*; *see also* Doc. 1-1 at Exhibit K. The Checklist, which contains two columns of checkboxes for each feature or service offered—one corresponding to Defendants' offerings and one for those of its competitors—shows that all the boxes are checked in the Defendants' column while none are checked in the competitors' column. Doc. 1-1 at Exhibit K. Plaintiff

---

Doc. 155, ¶ 6.

[3] Defendants are a for-profit, nationwide provider of online and blended learning educational programs for public and private schools, school districts and charter boards. Doc. 155, ¶ 4.

contends the Checklist "convey[s] the clear impression that [it] does not provide these features or services" when it, in fact, does, which renders Defendants' advertising both false and misleading. *Id.*, ¶¶ 55-57. The webpage leading to Defendants' Checklist originally contained an explicit reference to Plaintiff which has since been removed. *Id.*, ¶¶ 58-59. Plaintiff argues, however, that the checklist still portrays the same false and misleading message that Plaintiff does not provide all of the listed services. *Id.*

In support of its claim, Plaintiff filed the Expert Report ("Stec Report") of Jeffrey A. Stec[4] ("Dr. Stec"). *See* Doc. 157. The Stec Report evaluates whether Defendants' "use of false and misleading statements in their comparison checklist…has increased the likelihood that their customers would enroll their children." Doc. 170-2 at 1. The Stec Report concluded that 18.3% of respondents "believed the alleged false and misleading statements in the comparison checklist put out by the K12 Defendants indicated the features that [Defendants'] schools have that other online learning solutions do not have." *Id.* at 27. It further found that 14.3% of those respondents were either "Very Likely" or "Somewhat Likely"

---

[4] Dr. Stec is a market survey expert who is known to the Court. *See Wyndham Vacation Ownership v. Sussman*, 2021 WL 4948099 at *3 (M.D. Fla. 2021), *recon. denied*, 2021 WL 5177359 (M.D. Fla. 2021). Defendants concede that Dr. Stec has significant experience in trademark confusion surveys, but they question his experience in false advertising cases. *See* Doc. 170 at 4-5. For the purpose of this motion, the Court considers Dr. Stec to be qualified to conduct the instant survey.

to enroll their children in Defendants' programs "due to the alleged false and misleading statements in the comparison checklist." *Id.*

## II.   **Legal Standard**

A. Daubert *Motion*

Federal Rule of Evidence 702 governs the admission of expert witness testimony. It provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine the fact at issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

When applying this rule, the Court plays an important "gatekeeping" function to ensure that proposed expert testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). "District Courts are charged with this gatekeeping function to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation, expert testimony."

- 4 -

*Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1328-29 (11th Cir. 2014) (internal

citations omitted).

The *Daubert* court identified four factors that district courts should consider

when assessing the reliability of an expert's testimony: (1) whether the expert's

methodology has been tested or is capable of being tested; (2) whether the theory

or technique used by the expert has been subjected to peer review and publication;

(3) whether there is a known or potential error rate of the methodology; and (4)

whether the technique has been generally accepted in the relevant scientific

community. *See id.* at 593–94. However, the Supreme Court has emphasized that

these factors are not exhaustive and are intended to be applied in a "flexible"

manner. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).

*B.  Summary Judgment*

A party is entitled to summary judgment when the party can show that there

is no genuine issue as to any material fact and that the movant is entitled to

judgment as a matter of law. Fed. R. Civ. P. 56(c). Which facts are material depends

on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). The moving party bears the burden of showing that no genuine

issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In

determining whether the moving party has satisfied its burden, the court considers

all inferences drawn from the underlying facts in a light most favorable to the party

opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The court is not, however, required to accept all of the non-movant's factual characterizations and legal arguments. *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458–59 (11th Cir. 1994).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the nonmoving party must "go beyond the pleadings and by [their] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324. Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish a genuine issue of fact for trial. *Id.* The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

## III.   Analysis

### A.   Daubert *Motion*

In fulfilling its gatekeeping role, the Court has significant discretion in its application of the *Daubert* and Rule 702 factors to determine the reliability of

- 6 -

expert testimony. *See Kumho Tire*, 526 U.S. at 143. These factors "may" be employed but, most essentially, "the gatekeeping inquiry must be tied to the facts of a particular case." *Id.* at 143, 150 (internal citations omitted). Such discretion exists for cases like this one. *See id.* Though the Stec Report appears at first glance to arise from methodologically sound principles, it is ultimately based upon a misleading premise. Because it cannot, therefore, assist the trier of fact "to understand the evidence or to determine the fact[s] at issue," Defendants' motion to strike the Stec Report is due to be granted. Fed. R. Evid. 702(a).[5]

Dr. Stec's survey asked respondents to view extracted webpages from Defendants' website and then asked them a series of questions. Doc. 170-2 at 9-10. The primary webpage prompts the respondent to consider what differentiates Defendants from "other online learning solutions like Connections Academy and Time4Learning"and suggests they consider attributes like accreditation, teacher certification, and others when deciding where to send their child. *Id.* at 9. Further down the page, under a discrete heading titled, "K12 vs. Other Online Learning Solutions," a description states: "When comparing [Defendants] to other online

---

[5] Defendants filed a rebuttal report prepared by Sarah Butler ("Ms. Butler"). Doc. 193. The Court did not rely on her report in reaching this conclusion. However, to the extent Ms. Butler found the Stec Report to be flawed, her rationale supports the Court's analysis. *See* Doc. 170-1 at 59-60.

learning solutions like Connections Academy and Time4Learning, *use this checklist to weigh your options.*" *Id.* at 24-25 (emphasis added).[6]

Respondents are then shown the second page, which is a screenshot of the Checklist standing alone. *Id.* at 10. Without any other context or opportunity to evaluate the programs that *other* online learning solutions offer, the survey asked respondents to evaluate what the Checklist meant to them. *See id.* at 9-15. This is flawed. The Checklist is not portrayed on Defendants' website as a standalone advertisement of its programs and services, as it is portrayed in Dr. Stec's survey. *See id.* at 9-15, Exhibit 12. In reality, when a user clicks on the "View Checklist"[7] button of the webpage, a PDF copy of the Checklist opens in a new window for users to print or otherwise utilize in their search for an online educational program. *See* K12.COM, *Why K12 is the Outstanding Choice*, (last viewed on July 7, 2023), https://www.k12.com/about-k12/why-k12/k12-vs-online-solutions.html.

---

[6] By listing several competitors and generically referring to "other online learning solutions"—on the Checklist's second column and in this heading/sentence—the website and the Checklist make clear that the blank checkboxes cannot be attributed to any one competitor.

[7] The Court notes that though the website itself has a button that says, "View Checklist," in his survey, Dr. Stec presented the Checklist to survey respondents as what would appear if they had clicked "*Re*view Checklist" on the previous page. *Compare* Doc. 170-2 at 25 *with id.* at 28. While the distinction is subtle—"review" generally connotes a formal examination or assessment with an eye toward informing change, while "view" simply means to look at or inspect something—it is not innocuous. *See review, view*, OXFORDLANGUAGES (2023).

The Checklist is a marketing tool inviting the reader to compare the features of Defendants' program with competing online educational programs—Plaintiff itself highlighted in its Response to Defendants' Motion for Summary Judgment that "[Defendants] ha[ve] presented [the Checklist] as an 'invitation to consumers to compare the attributes of [Defendants'] competitors to those of [Defendant].' " Doc. 171 at 5 (quoting Doc. 17 at 10). If the survey respondent were allowed to make this comparison, she would see that Plaintiff offers the same features, there would be no deception, and FLVS would suffer no harm. But Dr. Stec's survey does not allow the respondent to make that comparison; instead asking her to simply guess or infer what some other online service may or may not offer. *See* Doc. 170-2 at 9-15.

The Stec Report's 18.3% result becomes meaningless when viewed in the proper context. *See id.* at 27. It does nothing to enhance the fact finder's ability to determine whether the Checklist is misleading because it does not examine that question, rather it assumes the Checklist contains false and misleading statements. *See, e.g., id.* ("18.3% of respondents believe the *alleged false and misleading statements in the comparison checklist*…indicated the features that K12-powered schools have that other online learning solutions do not have[.]"). However, the only context in which the statements could be considered false or misleading would be if they were viewed in a vacuum, where the respondent is unable to *use* the checklist to

assess the attributes of Defendants' competitors—in other words, the context of Dr. Stec's survey. The Stec Report accomplishes little more than to show that if a business advertises with a comparative checklist, some consumers will assume it does so to highlight attributes it possesses that its competitors do not.

Outside of contextual issues, Dr. Stec's survey mechanics are generally acceptable and do not invoke controversial analysis under *Daubert*. 509 U.S. at 593-94. However, because the survey ultimately portrays Defendants' website and the Checklist out of context, under Rule 702, the Stec Report is founded upon insufficient data and facts that simply do not aid the trier of fact. *Id.* at 702(a)-(b). Therefore, it is not a reliable scientific survey that would assist the jury and must be excluded. *See Kumho Tires*, 526 U.S. at 143.

### B. Summary Judgment

To recover for false advertising under the Lanham Act, a Plaintiff must show that:

> "(1) the ads of the opposing party were false or misleading, (2) the ads deceived, or had the capacity to deceive, consumers, (3) the deception had a material effect on purchasing decisions, (4) the misrepresented product or service affects interstate commerce, and (5) the movant has been—or is likely to be—injured as a result of the false advertising."

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002). As a threshold matter, Defendants argue that the Checklist is not

sufficiently widely disseminated to constitute commercial advertising, citing to data showing only 46 visits per month. Doc. 150 at 13-14 (citing *Suntree Techs., Inc. v. EcoSense Int'l, Inc.*, 693 F.3d 1338, 1349 (11th Cir. 2012)). However, as noted in *Suntree,* "where the customer market is particularly small[,] courts may find a statement to be sufficiently disseminated to constitute 'commercial advertising or promotion,' even though only distributed to a few customers (or even one)." 693 F.3d at 1349 (quoting *Schütz Container Sys., Inc. v. Mauser Corp.*, 2012 WL 1073153, 2012 U.S. Dist. LEXIS 44012 (N.D.Ga. Mar. 28, 2012)). In this context, it is clear that Defendants' Checklist is sufficiently widely disseminated to constitute commercial advertising.

Plaintiff also rightly notes that this Court rejected Defendants' motion to dismiss its false advertising claim. Doc. 25 at 11. However, it did so at a different stage of this litigation, before the facts were developed through the discovery process. *See id.* The Court now analyzes the issue with the benefit of a complete record.

Plaintiff's false advertising claim ultimately boils down to the first prong of the analysis: whether Defendants' Checklist is false or misleading. *See Johnson & Johnson*, 299 F.3d at 1247. It is not. To meet its burden on this element, Plaintiff must show that the advertisement is literally false, or, if literally true, that it is misleading. *Id.* Advertisements which are literally false require no further

- 11 -

evidence of consumer deception, however, "[i]f the court deems an ad to be true but misleading, the movant…must present evidence of deception." *Id.*

Plaintiff argues that "the only way the checklist can be *interpreted*" is to show that Plaintiff lacks attributes that Defendants possess. Doc. 171 at 8 (emphasis added). But, tellingly, that argument is solely based upon Plaintiff's *interpretation* of the Checklist. *See id.* The second column of the Checklist is labelled with the generic "Other Online Learning Solutions." Doc. 1-1 at Exhibit K. There can be no good faith contention that the corresponding blank checkboxes "state" that *none* of Defendants' competitors, including Plaintiff, possess *any* of those attributes, especially when viewed in the full context of the website.

Plaintiff attempts to dance around the question of whether the Checklist here is literally false by continuing to state in its papers that the Checklist is false *and* misleading. *See* Doc. 171 at 7. However, Plaintiff's executive, in deposition, could not identify anything literally false about the Checklist and Plaintiff all but concedes that its theory relies on the Checklist *misleading* consumers. *Id.* ("[Defendants] seek[] judgment, in part, because some witnesses testified that the Checklist is not "literally false," but even [Defendants] concede[] false advertising is actionable where "advertisements were false or misleading.") (emphasis original); *see also* Doc. 139-32 at 198-202. The only "statements" in the checklist are the features offered by Defendants, represented by checked boxes. *See* Doc. 1-1 at

- 12 -

Exhibit K. There is simply no evidence in the record that these statements are literally false. *See* Doc. 139-32 at 198-202.

Accordingly, Plaintiff must "provide expert testimony or other evidence" of consumer deception to prevail on its claim that the checklist is misleading. *Johnson & Johnson*, 299 F.3d at 1247. The only evidence Plaintiff has offered to show consumer deception, however, is the Stec Report.[8] Doc. 171 at 7-8. As described *infra*, the Stec Report does not reliably provide any evidence of consumer deception. *See supra* at III.A. Consequently, because no admissible evidence showing consumer deception has been offered and the advertisement in question is not literally false, there is no disputed issue of material fact regarding the false or misleading nature of Defendants' Checklist and Plaintiff's Count V claim for false advertising cannot stand.

## IV. Conclusion

Accordingly, it is **ORDERED** that Defendants' Motion to Exclude the Expert Report and Testimony of Jeffrey A. Stec is **GRANTED** and Dr. Stec's Report is hereby **STRICKEN**. Defendants' Motion for Summary Judgment, as

---

[8] Plaintiff also cites to deposition testimony from its own marketing and public relations employees expressing their opinions on the impact of the Checklist, however such assertions are of little probative value. *See* Doc. 171 at 7-8.

applied to Plaintiff's Count V false advertising claim, is hereby **GRANTED in part**.

 **DONE** and **ORDERED** in Chambers, Orlando, Florida on July 10, 2023.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party