**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

FLORIDA VIRTUAL SCHOOL,

        Plaintiff,                         Case No.: 6:20-cv-2354-GAP-EJK

v.

K12, INC. and K12 FLORIDA, LLC,

        Defendants.

_____/

**FLVS TRADEMARK INFRINGEMENT TRIAL BRIEF**

Plaintiff, Florida Virtual School ("FLVS"), files this trial brief in support of its trademark infringement and unfair competition claims, and states:

**I.**      **PRELIMINARY STATEMENT**

K12 infringed upon FLVS's trademarks by adopting similar marks to advertise and sell similar services to the same customers as FLVS. In so doing, K12 intentionally sought to capitalize on FLVS's widespread recognition in the Florida online education market by manipulating search engine results to confuse potential FLVS customers. This strategy largely succeeded, causing widespread actual confusion amongst Florida parents, students, and school officials. K12's infringement continues to the present day, despite K12's many representations to the contrary, and confirms a pattern of infringement which began in the prior litigation between the parties.

Under these facts, a permanent injunction and disgorgement of K12's profits are appropriate and necessary to stop K12's ongoing infringement and to forestall future infringement. Accordingly, FLVS respectfully requests that the Court enter judgment in favor of FLVS on its trademark infringement and unfair competition claims, permanently enjoin K12, and disgorge K12's profits.

## II.    BACKGROUND

FLVS is a public agency of the State of Florida which has developed and delivered online and distance learning education in Florida since 1997. (Doc. 302, Admitted Facts ¶¶ 1–2). FLVS owns seven federally registered trademarks pertaining to the marks "Florida Virtual School" and "FLVS." (Admitted Facts ¶ 13). These trademarks include:

| MARK | REGISTRATION NUMBER |
|---|---|
| FLORIDA VIRTUAL SCHOOL | 3,830,765 |
| FLVS | 3,873,393 |
| FLORIDA VIRTUAL SCHOOL | 5,113,225 |
| FLVS | 5,113,235 |



| | 5,113,241 |
| --- | --- |
| | 5,113,248 |
| | 5,113,259 |

(Doc. 143-1, Verghese Decl., ¶¶ 6, 10, and Exs. A–G). The United States Patent and Trademark Office has declared marks 3,830,765 ("Florida Virtual School") and 3,873,393 ("FLVS") incontestable under the Lanham Act. (PEXs. 668, 669).[1]

---

[1] "PEX" refers to exhibits listed on Plaintiff FLVS's exhibit list, "DEX" refers to exhibits listed on Defendant K12's exhibit list, and "JEX" refers to exhibits listed on the Joint Exhibit List.

K12 is a private corporation which competes with FLVS to deliver online and distance learning education in Florida and throughout the United States. (Admitted Facts ¶¶ 7–10). K12 has a long history of infringing upon FLVS's marks. This history began when K12 adopted the marks "Florida Virtual Academy," "Florida Virtual Program," "FLVA," and "FLVP" for its online education programs in Florida. (Admitted Facts ¶¶ 11–12). Such blatant infringement gave rise to the previous trademark litigation between the parties, which was ultimately resolved by the 2015 Settlement Agreement. (Admitted Facts ¶¶ 14–15).

While the 2015 Settlement Agreement ended the previous litigation, it unfortunately did not end K12's infringement. K12 adopted the "Florida Online School" and "FLOS" marks for its Hendry County program from 2019 to 2021 to further confuse the public and profit off the search engine optimization (abbreviated "SEO") FLVS spent years and millions of dollars developing. (Admitted Facts ¶¶ 19–20; JEX. 24). K12 continues to use the "Florida Online School" and "FLOS" marks on its website, web address, Google keywords, and emails despite its numerous representations that it has ceased its infringing conduct. (*E.g.,* (*E.g.,* PEXs 667, 697, 601–704); Doc. 17 at 12; Doc. 139 at 17–18, 39; Doc. 302 at 8). This pattern of infringement forced FLVS to file this lawsuit seeking injunctive relief and disgorgement of K12's profits.

The questions of fact and law which will be tried before the Court include:

- Whether K12 infringed upon FLVS's trademarks;

- Whether K12 can successfully establish any affirmative defenses that may excuse its infringement;

- Whether FLVS is entitled to injunctive relief;

- Whether FLVS is entitled to disgorge K12's FLOS profits; and

- The amount of FLOS profits which should be disgorged.

To aid the Court in reviewing the law and evidence, FLVS will discuss each question in turn.

## III.    TRADEMARK INFRINGEMENT

K12 infringed upon FLVS's trademarks by intentionally adopting similar marks to sell similar online education services to the same kindergarten through twelfth grade Florida customers through similar sales channels with similar advertising methods in the same Florida market FLVS operates within. "For a trademark infringement claim, a plaintiff must demonstrate (1) that it owns a valid mark with priority, and (2) that the defendant's mark is likely to cause consumer confusion with the plaintiff's mark." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 946 (11th Cir. 2023). There is no question that FLVS own at least five valid registered trademarks with priority pertaining to the marks "Florida Virtual School" and "FLVS."

"The likelihood of confusion analysis involves two steps. At step one, the court considers several factors which can provide circumstantial evidence of likelihood of confusion." *Id.* at 947. These factors are:

> (1) the strength of the allegedly infringed mark; (2) the similarity of the infringed and infringing marks; (3) the similarity of the goods and services the marks represent; (4) the similarity of the parties' trade channels and customers; (5) the similarity of advertising media used by the parties; (6) the intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public.

*Id.* A court may also, but does not have to, consider consumer sophistication as another factor. *Id.* at 957.

"At step two, the court weighs each of the relevant circumstantial facts—independently and then together—to determine whether the ultimate fact, likelihood of confusion, can reasonably be inferred." *Id.* at 947. "In drawing the ultimate inference about likelihood of confusion, the two most important circumstantial facts are respectively actual confusion and the strength of the mark." *Id.*

"[T]he analysis of the Florida statutory and common law claims of trademark infringement and unfair competition is the same as under the federal trademark infringement claim." *Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 652 (11th Cir. 2007) (quotation omitted).

Application of these factors favor a finding of likelihood of confusion.

### A.    FLVS's Marks are Strong.

FLVS's presumptively strong marks are buttressed by their widespread consumer recognition within Florida. "Strength or 'distinctiveness' describes a mark's ability to allow consumers to identify the source of a good or service." *FCOA*, 57 F.4th at 948. "So, strength or distinctiveness is just another way of talking about consumer recognition." *Id.* There are "two steps in assessing the strength of a mark: conceptual strength and commercial strength." *Id.*

"Conceptual strength describes the *potential* of a mark to aid consumer recognition, which we evaluate through an abstract linguistic analysis. Courts determine this potential by placing a mark on the sliding scale of trademark strength, from weakest to strongest: (1) generic, (2) descriptive, (3) suggestive, and (4) fanciful or arbitrary." *Id.* at 949 (emphasis in original). The mere fact that a mark is "descriptive" does not make it weak. *Id.* Rather, a descriptive mark with secondary meaning "is strong enough to be valid under the Lanham Act," and "a mark has secondary meaning when consumers view the mark as synonymous with the mark holder's goods or services." *Id.* Even a mark as descriptive as "American Airlines" may become strong because "with the mark holder's time and effort, American Airlines now calls to mind a specific airline through its secondary meaning." *Id.* (holding that the descriptive mark "Foremost Insurance Group" is conceptually strong). The evidence of commercial strength adduced at trial, *see infra*, will show

that FLVS's marks similarly call to mind FLVS within Florida and renders the marks strong.

Additionally, "[i]ncontestable descriptive marks . . . are statutorily presumed to be valid and thus must have some degree of secondary meaning." *Id*. Since the first two "Florida Virtual School" and "FLVS" marks have achieved incontestable status, (PEXs 668, 669), they are at least descriptive with secondary meaning. *Id*. K12's arguments that FLVS's marks are merely descriptive thus fail as a matter of law. *Id.*; *see also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 196 (1985) (holding that incontestability "is *conclusive* evidence of the registrant's exclusive right to use the mark" and that "[m]ere descriptiveness is not recognized by either § 15 or § 33(b) as a basis for challenging an incontestable mark"). Rather, under binding Eleventh Circuit precedent, incontestable marks are conceptually strong and presumed to be "relatively strong mark[s]" absent evidence that they are commercially weak. *FCOA*, 57 F.4th at 950–51.

"Commercial strength refers to the real-world consumer recognition of a mark, most often created by the efforts and work of the mark holder." *Id.* at 950. "Commonly used evidence of commercial strength includes third party use; advertising and promotion; sales and number and types of customers; recognition by trade, media, and customers; and survey of likely customers." *Id.* Here, the evidence of commercial strength overwhelmingly favors FLVS. FLVS regularly conducts

surveys gauging consumer recognition of its marks in Florida. (*E.g.*, PEX 212 at 5). These surveys demonstrate that up to 56% of potential FLVS customers recognize FLVS, and that far fewer customers recognize competitors like K12. (*E.g.*, PEX 193). As consumer surveys are "direct evidence of consumer recognition," they are highly probative of the commercial strength of FLVS's marks. *FCOA*, 57 F.4th at 950–52. Such evidence is further buttressed by FLVS's circumstantial evidence of consumer recognition, including its over $20 million advertising budget from 2014 to present, its more than 180 online courses, its over 6 million semester completions, and its many industry awards. (Doc. 143-2, FLVS Rog Response Nos. 2–3).

At trial, K12 will likely argue that FLVS admitted its marks are weak in internal discussions and by its adoption of the "FLEX" trademarks outside Florida. These arguments badly misconstrue the evidence and the legal standard for commercial strength. Per the Court's prior orders, only the commercial strength of FLVS's marks within Florida are relevant at the upcoming trial, and the at-issue trademarks are FLVS's primary marks within Florida. Any purported evidence that FLVS internally considers its marks weak outside Florida is thus irrelevant. Evidence of internal deliberations about the strength of FLVS's trademarks is also not probative of consumer recognition. *Cf. FCOA*, 57 F.4th at 950 (listing the evidence probative of commercial strength). Whether some FLVS employees fretted internally about consumer recognition outside Florida does not contradict the

evidence showing widespread consumer recognition of FLVS within Florida, or FLVS's uncontradicted evidence of traditional indicators of commercial strength like advertising, sales, and awards. This is especially true considering the reason FLVS adopted the FLEX mark outside of Florida was to avoid repeated questions about whether Florida-branded courses would meet other state's requirements. (Doc. 171-8, Reyes Dep. 88:6–89:1).

K12's argument that other entities regularly use parts of FLVS's trademarks also does not pass muster. Arguing that individual words are in use elsewhere is not probative because "in assessing the impact of third-party uses, we consider 'the entire name a third party uses, as well as the kind of business in which the user is engaged.'" *Fla. Int'l Univ. Bd. of Trs. V. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1257 (11th Cir. 2016) (quotation omitted); *see also Cal. Cooler, Inc. v. Loretto Winery, Ltd.*, 774 F.2d 1451, 1455 (9th Cir. 1985) ("holding that "validity is not judged by an examination of its parts [but] by viewing the trademark as a whole"). This is demonstrated by the Eleventh Circuit's recognition of "American Airlines" and "Foremost Insurance Group" as strong marks even though the terms "American," "airlines" and "insurance group" are regularly used by competitors. *See FCOA*, 54 F.4th at 949–52. Similarly, third-party use of individual words like "Florida," "virtual," or "school" is irrelevant to the strength of the mark here. Instead, the Court should consider whether "Florida Virtual School" and "FLVS" are strong as a whole.

*Cal. Cooler*, 774 F.2d at 1455. This is especially true when most if not all of the third-party uses K12 points to are either FLVS affiliates or have been abandoned, like K12's FLVA and FLVP marks. *See FCOA*, 54 F.4th at 951 ("Inactive businesses and marks are not relevant to our analysis [of third-party use].").

### B.     The parties' marks are very similar.

The likelihood of confusion is also high because FLVS's "Florida Virtual School" and "FLVS" marks are very similar to K12's "Florida Online School" and "FLOS" marks. For the second factor, similarity of the trademarks, "[t]he greater the similarity, the greater the likelihood of confusion." *Id.* at 952. "Of course, the marks don't need to be identical to support a finding of similarity, because the key is to determine if the similarities are sufficient to deceive the public." *Id.* To make that finding, courts "'consider[] the overall impressions that the marks create, including the sound, appearance, and manner in which they are used,' rather than comparing isolated features." *Id.* (quoting *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 13437 (11th Cir. 1999)) (brackets in original). Two marks may be similar despite being descriptive. *See FCOA*, 57 F.4th at 952–53 (holding that a factfinder could find the descriptive marks "Foremost Insurance Group" and "Foremost Title & Escrow" similar).

The textual similarity between the parties' marks are readily apparent:

- "**Florida** Virtual **School**" and "**Florida** Online **School**"

- "**FL**V**S**" and "**FL**O**S**"

For the full word marks, K12 chose to use two of the three words in FLVS's Florida Virtual School mark and a well-known synonym for the third. For the acronym, K12 chose to use three of the four letters in the FLVS acronym. This precisely follows the pattern K12 used in adopting its "Florida Virtual Academy," "FLVA," "Florida Virtual Program," and "FLVP" marks.

In response, K12 points to distinctions in the parties' logos, such as the inclusion of a panther in some versions of the FLOS logo. But while FLVS admittedly does not employ animals in its marks, this distinction obscures the principal way in which the parties *use* their marks: to advertise their online services. K12 leadership made clear through internal emails that it adopted the mark "Florida Online School" to maximize its ranking in search engine results. (JEX. 27); *see infra* Section III.F. K12, like FLVS and all exclusively online service providers, is primarily concerned with increasing its online visibility, and search engines are the principle way in which the public finds online services. Importantly, search engines consider only the *textual* aspects of a name or term when returning results, not *visual* aspects like color or images. The textual aspects are also generally the only aspects of a mark customers and other third parties use when discussing online companies through texts, emails, social media, or in person. Once the impression of similarity is created by text-centric search engine results or conversations, the mere fact K12

12

included a panther in its FLOS logo is not especially likely to prevent a consumer

from confusing or connecting FLVS with FLOS given that panthers are not uniquely

connected with K12, and arbitrarily chosen animals are often included in school

logos. This argument also fails to consider the numerous non-logo uses of "FLOS"

and "Florida Online School" that are even closer to FLVS's marks. When

considering the unique, online-focused circumstances of this case, the textual

similarities between the parties' marks deserve the greater weight. Accordingly, the

second factor favors FLVS.

## C.    The parties' services are the same.

FLVS and K12 are competitors who offer nearly identical online educational

services to Florida students in kindergarten through twelfth grade. This factor

therefore favors FLVS. Although K12 quibbles about minor purported differences

between the parties' services, such as whether FLVS and FLOS offered similar

programs for post-secondary or special education students, the standard for this

factor is "whether the products are of a kind the public could *think* originate from a

single source." *FCOA*, 57 F.4th at 953 (emphasis in original) (holding that

consumers could think housing and title insurance originate from the same source

despite Florida law prohibiting a single company from insuring both types of

policies). The testimony adduced at trial will show that FLVS does, in fact, offer

13

those services, and whether K12 arguably focuses on them more than FLVS is irrelevant to whether the public could *think* they originate from FLVS.

But the Court should not be distracted by this red herring of an argument. Both FLVS and K12 focus primarily on providing online education to Florida kindergarten through twelfth grade students, and these services are largely dictated by the courses students are required to take and the standards they are required to meet to graduate high school in the State of Florida. Such students account for almost all of FLOS's revenues, (*see* PEX 689 ¶ 42), and so they should be the primary focus of the Court's analysis as well. A focus on the fringes of specific online classes, as K12 suggests, misses the forest for the trees. The evidence will show these parties off the very same services.

### D.  The parties' customer bases and trade channels are the same.

FLVS and K12 are in direct competition to sell their online services to the same Florida kindergarten through twelfth grade students and Florida counties via the same trade channels. This factor "focuses on 'where, how, and [with] whom' the parties transact with their actual and potential customers." *FCOA*, 57 F.4th at 954. "The primary focus in this inquiry is on the overlap of the customer bases, because the greater the overlap, the greater the likelihood that consumers will be exposed to both marks and become confused." *Id.* "Therefore, direct competition or identity of sales is not required; we look to whether the companies cater to the same general

14

kinds of individuals." *Id.* (quotation and quotation marks omitted). "Likewise, the similarity of trade channels analysis focuses on whether the medium (e.g., stores, agents, online, mail, etc.) that customers frequent would expose them to both marks, not on whether the products or services are sold in the same location or manner." *Id.*

Here, both parties "cater to the same general kinds of individuals," i.e., Florida students interested in online education. Although K12 argues that Hendry County, not parents or students, was FLOS's customer, this argument is merely a made-for-litigation position adopted to avoid or confuse the obvious similarities between the parties' customers. Per its contract with Hendry County, K12 received 95% of FLOS's revenues, and these revenues derived almost exclusively from the number of student completions FLOS achieved in a given year. (JEX 16 § 8.1; Berry Dep. 24:15–22, 46:22–47:4). Moreover, 95% of FLOS's students were located outside of Hendry County. (Berry Dep. 38:2–17). It strains credulity that K12, a private for-profit business, did not consider FLOS parents and students as its customers when FLOS's revenues depended on K12 attracting and retaining those same parents and students. And if K12 merely sought to provide Hendry County, and Hendry County alone, with online educational services, then there would have been no reason for K12 to seek out and accept non-Hendry County students. The fact K12 did so anyway indicates these parents and students, not Hendry County, were its primary customers. Either way, it is also true that FLVS and K12 both contract with Florida

counties and school districts to provide online education, so both parties still cater to the same general kinds of business customers.

K12's remaining arguments on this factor likewise fail. As discussed, both FLVS and K12 sold to post-secondary and special education students, resulting in both entities selling to the same general kinds of individuals. Nor has K12 offered any real explanation for why FLOS having a slightly longer full-time application period than FLVS's full-time program meant FLOS did not cater to the same general kinds of online students as FLVS, especially when parents and students could sign-up for FLVS's part-time programs year-round. The near perfect identity between the parties' customers, along with their status as direct competitors, means this factor strongly favors FLVS.

The parties, as online education providers, also used the same trade channel to interact with their customers: the internet. The evidence adduced at trial will show that consumers sought out and interacted with FLVS and FLOS through their websites and web searches. For example, Florida parents Casey Kalajian and Lisa Kornheisl attempted to sign up for FLVS online, but enrolled in FLOS through its website instead. (Doc. 143-18, Kornheisl Dep. 13:8–14:10; Doc. 143-19, Kalajian Dep. 14:19–15:21). This was no accident, as K12 intentionally selected the mark "Florida Online School" to optimize its search engine results and piggyback off FLVS's efforts, (JEX. 27), and because K12 paid to have FLOS appear when

16

consumers searched for FLVS. (*E.g.*, PEXs 23, 27, 46, 68, 701, 702). In fact, the record evidence shows that FLOS teachers would, as an assignment, ask FLOS students to interact with FLOS's website, and that many students instead found FLVS's website. (*E.g.*, PEXs 333, 345). The similarity between the parties' trade channels, and the resulting confusion this caused, weighs heavily in FLVS's favor.

### E.    The parties' advertising focused on the same audience.

The fifth factor, similarity of advertising, favors FLVS because parties both advertised their services to the same consumers. This factor "focuses on the audience reached by the advertisements of the parties." *FCOA*, 57 F.4th at 955. "Like with similarity of trade channels and customer bases, the greater the overlap or similarity of the audiences, the greater the likelihood of confusion." *Id.* "Identity of advertising methods is not required, but instead we assess whether the overlap in readership of the parties' advertisements is 'significant enough' that 'a possibility of confusion could result' in a fashion very similar to the previous factor." *Id.* (quoting *PlayNation Play Sys., Inc. v. Velex Corp.*, 924 F.3d 1159, 1168–69 (11th Cir. 2019)).

Both FLVS and K12 focused their advertising efforts on reaching the same audience: Florida students seeking an online education. The evidence will show that the parties advertised their services to this audience through the same forms of media, including their respective websites, search engine results, social media, paid keyword advertising like Google AdWords, and at trade conferences. (*See, e.g.*, Doc.

143-1, Verghese Decl., ¶ 19; Doc. 143-4, Goldthwaite Dep. 54:17–57:7; Doc. 143-5, Lysaught Dep. 169:18–170-5). This makes sense, as both FLVS and FLOS aggressively sought to increase their revenues by attracting and retaining as many Florida students as possible to bolster their student completions. The similarity of advertising factor thus strongly favors FLVS.

### F.    K12's infringement is intentional.

The evidence strongly indicates that K12 intentionally adopted and promoted its FLOS marks to capitalize on FLVS's good will and consumer recognition by manipulating search engine results. "If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity." *Frehling*, 192 F.3d at 1340. An intent to infringe exists if the defendant "had a conscious intent to capitalize on the plaintiff's business reputation, was intentionally blind, or otherwise manifested improper intent." *FIU Board*, 830 F.3d at 1263. "Since improper motive is rarely, if ever, admitted (and this case provides no exception), the court can only infer bad intent from the facts and circumstances in evidence." *Jellibeans, Inc. v. Skating Clubs of Ga., Inc.*, No. C80-1689A, 1981 WL 40564, at *6, 212 U.S.P.Q. 170 (N.D. Ga. May 15, 1981), *aff'd*, 716 F.2d 833 (11th Cir. 1983) ("Intent, as the district court noted, must often be proved by circumstantial evidence.").

Internal K12 emails reveal K12 adopted the "Florida Online School" mark because it "will rank very well from an SEM/SEO perspective." (JEX 24). "SEM/SEO," in this context, refers to "search engine marketing" and "search engine optimization." The reason for the success of "Florida Online School" "from an SEM/SEO perspective" is simple: FLVS is the largest and most well-known online education provider in Florida, and consumer recognition surveys consistently show that potential Florida customers recognize FLVS more often than K12's brands. (*E.g.*, PEX 212 at 5). Utilizing marks nearly identical to FLVS's marks grants a competitor an enormous advantage "from an SEM/SEO perspective" because search engine algorithms would return FLOS's website when potential customers searched for FLVS due to the similarity in names and services. K12 confirmed its intent to employ this strategy when it repeatedly utilized paid keyword advertising to ensure that FLOS's website and K12.com webpages utilizing FLOS marks appeared as one of the first, sponsored results when the public searched for FLVS. (*E.g.*, PEXs 23, 27, 46, 68, 701, 702). Once FLOS's webpage was returned by the web search for FLVS, the similarity between the parties' marks and services would confuse consumers into clicking on FLOS's website instead of FLVS's. This strategy was extraordinarily effective, confusing even sophisticated actors like third-party school workers, parents who had performed independent research, and students enrolled in

19

FLOS. (*See*, *e.g.*, PEXs 24, 26, 40, 42, 44, 47, 328, 329, 331, 340, 343, 344, 347, 350, 351, 356, 357, 358, 360, and 693).

Further evidence of K12's intent to infringe lies in its continued use of the FLOS marks despite its repeated representation to this Court that it had abandoned them. (*E.g.*, Doc. 17 at 12; Doc. 139 at 17–18, 39; Doc. 302 at 8). For example, K12.com's Florida information page currently advertises its "Florida Online Schools" and explains "How to Enroll in Florida Online School," at its web address "https://www.k12.com/**florida-online-school**s/." (PEX 704) (emphasis added). K12 continues to use "Florida Virtual School" and "Florida Online School" as main search terms for Google keywords to direct the public to this webpage. (PEX 701–703). The DAOF website repeatedly mentions "Florida Online School" and "FLOS," (PEX 696), and DAOF email addresses still use "@flonlineschool.com." (PEX 667). This conforms with the pattern K12 established in the previous litigation where it agreed to stop using the "FLVA" marks but still used the "FLVA.COM" and "FLVA.NET" domains to redirect web traffic to its Florida websites. (PEXs 753–757). K12 never truly ceased its infringement in either the prior or the present litigation—it just learned how to better conceal it.

Such continued infringement distinguishes this case from *Optimum Technologies, Inc. v. Home Depot U.S.A., Inc.*, 217 F. App'x 899, 903 (11th Cir. 2007), where the court found no intent to infringe when the defendant slowly

corrected its purportedly infringing conduct upon receiving notice. Rather, an intent to infringe may be inferred when a party continues to infringe despite receiving a demand to cease-and-desist. *See*, *e.g.*, *Tiramisu Int'l LLC v. Clever Imports LLC*, 741 F. Supp. 2d 1279, 1288–89 (S.D. Fla. 2010) (finding "willfulness may be inferred by the fact that [the infringer] deliberately continued" to infringe); *PetMed Express, Inc. v. MedPets.Com, Inc.*, 336 F. Supp. 2d 1213, 1220 (S.D. Fla. 2004) (finding intentional infringement where infringer continued use of the mark after receiving several cease and desist letters). Here, K12 twice promised to cease its infringing conduct yet continued to infringe. Its ongoing use of the FLOS marks in its web addresses, like its use of "FLVA.COM" and "FLVA.NET," represents a clear continuation of its strategy to manipulate search results so that consumers are directed to K12 websites instead of FLVS websites when they search for FLVS.

Against this backdrop, K12's choice to adopt marks nearly identical to FLVS's marks in this case, along with its history of adopting marks similar to FLVS's marks like "Florida Virtual Academy," "FLVA," "Florida Virtual Program," and "FLVP," demonstrates a conscious intent to infringe. Even if this is not directly intentional, it is a case of willful blindness. *See Frehling*, 192 F.3d at 1340 (finding that a defendant was "intentionally blind" when it adopted marks confusingly similar to the marks of the well-known plaintiff and included its marks as part of its toll-free telephone number despite numerous objections from the

21

plaintiff). The evidence, taken together, strongly indicates that K12 intended to infringe upon FLVS's marks or was at least willfully blind to the possibility.

### G.      FLVS has ample evidence of actual confusion.

FLVS also has ample evidence of actual confusion. "Evidence of confusion by actual or potential customers is, of course, the best evidence of a likelihood of confusion." *FIU Board*, 830 F.3d at 1264. "[T]he quantum of evidence needed to show actual confusion is relatively small." *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 937 (11th Cir. 2010).

At trial, the Court will hear testimony from two Florida parents, Casey Kalajian and Lisa Kornheisl, who will testify that they conducted research into online schools, decided to enroll their children in FLVS, and instead enrolled their children in FLOS after conducting web searches for FLVS due to the similarity between the marks. The Court will also hear from FLOS employee Kimberly Kershner, who explained that FLVS and FLOS "gets mixed up all the time." (PEX 350). Additionally, FLVS will introduce dozens of exhibits demonstrating that parents, students, and other sophisticated individuals involved in online education regularly confused FLVS and FLOS. (*See*, *e.g.*, PEXs 24, 26, 40, 42, 44, 47, 328, 329, 331, 340, 343, 344, 347, 350, 351, 356, 357, 358, 360, and 693). Since FLVS's evidence of actual confusion by actual or potential customers is far more than "relatively small," this factor strongly favors FLVS. This is especially true when, as

here, the examples of actual confusion extend even to sophisticated and well-informed customers, businesses, and individuals.

Since all likelihood of confusion factors weigh in FLVS's favor, the Court should find that K12 infringed upon FLVS's marks.

## IV.    K12's AFFIRMATIVE DEFENSES

### A.    K12 did not plead false advertising or set-off counterclaims.

K12 has indicated that it will advance unpled false advertising and set-off counterclaims against FLVS at trial to reduce any disgorged profits by $730,510,009. (Doc. 302 at 9–10, 13). K12 believes FLVS falsely claimed "in its national advertising since 2020 that it has been the 'leader' in providing online education services to the kindergarten through twelfth grade market since 1997." *Id.* K12 included several exhibits relevant to these unpled claims in its exhibit list, including a cease-and-desist letter K12 sent FLVS in December 2022. (*E.g.*, DEXs. 121–123). K12 supposedly derives its $730 million in damages from "FLVS's national revenues since 2020." (Doc. 302 at 10, 13).

These counterclaims are outside the scope of the of this litigation because K12 never pled them in its Amended Answer or anywhere else. (*See generally* Doc. 155). K12 pled only one counterclaim in its Amended Answer: "Cancellation of FLVS's Trademark Registrations." (Doc. 155, Counterclaim, ¶¶ 54–75). Since K12 sent its cease-and-desist letter in December 2022, K12 was well aware of the potential for

23

any purported false advertising and set-off counterclaims when it filed its Amended Answer in March 2023. K12 could easily have pled these counterclaims in its Amended Answer. K12 chose not to. K12 chose instead to first inform FLVS that it intended to advance these unpled counterclaims at trial literally days before the Pretrial Stipulation was due.

Binding authority, common-sense, and fundamental due process hold that "a judgment may not be based on issues not presented in the pleadings and not tried with the express or implied consent of the parties." *Cioffe v. Morris*, 676 F.2d 539, 541 (11th Cir. 1982); *see also Peace United, Ltd. v. 1906 Collins, LLC*, No. 17-21881-CIV, 2022 WL 2802796, at *2 (S.D. Fla. July 18, 2022) ("Defendants cannot raise unpled affirmative defenses or counterclaims at trial."). Both false advertising and set-off are counterclaims under federal law. *See* 15 U.S.C. § 1125(a) (creating a private right of action for false advertising under the Lanham Act); *Allapattah Servs., Inc. v. Exxon Corp.*, 157 F. Supp. 2d 1291, 1322 (S.D. Fla. 2001) ("A set-off is a permissive counterclaim." (citing 3 James Wm. Moore *et al.,* Moore's Federal Practice, § 13.31 (3d. ed. 2001)). Rule 8 therefore required K12 to plead its counterclaims in its Amended Answer. *See* Fed. R. Civ. P. (8). K12 failed to do so.

Any arguments that FLVS expressly or impliedly consented to these counterclaims fail on their face. FLVS had no idea that K12 wished to advance these claims at the upcoming trial until just before the Pretrial Stipulation was due. FLVS

24

immediately objected to trying these unpled counterclaims and to introducing exhibits relating solely to them. (Doc. 302 at 4–5, 26 ¶ 15; FLVS Objections to DEXs. 121–123). FLVS has not expressly consented to trying these claims, and FLVS's objections in the pretrial stipulation and this Trial Brief foreclose any implied consent argument. *Doe #6 v. Miami-Dade Cnty.*, 974 F.3d 1333, 1339 (11th Cir. 2020) (explaining that implied consent only occurs when a party fails to object to evidence and the issues are not otherwise raised by the pleadings).

"'[T]rial of unpled issues by implied consent is not lightly to be inferred' and must comply with 'the notice demands of procedural due process.'" *Id.* (quoting *Jimenez v. Tuna Vessel Granada*, 652 F.2d 415, (5th Cir. Unit A July 1981)) (alteration in original). Therefore, "implied consent under Rule 15(b) will not be found if defendant will be prejudiced," including "if the defendant could have offered additional evidence in defense." *Cioffe*, 676 F.2d at 541–42. K12's unpled counterclaims obviously prejudiced FLVS. These purported claims have not been subject to discovery, a motion to dismiss, or summary judgment. Nor can FLVS now retain experts to challenge K12's liability and damages case.

K12 may attempt to reframe its false advertising and set-off counterclaims as one aspect of its unclean hands defense. (*See* Doc. 302 at 9). The Court should summarily reject any such argument because K12's unclean hands affirmative defense made no mention of false advertising, and K12 cannot raise an unpled

25

affirmative defense at trial. (Doc. 155 at 28). This defense also fails on its merits because (1) FLVS did not falsely advertise its services; (2) K12's false advertising counterclaim is not directly related to FLVS's trademark infringement claim; and (3) K12 has no evidence that it was personally injured by FLVS's purported false advertising.

"In order to assert the affirmative defense of unclean hands, a defendant must show: '(1) that a plaintiff's wrongdoing is directly related to the claim against which it is asserted' and (2) that it was personally injured by the plaintiff's conduct." *Ford Motor Co. v. O.E. Wheel Distributors, LLC*, 868 F. Supp. 2d 1350, 1367 (M.D. Fla. 2012) (quoting *Calloway v. Partners Nat'l Health Plans,* 986 F.2d 446, 450–51 (11th Cir. 1993)). "Notably, in trademark infringement actions, courts have required 'clear and convincing evidence of 'egregious' misconduct before invoking the doctrine of unclean hands.'" *Id.* at 1368 (quoting *Citizens Fin. Grp., Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110, 129 (3d Cir. 2004)). Should the Court wish to consider this unpled affirmative defense on its merits, then the evidence adduced at trial will show that FLVS did not falsely advertise its services, and that the cherry-picked examples K12 points to are neither false, misleading, nor often even advertisements, and certainly not clearly and convincingly egregious misconduct.

More fundamentally, FLVS's purported false advertising has no relationship to its trademark infringement claims against K12. The defense of unclean hands only applies when the plaintiff's purported bad act is directly related to the plaintiff's claims, *Calloway*, 986 F.2d at 450, and whether or not FLVS made false statements in advertisements does not excuse or relate to K12's wholly separate infringement on FLVS's marks. Such statements may, at most, relate to K12's contention that its former FLVA marks were senior to FLVS's marks in the primary market. However, K12 surrendered its FLVA marks to FLVS in the 2015 Settlement Agreement, (JEX 14 at 9–10), and its FLOS marks were created in 2019, after FLVS unquestionably offered kindergarten through twelfth grade online education. (Doc. 289 at 14–15). Nor does K12 have any evidence that it was personally injured, i.e., suffered actual damages, from FLVS's purported false advertising. Without any direct causal relationship to FLVS's claims or proof of injury, K12's unpled false advertising claim must fail.

### B.    K12's failed cancellation counterclaims do not affect FLVS's infringement claims.

K12 contends that the "misconduct" outlined in its cancellation counterclaims should bar or limit its liability. (Doc. 302 at 8–9). But as FLVS explains more fully in its Phase I Trial Brief, the Court has already granted summary judgment on most of K12's cancellation counterclaims, and the remaining counterclaims are foreclosed by *Angel Flight of Georgia, Inc. v. Angel Flight America, Inc.*, 522 F.3d 1200, 1210

27

(11th Cir. 2008). (FLVS Phase I Trial Brief). Any arguments K12 might raise related to the 2010 trademark applications are barred by the 2015 Settlement Agreement, and FLVS truthfully claimed primary use for its 2016 claims. *Id.* Accordingly, K12 cannot use its counterclaims to reduce its liability for FLVS's infringement claims.

### C.    FLVS did not delay in filing this lawsuit.

K12 argues its liability should be negated or reduced because FLVS first learned of FLOS in June 2019 but did not initiate this action until December 2020. (Doc. 302 at 9). This argument fails because FLVS did not delay in enforcing its rights as a matter of law and any purported delay is excusable.

To assert delay as an affirmative defense in a trademark case, K12 must prove there was "(1) a delay in asserting a right or a claim; (2) that the delay was not excusable; and (3) that there was undue prejudice to the party against whom the claim is asserted." *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1141 (11th Cir. 2018) (quoting *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1203 (11th Cir. 1997)). "While the Lanham Act does not contain a statute of limitations, in trademark cases we have 'applie[d] the period for analogous state law claims as the touchstone for laches.'" *Id.* (quoting *Kason*, 120 F.3d at 1203) (bracket in original). "In Florida, this is four years." *Id.* (citing § 95.11(3), (6), Fla. Stat.). Since FLVS initiated this action a year and a half after learning about FLOS—well

28

within the four-year statute of limitations "touchstone" for delay—FLVS did not delay in asserting its rights as a matter of law. *Id.*

The purported delay was also excusable under the doctrine of progressive encroachment. *Kason*, 120 F.3d at 1205. "Under this doctrine, where a defendant begins use of a trademark or trade dress in the market, and then directs its marketing or manufacturing efforts such that it is placed more squarely in competition with the plaintiff, the plaintiff's delay is excused." *Id.* K12 opened FLOS in partnership with Hendry County, a very small rural school district. (Doc. 171-10, K12 Corp. Rep. Dep. 200:13–19, 205: 17–22). Had K12 enrolled only Hendry County students, as FLVS reasonably assumed, then FLOS enrollment would have been extraordinarily small, the competition between FLVS and FLOS negligible, and the likelihood of confusion substantially lower. But unbeknownst to FLVS, K12 actually used FLOS and its infringing marks to compete with FLVS throughout Florida, with approximately 95% percent of FLOS enrollments coming from outside Hendry County. (Berry Dep. 38:2–17). FLVS could not have known the scale of K12's FLOS ambitions until after the 2019–2020 school year enrollments were calculated, and promptly sued K12 once it placed FLOS more squarely in competition with FLVS. "The senior user has no obligation to sue until 'the likelihood of confusion looms large,'" and FLVS did not know how large the likelihood of confusion with FLOS loomed until after the 2019–2020 school year. *Kason*, 120 F.3d at 1206

29

(quoting J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 31.19 (4th ed. 1997)).

### D.    K12's waiver and acquiescence defenses fail as a matter of law.

K12's waiver and acquiescence defenses, which appear to be based on the same factual underpinnings as its delay argument, (*See* Doc. 302 at 26), fail because "'waiver' has no trademark roots." *Commodores*, 879 F.3d at 1142 (quotation omitted). In *Commodores*, the Eleventh Circuit held that if a defendant advances a waiver defense "based on the same facts as set forth in support of his [failed] laches defense, there is similarly no reason to conclude that [the plaintiff] waived its ability to protect its marks." *Id.* Here, there is no reason to conclude FLVS waived its rights or acquiesced to K12's use through a purported delay when FLVS did not actually delay in enforcing its rights and any delay is excusable. FLVS also never expressly acquiesced to K12's FLOS marks. This defense is facially deficient.

### E.    K12 did not engage in descriptive fair use.

K12's use of its FLOS marks was neither descriptive nor fair. "A fair-use defense  is established if a defendant proves that its use is '(1) other than as a mark, (2) in a descriptive sense, and (3) in good faith.'" *Int'l Stamp Art, Inc. v. U.S. Postal Serv.*, 456 F.3d 1270, 1274 (11th Cir. 2006). "Trademarks are 'any word, name, symbol, or device, or any combination thereof used to identify and distinguish one's goods from those manufactured or sold by others and to indicate the source of the

goods.'" *Leigh v. Warner Bros.*, 212 F.3d 1210, 1216 (11th Cir. 2000) (quoting 15 U.S.C. § 1127) (cleaned up). "[L]ettering, type-style, size and visual placement and prominence of the challenged words" help determine whether a term is being used as a trademark, *McCarthy*, § 11:46, as well as the "size, location, and other characteristics in comparison with the appearance of other descriptive matter or other trademarks." *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 401 (2d Cir. 2009) (quoting *Restatement (Third) of Unfair Competition* § 28 comment *c*). The quintessential test is whether the defendant used the mark "as a symbol to attract public attention." *Id.*

Here, K12 obviously used "Florida Online School" and "FLOS" as trademarks by naming its Hendry County program using these terms, and advertising its services with logos and promotional materials featuring them. K12 placed these terms front and center as the public symbol for its Hendry County online program in the same way that FLVS used its trademarks. By the same token, K12's use of "Florida Online School" and "FLOS" as trademarks means its use was not merely descriptive. And, as discussed *supra* Section III.F, K12 adopted these marks with the intent to infringe upon FLVS's trademarks and confuse the market. *See Int'l Stamp Art*, 456 F.3d at 1284 (explaining that the defense "asks whether the alleged infringer intended to trade on the good will of the trademark owner by creating

31

confusion as to the source of the goods or services"). K12's descriptive fair use claim

thus fails.

### F.      FLVS did not breach Section 14 of the 2015 Settlement Agreement.

K12 suggested in the Joint Final Pretrial Statement that FLVS breached

Section 14 of the 2015 Settlement Agreement by not "negotiat[ing] in a good faith

effort to avoid litigation." (Doc. 302 at 9). Section 14 states:

> 14. Conference Prior to Litigation. The Parties agree that, in the event
> that FLVS intends to challenge a new mark chosen by K12 following
> its cessation of the K12 Marks, before an action may be filed, FLVS
> shall serve written notice upon K12 detailing the nature of the dispute.
> Within fifteen (15) business days following service of the written
> notice, representatives of each Party having authority to settle the
> dispute, along with their attorneys, will negotiate in good faith in an
> effort to resolve it without litigation.

(JEX. § 14). FLVS complied with Section 14 by serving K12 with written notice and

conferring in good faith prior to filing this action. That the parties were unable to

resolve their differences without litigation does not mean FLVS failed to negotiate

in good faith. This supposed breach, which was not pled in K12's Amended Answer

and is thus outside the bounds of the upcoming trial (*See* Doc. 155), is merely an

unconvincing attempt to avoid the prohibition against litigating settlement

discussions at trial. *See* Fed. R. Civ. P. 408(a)(1).

32

## V.    INJUNCTIVE RELIEF

### A.    Permanent injunctive relief is warranted.

FLVS is entitled to permanent injunctive relief preventing K12 from further infringing upon its trademarks. "Under traditional equitable principles, a plaintiff seeking a permanent injunction must demonstrate (1) it has suffered an irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction." *Angel Flight*, 522 F.3d at 1208.

"In ordinary trademark infringement actions . . . complete injunctions against the infringing party are the order of the day." *Id.* at 1209 (quoting *SunAmerica*, 77 F.3d at 1336) (ellipsis in original). Not issuing an injunction effectively grants the infringer a judicially created license to infringe. *See* 5 McCarthy on Trademarks and Unfair Competition § 30:1 (5th ed.) ("A permanent injunction is the usual and normal remedy once trademark infringement has been found in a final judgment. Consider the alternative. If a court were to permit the infringer to continue its infringing activities, the result would be a judicially imposed compulsory license given to an infringer.").

"It is generally recognized in trademark infringement cases that (1) there is not adequate remedy at law to redress infringement and (2) infringement by its nature

causes irreparable harm." *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1029 (11th Cir. 1989) (quoting *Processed Plastic Co. v. Warner Commc'ns*, 675 F.2d 852, 858 (7th Cir. 1982)). The Lanham Act itself provides that a "plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction." 15 U.S.C § 1116(a). There is no reason to believe a remedy at law would fully repair FLVS's injuries so long as K12 continues to infringe upon FLVS's marks and confuse the market.

The balance of harms in this case also favor granting a permanent injunction. *See It's A 10, Inc. v. Beauty Elite Grp., Inc.*, 932 F. Supp. 2d 1325, 1333 (S.D. Fla. 2013) (granting an injunction even when defendant represented it had ceased using the mark). This is because "a plaintiff who had spent substantial time and money developing the quality and reputation of its marks would suffer substantial harm if the injunction was not granted. In contrast, a defendant who had no right to use the mark could suffer no legitimate hardship by being enjoined from using it." *Id.* (citing *Gaffigan v. Does*, 689 F. Supp. 2d 1332, 1341 (S.D. Fla. 2009)). For example, the *It's a 10* court permanently enjoined future trademark infringement when the plaintiff had "spent over $15 million on the advertising promotion of the [It's a 10] trademark and trade dress" and had "invested an immeasurable amount of time and effort in the development of the It's a 10 brand and product line." *Id.* Here, the

34

balance of harms similarly favors an injunction because FLVS has spent over $20 million in advertising its marks from 2014 to present and "invested an immeasurable amount of time and effort" developing its products and brand, as evidenced by its more than 180 online courses, over 6 million semester completions, and numerous awards. (Doc. 143-2, FLVS Rog Response Nos. 2–3).

K12 may argue that the balance of harms weighs against issuing an injunction because it ceased its infringing conduct by changing FLOS's name to DAOF. (*See* Doc. 302 at 8). But as discussed *supra* Section III.F, the evidence reveals that K12 continues to use the "Florida Online School" and "FLOS" marks to the present day on its websites, domain names, and email addresses. (*E.g.*, PEXs 667, 697, 601–704). The balance of harms would still favor an injunction even if K12 had ceased its infringing conduct because K12 "would not be harmed by an injunction preventing its use of [FLVS's] marks" when K12 "has voluntarily ceased using the marks." *PODS Enterprises, LLC v. U-Haul Int'l, Inc.*, 126 F. Supp. 3d 1263, 1287 (M.D. Fla. 2015) (granting a permanent injunction after the defendant voluntarily ceased using the marks). The "balance of hardships favors injunction" when a defendant stops infringing "because the defendant without right to use the marks in question would not suffer hardship." *Id.* (citing *It's a 10*, 932 F. Supp. 2d at 1333). The Eleventh Circuit has "confirm[ed] a district court's 'equitable discretion about

whether to issue an injunction after the conduct has ceased.'" *Id.* (quoting *Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC*, 684 F.3d 1211, 1220 (11th Cir. 2012)).

K12, not FLVS, has the "burden of establishing with absolute clarity that all infringement has ceased such that Plaintiff's request for a permanent injunction would be moot." *It's a 10, Inc. v. Beauty Elite Grp., Inc.*, No. 13-60154-CIV, 2013 WL 6834804, at *12 (S.D. Fla. Dec. 23, 2013) (citing *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1184 (11th Cir. 2007)). K12 must show it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur" to avoid an injunction, considering "(1) whether the challenged conduct was isolated or unintentional, as opposed to a continuing and deliberate practice; (2) whether the defendant's cessation of the offending conduct was motivated by a genuine change of heart or timed to anticipate suit; and (3) whether, in ceasing the conduct, the defendant has acknowledged liability." *Sheely*, 505 F.3d at 1184. Injunctive relief is not moot where, as here, the infringing conduct has not ceased, is "a continuing and deliberate" practice carried through multiple lawsuits, and the defendant has neither admitted liability nor ceased infringing due to "a genuine change or heart." *See id.*

For the final factor, "the public interest ordinarily favors the issuance of injunctions to avoid consumer confusion" in trademark infringement cases. *PODS*, 126 F. Supp. 3d at 1287. "The reason is simple: the public deserves not to be led

36

astray by the use of inevitably confusing marks." *Angel Flight*, 522 F.3d at 1209.

Since a likelihood of confusion exists between FLVS's and K12's trademarks, "[i]t follows that to prevent consumer confusion, the public interest favors a permanent injunction." *PODS*, 126 F. Supp. 3d. at 1287.

> **B.      The scope of the injunctive relief should prevent K12 from continuing to employ variations of FLVS's marks.**

FLVS respectfully requests permanent injunctive relief sufficient to prevent any future infringement from K12. K12 has now adopted three sets of marks nearly identical to FLVS's registered trademarks: "Florida Virtual Academy," "FLVA," "Florida Virtual Program," and "FLVP" originally, and now "Florida Online School" and "FLOS." These marks follow a consistent naming pattern of "Florida" followed by a synonym for either "Virtual" or "School," plus an acronym version identical to "FLVS" save for a single letter. K12 has also exhibited a trend of continuing to use variations of its previous, infringing marks in its promotional materials, web addresses, and in keywords for advertising. (*See* PEXs 667, 697, 601–704, 753–757).

Accordingly, FLVS respectfully requests that the Court permanently enjoin Stride, Inc., K12 Florida, Inc., and their subsidiaries, divisions, licensees, dealers, franchisees, assigns, affiliates, and each of their directors, officers, agents, servants, employees, representatives, attorneys, and those persons in active concert or participation with them, from using the terms "Florida Virtual School," "FLVS,"

"Florida Online School," and "FLOS," including without limitation all forms of those terms regardless of whether (a) any or all of the letters are capitalized or in lower case, (b) they are in singular or plural, (c) they replace one or more words with a synonym or gerund, or (d) they are modified before or after with one or more words or incorporated into or combined with other words (e.g. as part of a phrase) or any other marks, names or designations that are confusingly similar to FLVS's marks, or any other term confusingly similar to, or that is likely to cause dilution of, FLVS's marks in any manner, including without limitation, as trademarks, service marks (or any other type of designation), trade names, business names, descriptors, product names, domain names, keywords, metatags, or on websites (whether as part of hidden or visible text), Internet sites (including without limitation social media sites), products, or on any other electronic or printed material for the purpose of advertising, promoting, marketing, or describing any products or services. *See PODS*, 126 F. Supp. 3d at 1292–93 (entering a permanent trademark injunction with almost identical language restricting the defendant's use of the term "pods").

Such an injunction would address and prevent the recurrence of K12's prior and present infringement without unduly burdening K12. While "an injunction should not 'impermissibly prohibit conduct that defendant has the right to do,'" "[a]t the same time, when issuing an injunction against a party 'who has transgressed the governing legal standards, a court of equity is free to proscribe activities that,

standing alone, would have been unassailable.'" *Id.* at 1287–88 (quoting *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1203 (11th Cir. 2001)) (cleaned up). Detailed language is necessary because Rule 65 requires that every injunction "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d). The comprehensive injunction described above is more than warranted in this case where K12 has continually used every possible variation of FLVS's trademarks to confuse the public, and will likely do so again unless the Court permanently enjoins them.

## VI.    DISGORGEMENT

### A.    FLVS is entitled to disgorge K12's FLOS profits.

Disgorgement of K12's FLOS profits is appropriate due to K12's willful and deliberate infringement and the need to deter future conduct.[2] "Disgorgement of profits is 'appropriate where: (1) the defendant's conduct was willful and deliberate, (2) the defendant was unjustly enriched, or (3) it is necessary to deter future conduct.'" (Doc. 302, Agreed Principles of Law ¶ 46 (quoting *PlayNation*, 924 F.3d at 1170). "Conduct is willful if the infringer was 'knowingly and deliberately

---

[2] For preservation purposes only, FLVS also contends that disgorgement is appropriate because K12 was unjustly enriched by causing potential FLVS students to attend FLOS. However, in light of the Court's rulings on FLVS's claim for actual damages, FLVS will not focus on this as a basis for disgorgement at trial.

cashing in upon the good will of [the infringed]." *PlayNation*, 924 F.3d at 1170 (quoting *Burger King v. Mason*, 855 F.2d 779, 781 (11th Cir. 1988)) (brackets in original). "[T]he law in this Circuit is well settled that a plaintiff need not demonstrate actual damage to obtain an award reflecting an infringer's profits." *Burger King*, 855 F.2d at 781. As discussed *supra* Section III.F, K12 deliberately infringed upon FLVS's marks by knowingly adopting similar marks to confuse the market and search engines, demonstrated a pattern of infringing upon FLVS's marks, and continues to infringe upon FLVS's marks despite claiming to have stopped. Disgorgement is thus appropriate due to K12's intentional infringement and to prevent future infringement.

### B.    The Court should disgorge a substantial amount of K12's profits.

A substantial disgorgement of K12's FLOS profits is appropriate under the facts of this case. To disgorge K12's profits, "Plaintiff need only prove Defendants' sales before the burden shifts to Defendants to prove their expenses and other deductions." (Doc. 295 at 5 (citing *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1488–89 (11th Cir. 1987) & 15 U.S.C. § 1117(a))). "Moreover, under the Lanham Act and the common law, it is the infringer's burden to prove any proportion of its total profits which may not have been due to the infringement." *Nutrivida, Inc. v. Immuno Vital, Inc.*, 46 F. Supp. 2d 1310, 1315 (S.D. Fla. 1998). The Supreme Court has explained that this may result in "a windfall to

40

the trademark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer." *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 207 (1942).

FLOS earned millions of dollars between 2019 and 2021. (PEX 689 ¶ 66).[3] K12 has advanced no reasonable method by which to apportion its FLOS profits should the Court conclude disgorgement is appropriate. Rather, K12's financial expert Shirley Webster impermissibly relied on the work of K12's survey expert, Sarah Butler, to argue that FLVS should be apportioned no FLOS profits because it lacks evidence of actual damages. (DEX 105 at 59–62). This "opinion" is legally incorrect because "the law in this Circuit is well settled that a plaintiff need not demonstrate actual damage to obtain an award reflecting an infringer's profits." *Burger King*, 855 F.2d at 781. The Court has also stricken this opinion "to the extent it relies on the opinions of Ms. Butler." (Doc. 298 at 7). Since K12, not FLVS, bears the burden of apportioning its profits and has failed to do so, the Court should disgorge all K12 profits "related to Defendants' Hendry County program between

---

[3] Out of an abundance of caution, FLVS will refrain from including precise dollar amounts in this brief for FLOS's revenues and costs due to K12's designation of that information as highly confidential. This information will be provided at trial under such conditions as the Court may impose. In the meantime, FLVS refers the Court to the expert damages reports previously filed under seal. (Doc. 273-1; Doc. 273-2).

2019 and 2021, i.e., during the two years Defendants used 'Florida Online School' as the name for that program." (Doc. 295 at 6).

This disgorgement should include at least some of K12's 2021–2022 profits. While K12 changed FLOS's name to DAOF in February 2021, the evidence shows that K12 continues to use the FLOS marks in its promotional materials, web addresses, and email addresses to profit off the market confusion created by its infringement. (PEXs. 667, 695–716, 743, 745). This is undoubtedly infringement "related to" K12's operation of the "Florida Online School."

Similarly, FLOS/DAOF retains a substantial number of students from year-to-year. (Nov. 17, 2022 Graham Dep. 216:12–217:1).[4] Thus, many FLOS/DAOF students who enrolled while the school was named FLOS remained after the name change. Unlike a typical company which sells discrete products or one-off services, a school, by its nature, anticipates that a certain number of students will remain enrolled from year to year. K12 thus "gained more from the infringement than the defendant's [2019–2021] profits reflect." *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778 F.3d 1059, 1077 (9th Cir. 2015) (affirming an increased disgorgement award to account for lost goodwill). K12 should not be permitted to

---

[4] As with FLOS's revenues and purported costs, FLVS will refrain from providing FLOS/DAOF's precise retention rates in this trial brief. The Court may find this percentage at the cited deposition excerpt.

retain profits related to its 2019–2021 FLOS operations, and the FLOS/DAOF yearly retention rate provides a reasonable basis for separating such profits.

K12 argues that disgorgement is inappropriate because its claimed FLOS costs exceed its claimed FLOS revenues. (Doc. 302 at 9). But the made-for-litigation cost summaries K12 and Webster base this claim on are unreliable, fail to account for over millions of dollars of revenue in true-up, and include millions in costs facially unrelated to FLOS. (*See* PEX. 638; PEX. 688 ¶¶ 32–33). FLOS/DAOF is a wholly owned Stride, Inc. subsidiary for which K12 does not keep separate financial records. (Nov. 17, 2022 Johnson Dep. 70:9–13; May 15, 2023 Johnson Dep. 13:7–14:6). K12 employees created K12's claimed revenue and cost numbers for K12 to use in this litigation. (Doc. 275-2, Webster Dep. 81:18–83:8; Nov. 17, 2022 Johnson Dep. 91:2–92:18; Nov. 17, 2022 Graham Dep. 201:16–203:3; May 15, 2023 Johnson Dep. 14:20–15:4, 32:18–33:13). The summaries Webster relied on were produced in response to interrogatories and labeled as "K12/Stride FLVS – Infringement Lawsuit – Interrogatories." (Doc. 275-6; Doc. 275-7). Nevertheless, Webster simply copy-and-pasted these summary numbers into her expert report without any independent verification beyond brief conversations with K12 financial analysts. (Doc. 275-2, Webster Dep. 81:18–83:8).[5]

---

[5] Webster's original 2022 report and deposition, and financial corporate representative depositions, referenced only STRIDE0029408 (Doc. 275-6) and STRIDE0030644 (Doc. 275-7). Webster's

Such unreliable financial summaries "fail[] to provide any usable information as to any relevant deductions." *Deltona Transformer Corp. v. The Noco Co.*, No. 6:19-CV-308-CEM-LHP, 2023 WL 6376363, at *6 (M.D. Fla. Sept. 29, 2023). This Court held just two weeks ago in another trademark infringement case that a defendant failed to prove costs for disgorgement purposes when the only documentary evidence it provided was a summary document "which purportedly provided percentages for different types of costs and expenses incurred by Defendant." *Id.* "There are many problems with this document. First, it is a summary document and the underlying data was not produced, so there is no way to review the accuracy of the numbers." *Id.* The Court also questioned another cost summary's "admissibility given that it was created in anticipation of litigation and the underlying information was not disclosed to Plaintiff." *Id.* The Court thus discounted the defendant's evidence of costs. *Id.*

Here, as in *Deltona*, the Court should discount K12's evidence of costs due to its unreliable, summary nature, K12's failure to produce supporting documentation, and the inconsistencies evident from the record. Had Webster investigated K12's claims, she would have learned that K12 shifted millions of dollars from one year to the next in an apparent attempt to lower the FLOS revenues available for

---

2023 report cited the updated versions of those same documents, STRIDE0031333 (PEX 553) and STRIDE0031647 (PEX 637), respectively.

44

disgorgement. (PEX. 689 ¶ 66). She would also have observed claimed FLOS costs which are facially unrelated to FLOS/DAOF, such as millions in duplicative costs encompassing regions outside Hendry County. (*See* PEX. 637). These inadequacies render K12's claimed costs unreliable. Unlike FLVS, which had its damages expert independently verify K12's revenue numbers, K12 has failed to carry its burden to prove its costs. 15 U.S.C. § 1117(a). Accordingly, the Court should disgorge K12's FLOS revenues, not its claimed profits. *See Tiramisu*, 741 F. Supp. 2d at 1290–91 (disgorging gross revenues when a infringer failed to provide adequate evidence of its costs and collecting cases).

Should the Court find all of K12's claimed costs reliable, however, the Court may still order disgorgement of K12's claimed 2019–2020 profits and any portion the Court believes appropriate of its claimed 2020–2021 profits. (DEX 105, Supplemental Schedule 1.0). The Lanham Act provides for the disclosure of *any* profits realized by an infringer. 15 U.S.C. § 1117(a). K12 realized substantial profits in the 2019–2020 and 2021–2022 school years through infringement, and K12 should not be permitted to retain those profits merely because it claims its mismanagement ultimately rendered its FLOS business unit somehow unprofitable in an aggregation of costs and profits by a parent company. This is especially true given that any profits FLOS made were passed along to its parent companies. Importantly, the Lanham Act provides that "[i]f the court find that the amount of the

45

recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a); *see also Burger King*, 855 F.2d at 781 ("The [Lanham] Act confers upon the district court a wide scope of discretion to determine the proper relief due to an injured party."). An award of such profits would be a just outcome in this case considering the need to deter K12's longstanding, intentional, and ongoing infringement.

## VI.   CONCLUSION

For the foregoing reasons, and based on the evidence that will be introduced at trial, FLVS respectfully requests that the Court enter judgment in its favor on its infringement and unfair competition claims, permanently enjoin K12 from future infringement, and disgorge K12's FLOS profits.

Dated October 11, 2023.

/s/ Stephen H. Luther
Stephen H. Luther
Trial Counsel
Florida Bar No. 528846
LUTHER LAW PLLC
4767 New Broad Street, # 1029
Orlando, FL 32814
407 501-6711 x101 (Main)
407 501-7049 (Direct)
sluther@lutherlawgroup.com

Thomas E. Bishop
Florida Bar Number 956236
Katharine N. Roth
Florida Bar Number 106692
Kyle William Mason

Florida Bar Number 1045149
BISHOP & MILLS PLLC
510 N. Julia Street
Jacksonville, Florida 32202
(904) 598-0034/(904)
598-0395 (facsimile)
tbishop@bishopmills.com
kroth@bishopmills.com
kmason@bishopmills.com
service@bishopmills.com

David J. D'Agata, Esq.
General Counsel
Florida Bar No. 663891
Luis R. Guzman, Esq.
Sr. Asst. General Counsel
Florida Bar No. 570613
Florida Virtual School
5422 Carrier Drive, Suite 201
Orlando, Florida 32819
Office: 407-513-3451
ddagata@flvs.net
luguzman@flvs.net

*Attorneys for Plaintiff, Florida Virtual School*