UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

FLORIDA VIRTUAL SCHOOL,

    Plaintiff,

v.                                        Case No:   6:20-cv-2354-GAP-EJK

K12, INC. and K12 FLORIDA, LLC,

    Defendants

## MEMORANDUM OPINION

This cause came before the Court following a bifurcated bench trial conducted October 16-19, 2023. In Phase 1, the parties presented their cases on Defendants' Counterclaim for Cancellation of Plaintiff's federally registered trademarks for fraud on the U.S. Patent and Trademark Office.

**I.  Background**

Plaintiff Florida Virtual School ("Plaintiff") is an agency of the State of Florida which provides online educational services to kindergarten, elementary, middle, and high school students in Florida and around the world. Doc. 1, ¶ 2. Defendants K12, Inc. and K12 Florida, LLC ("Defendants") are for-profit companies similarly engaged in the business of providing online educational services to kindergarten through twelfth grade students in Florida and globally. *Id.*, ¶¶ 3-4. Plaintiff filed

suit on December 22, 2020, alleging trademark infringement, false advertising, unfair competition, and breach of the parties' agreement resolving related prior litigation[1] (the "Settlement Agreement"). *Id.*, ¶¶ 74-143. After discovery yielded several factual revelations, and with leave of the Court, Defendants amended their Answer on March 13, 2023, to include a Counterclaim for Cancellation of Plaintiff's trademarks on the basis of fraud on the U.S. Patent & Trademark Office ("PTO"). Doc. 155, ¶¶ 54-75; *see also* Docs. 133, 151, 153. Defendants allege that Plaintiff was not active in the primary education market in 2002, despite stating so in its applications to the PTO. Doc. 155, ¶¶ 69-70, 74-75.

On cross motions for summary judgment, the Court determined that Defendants' Counterclaim was precluded as to Plaintiff's two 2010 trademark registrations[2] by release clauses in the Settlement Agreement. Doc. 289 at 6-12. The Court additionally found that there was no basis for Defendants' allegations as applied to two of Plaintiff's other trademark registrations.[3] *Id.* at 14-15. The Court concluded there were disputed questions of material fact as to the issues of falsity,

---

[1] Plaintiff previously sued Defendants for trademark infringement in Case No. 6:11-cv-831-ORL-31-KRS. Doc. 302 at 16.

[2] *See also* Doc. 1-1 at 2, 4 (Plaintiff's 2010 trademarks are Registrations No. 3,830,765 and No. 3,873,393).

[3] *See also* Doc. 1-1 at 12, 18 (Plaintiff's applications did not claim these trademarks—Registrations No. 5,113,241 and No. 5,113,259—were used in commerce until 2016).

knowledge, and intent regarding Plaintiff's three remaining trademark registrations (the "Marks") and set the matter for a bench trial. *See id.* at 15-18.

## II.     Findings of Fact[4]

The parties agree that Plaintiff is a public agency that began developing and delivering online and distance learning programs in 1997. Doc. 302 at 15. Plaintiff was initially named Florida Online High School before it was renamed Florida Virtual School in 2001. *Id.* Defendants operate several distinct online schools in Florida, including the Digital Academy of Florida and the Florida Cyber Charter Academy. *Id.* at 16. Both parties presently offer kindergarten through twelfth grade (K-12) online educational services. *Id.* at 16. Plaintiff's three federally registered trademarks in dispute were issued by the PTO on January 3, 2017: Registrations No. 5,113,225, No. 5,113,235, and No. 5,113,248. *Id.* at 16-17; *see also* Doc. 1-1 at 6-10, 15-16.

Founded in 1997 as an online high school, Plaintiff had few, if any, competitors at the time of its inception. Doc. 334 at 8:10-13. It did not operate in the kindergarten through fifth grade (K-5) market and did not have an interest in doing so at that time. *Id.* at 8:19-21, 9:22-24. However, during its early years, Plaintiff was

---

[4] The evidence introduced in Phase 1 revolved primarily around establishing a timeline for Plaintiff's foundational years and growth into various educational markets.

regularly running pilot programs and developing courses and curriculum for middle school-aged students (grades 6-8). *See id.* at 34:15-35:8; *see also* Doc. 352-7. Indeed, Plaintiff developed and launched its first middle school courses in 2002. Doc. 334 at 85:12-21. Then, in 2004, the Florida Legislature required Plaintiff to create a full suite of middle school courses, which were ultimately available for the 2004-2005 school year.[5] Doc. 351-20 at 31; Doc. 351-34; Doc. 352-51 at 2; *see also id.*; Doc. 334 at 105:7-18.

After seeing the rapid growth of its middle school (grades 6-8) program, Plaintiff began expanding into elementary (K-5) education services with the hiring of Sarah Sprinkel ("Sprinkel") in 2008. *See* Doc. 334 at 37:6-10, 85:18-21; Doc. 331 at 109:4-8. Sprinkel began working with smaller groups of students to initially build out "specials" program areas like art, music, and physical education. Doc. 331 at 109:4-110:5; *see also* Doc. 334 at 47:3-6. One of the first such pilots was the Captain Cardio physical education program that Sprinkel piloted in 2009.[6] Doc. 331 at

---

[5] Plaintiff's corporate representative, John Schultz ("Schultz"), credibly testified that there would have been approximately 100,000 semester completions in the middle school grades (6-8) between 2002-2010. Doc. 334 at 99:1-5. Schultz estimated that since 2010 there have likely been roughly one million semester completions in grades K-8. *Id.* at 99:6-13; *see also* Doc. 352-37, Doc. 352-38.

[6] Sprinkel testified that the Captain Cardio program was run, at least in part, in conjunction with existing schools like Audubon Park in Winter Park, Florida. Doc. 331 at 110:17-22.

109:22-24. After the "specials" were developed, Sprinkel's team moved on to the core subjects of reading, math, science, and social studies. *Id.* at 110:25-111:2.

On July 31, 2008, Plaintiff inked a partnership with Connections Academy, another online education services company, to provide it with a full online education program for kindergarten through eighth grades (K-8). Doc. 334 at 97:12-18; *see also* Doc. 350-4. While Connections Academy provided much of the day-to-day instructional and operational oversight during this period, the students were enrolled with Plaintiff's school and were considered by the state to be Plaintiff's students. Doc. 334 at 96:5-98:10. During this partnership, Plaintiff deployed its Marks alongside Connections Academy's to co-brand their K-8 educational program. *Id.* at 33:25-34:8, 102:18-104:4; *see also, e.g.*, Doc. 351-33. Beginning in 2015, Plaintiff tasked Clark Berry ("Berry") and others to build off of Sprinkel's work to develop its own full suite of elementary programs in order to bring all of its K-8 services in-house. Doc. 330 at 36:19-37:7; *see also* Doc. 352-23. Plaintiff ceased its partnership with Connections Academy following the 2017-2018 school year, after which it provided K-12 services fully in-house. Doc. 334 at 114:4-6; *see also* Doc. 302 at 16.

On April 27, 2016, Plaintiff filed applications to register the Marks at issue in this litigation. *See* Docs. 352-1, 352-2, 352-3. Each application listed Allison R. Imber ("Imber") as the corresponding attorney and each was signed by Melissa Wurzel

("Wurzel"), Plaintiff's Senior Director of Marketing and Communications at the time. *See id.*; *see also* Doc. 327-9 at 30:22-31:7. In the description of services section, Plaintiff stated that it provided online educational services, conducted distance learning instruction, and developed curriculum—all at the primary and secondary level. *See* Doc. 350-1 at 1, Doc. 350-2 at 1, Doc. 350-3 at 2-3. The applications for Registrations No. 5,113,225 and No. 5,113,235 stated that the trademarks were first used in commerce "[a]t least as early as 00/00/2002," and the application for Registration No. 5,113,248 listed the date of first use in commerce as "[a]t least as early as 01/00/2008." *Id.*

### III.  Legal Standard

"In any action involving a registered mark the court may…order the cancellation of registrations, in whole or in part" when such action is warranted. *See* 15 U.S.C. § 1119. "One ground on which a party may petition to cancel a registered service mark is that the registration was obtained fraudulently." *Select Export Corp. v. Richeson*, No. 10-80526-CIV-DIMITROULEAS, 2011 WL 13135114, *9 (S.D. Fla. May 5, 2011); *see* 15 U.S.C. § 1064(3). Fraud occurs when an applicant "knowingly makes false, material representations of fact in connection with an application for a registered mark." *Sovereign Mil. Hosp. Ord. of Saint John v. Florida Priory of the Knights Hosp. of the Sovereign Ord. of Saint John*, 702 F.3d 1279, 1289 (11th Cir. 2012).

Fraud must be proven "to the hilt" with clear and convincing evidence. *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009). "To carry this burden, a party alleging fraud must show: (1) the applicant made a false representation to the []PTO; (2) the false representation was material to the registrability of the mark; (3) the applicant had knowledge of the falsity of the representation; and (4) the applicant made the representation with intent to deceive the []PTO." *Flame & Wax, Inc. v. Laguna Candles*, Cancellation No. 92072343, 2022 WL 3083070, *20-21 (T.T.A.B. Aug. 1, 2022). "If fraud can be shown in the procurement of a registration, the entire resulting registration is void." *Nationstar Mortgage LLC v. Mujahid Ahmad*, 112 U.S.P.Q.2d 1361, 2014 WL 6480655, *4 (P.T.O. T.T.A.B. 2014).

**IV.    Analysis**

Fundamental to any successful claim for fraud on the PTO is the existence of an applicant's false representation. *See In re Bose Corp.*, 580 F.3d at 1243. While there is no question here that the statements in its application were material,[7] Plaintiff did not make any false representations to the PTO. Moreover, even if it did misrepresent the date of first use, that alone "cannot be a basis for invalidating the registration." *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1210

---

[7] On cross motions for summary judgment, the Court held that the second element here is satisfied, recognizing that "[a]n applicant's statements as to its use of a mark for particular goods and services are unquestionably material to registrability." Doc. 289 at 16 (quoting *Nationstar Mortgage LLC v. Mujahid Ahmad*, 112 U.S.P.Q.2d 1361, 2014 WL 6480655, *3 (P.T.O. T.T.A.B. 2014)).

(11th Cir. 2008). Finally, Defendants have not shown clear and convincing evidence that Plaintiff possessed the requisite intent to constitute fraud on the PTO. *See In re Bose Corp.*, 580 F.3d at 1243.

### A. False Representation

Defendants' Counterclaim alleges that Plaintiff's assertion in its applications that its Marks had been used in "primary" education markets since 2002 is false. *See* Doc. 359 at 4. Their contention, however, is dependent on restricting the definition of the term "primary" to only encompass kindergarten through fifth grade ("K-5") education. *See id.* at 5. Indeed, Defendants admit that Plaintiff was serving middle school (grades 6-8) students at least as early as 2004. *Id.* at 6. And Plaintiff's corporate representative credibly testified that it was developing middle school courses on a small scale in the 2002-2003 period, having launched its initial courses in 2002. Doc. 334 at 85:12-16; *see also* Doc. 351-34.[8] Sprinkel's testimony further showed that Plaintiff was developing and piloting elementary courses like "Captain Cardio" as far back as 2009.[9] Doc. 331 at 109:4-111:2, 129:11-130:3. Therefore,

---

[8] *See also* Doc. 334 at 83:2-7 ("So from 2002, at that point, online learning, we were seeing tremendous success and then also greater demand. There was the intent to grow beyond the high school, secondary market. And in 2002, we were developing middle school courses to get into that primary market, primary meaning kindergarten through eighth grade at that point in time."), *id.* at 87:8-11 ("2002 was the initial two courses. There was a middle school geography course and an FCAT test prep course that were launched in 2002. The full suite of middle school courses was released in 2004."), *id.* at 90:17-8, 98:17-99:5.

[9] The Court recognizes that the Marks were also plainly in use at the elementary level

contrary to Defendants' assertion in its post-trial brief, Plaintiff's representation can only be false if the Court adopts Defendants' restrictive definition of "primary." *See* Doc. 359 at 5.

Thus, the Court must determine whether "primary" education can include middle school grades or whether it is restricted to grades K-5. First, Defendants point to a repealed Florida Statute which defines "secondary school" as "primarily serv[ing] students in grades 6 through 12" to show that primary cannot, therefore, include grades 6-8.[10] Fla. Stat. § 1003.413(1) (eff. 2006-2012). However, this statute's brief existence, together with the fact that it was not in effect when Plaintiff began using its marks or when it filed its applications to the PTO, affords it little weight. *See id.* Defendants similarly direct the Court to a provision of the Florida Administrative Code which refers to "Primary Education" as "Age Three Through Grade Three." Fla. Admin. Code r. 6A-4.0142 (2000). That too, however, is collateral at best. That reference is one example extrapolated from a complex chapter setting out qualifications for an exhaustive array of teaching and administrative certifications that only serves to further muddy any semblance of a concrete,

---

from 2008 onwards through Plaintiff's contract with Connections Academy. *See* Doc. 350-4; Doc. 334 at 22:25-23:3, 33:25-34:8, 40:6-41:5.

[10] The Court notes that Defendants' proposition is undercut by their own reference to Plaintiff's initial "secondary services" as "(grades 9-12)" in their post-trial brief. Doc. 359 at 6.

- 9 -

consistent structure. *See, e.g.*, *id.* at r. 6A-4.0151 (Specialization Requirements for Certification in *Elementary* Education (Grades *K-6*)) (emphasis added), *id.* at r. 6A-4.0161 (Specialization Requirements for Certification in *Middle Grades* English (Grades *5-9*)) (emphasis added).

Additionally, several witnesses at trial described their understanding of "primary" education. Sprinkel and Berry considered primary to refer to kindergarten through third grade (K-3), however Sprinkel remarked that "every school district is different."[11] Doc. 330 at 51:14-19; Doc. 331 at 112:3-113:6. Sprinkel also observed that the definition of elementary school had changed over time, remarking that it was once first through sixth grade, then became kindergarten through sixth grade, and finally the present kindergarten through fifth grade. Doc. 331 at 112:16-20. She stated that "secondary school was always going to be in your high school." *Id.* at 112:25-113:3. Kerrie DeMilio, a Senior Marketing Coordinator employed by Defendants, defined primary school as kindergarten through fifth grade, stating that secondary school means sixth through twelfth grade. *Id.* at 50:6-15; *see also id.* at 42:10-13. Jason Schultz ("Schultz"), Plaintiff's Senior Director of Instruction and corporate representative, described primary school as kindergarten through eighth grade. Doc. 334 at 83:6-7; *see also id.* at 74:11-13, 80:9-23.

---

[11] Berry referred to grades four and five as "intermediate." Doc. 331 at 78:6-8.

This simply is not clear and convincing evidence of a false representation to the PTO. First, as Imber testified, Plaintiff used the preapproved language suggested by the trademark identification manual to facilitate its reduced-fee application. Doc. 331 at 66:16-24. She based her choice of language on internal investigations and the specimens attached to the application that demonstrated those services, including developing curriculum for primary level education. *Id.* at 68:3-10. This was corroborated by Wurzel, who testified that she would have diligently reviewed these applications and had access to the pertinent records necessary to do so with accuracy. Doc. 327-9 at 50:7-51:14.

Secondly, as recounted *infra*, specific definitions for primary and secondary education are elusive; and they frequently change. *See infra* at 9-10. Plaintiff, however, who filed the applications, has testified through its corporate representative that it considered primary education to include kindergarten through eighth grade. Doc. 334 at 83:6-7. Though Defendants disagree with Plaintiff's definition, there is ample evidence in the record to suggest that—even apart from Schultz's testimony—primary education is commonly understood to encompass at least up to sixth grade, and perhaps beyond. *See, e.g.*, Doc. 331 at 112:16-113:3. This quibble over the definition of primary is not sufficient to constitute a false representation to the PTO. *See Flame & Wax*, 2022 WL 3083070 at *20-21.

Even if the Court is wrong in its conclusion regarding the definition of "primary," Defendants' Counterclaim is foreclosed by Eleventh Circuit case law. *See Angel Flight*, 522 F.3d at 1210. "A misstatement of the date of first use in the application is not fatal to the securing of a valid registration as long as there has been valid use of the mark prior to the filing date." *Id.* at 1210 (citing *Car Subx Serv. Sys., Inc. v. Exxon Corp.*, 215 U.S.P.Q. 345, 351 (P.T.O. T.T.A.B. 1982)).

Defendants contend that this standard is inapplicable because Plaintiff did not make any valid use of its Marks in commerce for primary school programs or curriculum development. *See* Doc. 359 at 11. However, it is clear from the record that Plaintiff's Marks *were* being used in commerce in the primary market—regardless of how that is defined—through its agreement with Connections Academy from 2008 onwards.[12] *See, e.g.*, Doc. 330 at 59:22-60:3, 84:9-24, Doc. 331 at 124:3-16, Doc. 334 at 24:12-18, 26:2-13, 27:23-28:4, 39:22-41:5, Doc. 350-4, Doc. 350-6, ¶¶ 6.2, 7.4, Doc. 351-33, Doc. 351-77, Doc. 351-79. Moreover, beginning in 2009, Plaintiff was launching pilot programs and developing its own in-house elementary curriculum branded with its Marks. *See* Doc. 331 at 109:14-111:2. Because Plaintiff's Marks were plainly used in commerce in the primary market for *years* prior to the

---

[12] Plaintiff's co-branding with Connections Academy from 2008 onwards also defeats Defendants' afterthought argument regarding the five-year requirement for Section 2(f) acquired distinctiveness. *See* Doc. 359 at 12.

filing of its application, any misstatement of such dates of first use cannot be grounds for cancellation. *Angel Flight*, 522 F.3d at 1210; *see also Direct Niche, LLC v. Via Varejo S/A*, 898 F.3d 1144, 1150 (11th Cir. 2018) (describing that actual sales, in addition to evidence of advertising, publicity, and solicitation, suffice to show use in commerce); *see also, e.g.*, Doc. 351-76 at 4.

Defendants' secondary argument that Plaintiff's statements of exclusive use were false because the Settlement Agreement included a safe harbor has even less merit. The parties' Settlement Agreement—which *resolved* their initial trademark dispute—granted Defendants a limited period within which to continue using marks that are not at issue in this litigation and were not admitted or found to be confusingly similar or infringing. *See* Doc. 350-14 at 3-5, 10. The existence of that safe harbor provision is not evidence that Plaintiff's statements in its subsequent trademark application of exclusive use of its Marks were false. Indeed, pursuant to the terms of the Settlement Agreement, *Plaintiff* was the owner of those marks at the time it filed its trademark applications; Defendants were merely licensees. Doc. 350-14 at 9-10, 22-23. "The law is clear that while a license is in effect, use of a licensed mark by a licensee inures to the benefit of the licensor." *Clayton v. Howard Johnson Franchise Sys., Inc.*, 730 F. Supp. 1553, 1560 (M.D. Fla. July 27, 1988) (citing 15 U.S.C. § 1055); *see also In Dime We Trust, RLT v. Armadillo Distrib. Enters., Inc.*, No. 8:21-cv-1967-SDM-AAS, 2023 WL 4931164, *3 (M.D. Fla. June 6, 2023). In fact, evidence that

Plaintiff acquired marks which "[it] claimed caused confusion" *prior* to filing its applications, if anything, bolsters its statements of exclusive use of its Marks. Doc. 359 at 10; *see also* Doc. 331 at 74:17-76:23.

### B. Knowledge & Intent

Finally, even if the Court has misinterpreted *Angel Flight*, there is simply no evidence in the record that Plaintiff knowingly intended to deceive the PTO.

Relying on a Trademark Trial and Appeal Board ("T.T.A.B.") opinion, Defendants contend that "reckless disregard" is sufficient to constitute subjective intent. *See* Doc. 359 at 12-13 (citing *Chutter, Inc. v. Great Management Grp., LLC Chutter, Inc. v. Great Concepts, LLC*, 2021 WL 4494251 (P.T.O. T.T.A.B. Sept. 30, 2021) *rev'd on other grounds*, *Great Concepts, LLC v. Chutter, Inc.*, 84 F.4th 1014, 1034 n.2 (Fed Cir. 2023)). However, T.T.A.B. decisions—though capable of carrying preclusive effect in certain circumstances—are not binding on this Court. *See B&B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 147-60 (2015) (holding that issue preclusion can attach to some T.T.A.B. decisions); *see also Bonner v. City of Prichard, Ala.*, 661 F.3d 1206, 1209 (11th Cir. 1981).

Contrary to the *Chutter* court's "reckless disregard" standard, in the Eleventh Circuit, fraud "requires a purpose or intent to deceive the PTO in the application for the mark." *Sovereign Mil. Hosps. Ord. of Saint John of Jerusalem of Rhodes and of Malta v. Florida Priory of Knights Hosps. of Sovereign Ord. of Saint John of Jerusalem,*

*Knights of Malta, Ecumenical Ord.*, 702 F.3d 1279, 1289 (11th Cir. 2012). More pointedly, the "declarant-focused text of the application oath requires the signatory's good-faith, *subjective belief* in the truth of its contents." *Id.* at 1290 (emphasis added). "If the declarant subjectively believes the applicant has a superior right to use the mark, there is no fraud, even if the declarant was mistaken." *Id.* at 1292. "Subjective intent to deceive, however difficult it may be to prove, is an indispensable element in the analysis." *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009). The Court cannot sidestep this body of binding precedent in favor of the T.T.A.B.'s holding in *Chutter*.[13]

It is true that, "because direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence." *In re Bose Corp.*, 580 F.3d at 1245. Here, however, there is no evidence that Plaintiff, or its agents, had a subjective intent to deceive the PTO. Defendants contend that Wurzel, who signed the PTO applications, was not even aware of the Marks' first use dates or that actual use was required. Doc. 359 at 13. Upon review of her deposition transcript, however, Wurzel merely admitted that she did not precisely recall the

---

[13] This conclusion is bolstered by the Federal Circuit's holding in *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir. 2009). In reversing its decision to cancel a mark for fraud, the Federal Circuit noted that the T.T.A.B. had departed from long standing precedent to "erroneously lower[] the fraud standard to a simple negligence standard." *Id.* at 1244; *see also id.* at 1243-46.

details of events that occurred over seven years prior to the date of her testimony.[14] Doc. 327-9 at 24:16-27:22; *see also id.* at 5:12-8:8, 21:9-12, 47-58. Wurzel also testified that she was aware that her signature attested to the accuracy of Plaintiff's declarations and confirmed that she worked with and relied upon counsel in finalizing and reviewing the documents. Doc. 327-9 at 24:21-25:1, 46:14-18, 49:9-50:6.

Though Defendants meekly imply that Imber may have failed to diligently verify information received from Plaintiff, it is telling that Defendants did not argue that Imber's testimony evinced any intent to deceive the PTO. *See* Doc. 359 at n.13. On the contrary, Imber's testimony was highly credible and conveyed a thorough knowledge and understanding of the trademark registration process, which supports Plaintiff's argument that it made a concerted, good-faith effort to describe its Marks and its use thereof. *See* Doc. 331 at 80:7-101:11. In fact, based on Imber and Wurzel's testimony, the evidence would likely be insufficient to show intent even under the *Chutter* standard. 2021 WL 4494251 at *9 ("[B]y *failing to make an*

---

[14] *See, e.g.*, Doc. 327-9 at 50:7-21 ("Q:…So in the course of signing this declaration attesting to facts about the trademark use, would you have consulted records to determine whether the statements were accurate or not at the time you executed the declaration? A: Again, it was seven years ago so I can't tell you exactly what I did, but I would have reviewed the document. I would have tried to check it as best I could before signing it and then I would have signed it if I felt like, you know, things were in line. Did I review every single word and scrutinize every single word, I don't know that I could say that, but I wouldn't have signed it if I hadn't reviewed it.").

*appropriate inquiry* into the accuracy of the statements the declarant acts with a reckless disregard for the truth.") (emphasis added).

What amounts to, at best, evidence of negligence does not come close to showing that Wurzel or anyone else *knew* that the Marks had not been used in commerce and filed the applications anyway. *See Spiral Direct, Inc. v. Basic Sports Appeal*, 293 F. Supp. 3d 1334, 1361 (M.D. Fla. Dec. 12, 2017) ("Conversely, where a trademark owner *knows* that he has not used a trademark in commerce but nonetheless submits an application based on use of the mark in commerce, the Court may infer a fraudulent intent.") (emphasis added). Regarding Plaintiff's 2010 registrations, this Court has already rejected Defendants' recycled infectious invalidity arguments. *See* Doc. 289 at 13-14. Whatever concerns may be present in those registrations are not indicative of any subjective intent to deceive the PTO in the filing of Plaintiff's 2016 applications. Defendants' kitchen sink arguments invoking Plaintiff's statements to the legislature and during other legal proceedings, and their arguments related to puffery and unpled claims of false advertising fare no better.

### V.     Conclusion

While there may be a quibble as to the precise definition of "primary" education, Defendants have not shown that Plaintiff's applications contained any false representations or evidence of nefarious intent remotely rising to the level of

fraud on the PTO. Accordingly, a **JUDGMENT** will be entered for the Plaintiff and against the Defendants on the Defendants' Counterclaim for Cancellation of Plaintiff's federally registered trademarks for fraud on the U.S. Patent and Trademark Office. *See* Doc. 155, ¶ 54.

All pending motions from Phase I are hereby **DENIED as moot**.

**DONE** and **ORDERED** in Orlando, Florida on December 1, 2023.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties