# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

FLORIDA VIRTUAL SCHOOL,

        Plaintiff,

v.                                   Case No:   6:20-cv-2354-GAP-EJK

K12, INC. and K12 FLORIDA, LLC,

        Defendants

---

## MEMORANDUM OPINION

This cause came before the Court following a bifurcated bench trial conducted from October 16-19, 2023. In Phase I, the parties presented their cases on Defendants' Counterclaim for cancellation of Plaintiff's federally registered trademarks for fraud on the U.S. Patent and Trademark Office.[1] The Court then proceeded to Phase II where it heard evidence and argument on Plaintiff's claims for trademark infringement and unfair competition. This opinion resolves the Phase II issues.

---

[1] *See also* Doc. 363 (Phase I Ruling).

I. **Background**

*A. History of the Case*

This is a marathon trademark dispute twelve years in the making between two competitors in the online education market. In 2011, Plaintiff Florida Virtual School ("Plaintiff") sued Defendants K12, Inc. and K12 Florida, LLC ("Defendants") for using the marks, "Florida Virtual Academy/Program" and the associated acronyms, "FLVA/P." *See Florida Virtual School v. K12, Inc. and K12 Florida, LLC*, 6:11-cv-831-Orl-KRS, Doc. 1 (M.D. Fla. May 18, 2015). That dispute was resolved by a settlement agreement dated November 3, 2015 (the "Agreement"). Doc. 350-14. The Agreement, in addition to requiring Defendants to cease their use of those marks, also prevented them from using the words "Florida" and "Virtual" together in a mark and listed four examples of prohibited marks. *Id.* at 3, 7-8, 16. It listed acceptable marks, but did not require Defendants to use one of those marks.[2] *Id.*

In 2019, Defendants launched the "Florida Online School," abbreviated "FLOS,"[3] under a contract with the Hendry County School District ("HCSD"). *See* Doc. 353 at 51:6-12; Doc. 354 at 7:4-17. Approximately one year later, Plaintiff

---

[2] *See* Doc. 350-14 at 8 ("The parties further agree that K12 is not required to select a mark listed on Appendix A, and that there shall be no presumption against K12's choice of a mark not listed on Appendix A.").

[3] Hereinafter, the Court refers to these two marks collectively as the "Florida Online School" mark.

demanded that Defendants abandon that mark. *See* Doc. 342 at 163:10-164:25. Defendants acquiesced and, after conducting surveys and consulting with HCSD, Defendants chose a new name—"Digital Academy of Florida." *Id.*; Doc. 353 at 44:16-23, 51:19-52:2; Doc. 354 at 14:6-15:10. That name is not in dispute. A contractual amendment with HCSD for use of this new name was executed on February 2, 2021, and implemented as soon as practicable the next year. Doc. 352-46; Doc. 353 at 60:4-7; Doc. 354 at 14:6-16:2. However, impatient with Defendants' progress, Plaintiff filed this suit in December 2020 contesting their prior use of "Florida Online School." *See* Doc. 1.

In its Complaint, Plaintiff asserts several claims and seeks damages and injunctive relief. Doc. 1, ¶¶ 74-143. However, by the time of trial—three-hundred and twenty-nine docket entries later—numerous aspects of Plaintiff's case had been resolved against it. *See* Doc. 261; Doc. 297; *see also* Doc. 287; Doc. 295; Doc. 298. On July 10, 2023, the Court granted Defendants' motion for summary judgment, in part, on Plaintiff's Count V claim for false advertising, while simultaneously striking the expert report and testimony of Jeffrey Stec ("Stec").[4] *See* Doc. 261. Upon review of the parties' broader cross motions for summary judgment on September 5, 2023, the

---

[4] The Court found that the Stec report showed no evidence of consumer confusion, which precluded Plaintiff's false advertising claim as a matter of law. Doc. 261 at 13; *see also Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002).

Court granted summary judgment for the Defendants on Plaintiff's breach of contract claim after determining that Plaintiff had presented no evidence of damages. Doc. 297 at 7-9. However, the Court concluded that disputed questions of material fact remained as to the issues of trademark infringement and unfair competition and set the matter for a bench trial. *Id.* at 9-24; *see also* Doc. 293.

Thus, the only relief remaining for Plaintiff in this case is an injunction—against Defendants' use of a name which it relinquished years ago—and the disgorgement of Defendants' profits for using that name during a brief period of time.[5]

## B. *The Trademarks*

Plaintiff alleges that Defendants' use of the "Florida Online School" mark infringed upon seven trademarks it has registered with the U.S. Patent and Trade Office ("PTO"). Doc. 1, ¶¶ 41-46. They include federal trademark registrations No. 3,830,765 and No. 3,873,393, which were registered in 2010 and formed the basis of the previous litigation between these parties. *See* Doc. 1-1, *Florida Virtual School v. K12, Inc. and K12 Florida, LLC*, 6:11-cv-831-Orl-KRS, Docs. 1, 130 (M.D. Fla. May 18,

---

[5] On August 25, 2023, the Court granted, in part, Defendants' motion to strike the expert report and testimony of Daniel Gallogly ("Gallogly") as to Plaintiff's lost profits, ruling that Gallogly's report on the matter was "wholly deficient." Doc. 287. Then, on September 1, 2023, the Court granted, in part, Defendants' motion to restrict Gallogly's testimony on disgorgement to revenue Defendants earned in the two years they used the Florida Online School mark. *See* Doc. 295.

2015). Those two marks have subsequently attained "incontestable status" with the PTO. *See* Doc. 142-1, ¶ 7. Plaintiff's other marks at issue, which were registered in 2017, are: No. 5,113,225, No. 5,113,235, No. 5,113,248, No. 5,113,241, and No. 5,113,259. *See* Doc. 1-1. Plaintiff's marks are listed here:

| Mark | Registration Number |
|------|---------------------|
| FLORIDA VIRTUALSCHOOL | 3,830,765 |
| FLVS | 3,873,393 |
| FLORIDA VIRTUAL SCHOOL | 5,113,225 |
| FLVS | 5,113,235 |
|  | 5,113,241 |
|  | 5,113,248 |
|  | 5,113,259 |

Doc. 325 at 2-3.

Defendants' "Florida Online School" mark included an image of a Florida panther and had no asserted registration or trademark protection:



Doc. 323 at 14.

## II.   Legal Standard

A defendant who, without consent, uses "in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark" that "is likely to cause confusion, or to cause mistake, or to deceive" is liable for trademark infringement under the Lanham Act. 15 U.S.C. § 1114(1); *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1255 (11th Cir. 2016) [hereinafter "*FIU Board*"]. "To prevail under this section, a claimant must show (1) that it had prior rights to the mark at issue and (2) that the defendant had adopted a mark or name that was the same, or confusingly similar to its mark, such that consumers were likely to confuse the two." *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1193 (11th Cir. 2001).

Courts in the Eleventh Circuit consider seven factors when assessing whether a likelihood of consumer confusion exists: "(1) the strength of the allegedly

infringed mark; (2) the similarity of the infringed and infringing marks; (3) the similarity of the goods and services the marks represent; (4) the similarity of the parties' trade channels and customers; (5) the similarity of advertising media used by the parties; (6) the intent of the alleged infringer to misappropriate the proprietor's good will; and (7) the existence and extent of actual confusion in the consuming public." *FIU Board*, 830 F.3d at 1255 (citing *Tana v. Dantanna's*, 611 F.3d 767, 774–75 (11th Cir. 2010)). In applicable contexts, Eleventh Circuit courts also consider consumer sophistication in determining likelihood of confusion, mindful that "sophisticated consumers of complex goods or services are less likely to be confused than casual purchasers of small items." *Id.* at 1256; *see also FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 47 F.4th 939, 947 (11th Cir. 2023). The strength of the mark and evidence of actual confusion are the most important factors. *See FIU Board*, 830 F.3d 1255; *see also FCOA LLC*, 47 F.4th at 947.

### III.   Analysis & Findings of Fact[6]

#### A. Trademark Infringement & Unfair Competition[7]

––––––––––––––––––––

[6] The parties agree that Plaintiff is a public agency that began developing and delivering online and distance learning programs in 1997. Doc. 302 at 15. Plaintiff was initially named Florida Online High School before it was renamed Florida Virtual School in 2001. *Id.* Defendants operate several distinct online schools in Florida, including the Digital Academy of Florida and the Florida Cyber Charter Academy. *Id.* at 16. Both parties presently offer kindergarten through twelfth grade (K-12) online educational services. *Id.* at 16.

[7] In the Eleventh Circuit, "[c]ourts may use an analysis of federal infringement claims as a 'measuring stick' in evaluating the merits of state law claims of unfair competition." *Suntree*

### 1.  Strength of the Marks

The first factor analyzes the strength of Plaintiff's marks: "[t]he stronger the mark, the greater the scope of protection accorded it, the weaker the mark, the less trademark protection it receives." *Frehling Enters., Inc. v. Int'l Select Grp., Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999); *see also Sovereign Mil. Hosp. Ord. of Saint John of Jerusalem of Rhodes & of Malta v. Fla. Priory of the Knights Hosps. of the Sovereign Ord. of Saint John of Jerusalem, Knights of Malta, the Ecumenical Order*, 809 F.3d 1171, 1182 (11th Cir. 2015). Generally understood to be the "second most important factor," courts assess the strength of the mark in two ways. *Sovereign Mil.*, 809 F.3d at 1182 (quoting *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 938 (11th Cir. 2010)). First, to determine the marks' conceptual strength, the factfinder must classify a mark as "generic, descriptive, suggestive, or arbitrary based on the relationship between the mark and the service or good it describes." *FIU Board*, 830 F.3d at 1256. "Generic marks are the weakest and not entitled to protection" whereas arbitrary marks are "the strongest of the four categories." *Id.* at 1256-57. Courts then analyze "commercial strength," including the "degree to

---

*Technologies, Inc. v. Ecosense Intern., Inc.*, 693 F.3d 1338, 1345 (11th Cir. 2012); *see also Planetary Motion, Inc. v. Techslposion, Inc.*, 261 F.3d 1188, n. 4 (11th Cir. 2001) (citing *Investacorp, Inc. v. Arabian Inv. Banking Corp.* (*Investcorp*) E.C., 931 F.2d 1519, 1521 (11th Cir. 1991), *cert. denied*, 502 U.S. 1005 (1991)). "[T]he legal standards we apply to [the FDUPTA] claim are the same as those we have applied under section 43(a) of the Lanham Act." *Suntree*, 693 F.3d at 1345.

which third parties make use of the mark." *FCOA LLC v. Foremost Title & Escrow Servs. LLC*, 57 F.4th 939, 950 (11th Cir. 2023); *Frehling*, 192 F.3d at 1335. The more that third parties use the mark, the weaker it is, and the less protection it deserves. *Frehling*, 192 F.3d at 1335.

### a. Conceptual Strength

The parties are generally in agreement that Plaintiff's marks are, at best, descriptive. *See* Doc. 360 at 4; Doc. 361 at 3. The Court agrees. "Descriptive marks describe a characteristic or quality of an article or service (e.g., 'vision center' denoting a place where glasses are sold)." *FCOA LLC*, 57 F.4th at 949 (quoting *Frehling*, 192 F.3d at 1335). Plaintiff's marks plainly *describe* a place where students can learn via the internet in Florida—"FLORIDA VIRTUAL SCHOOL"—and require no "effort of the imagination [whatsoever] by the consumer in order to be understood as descriptive." *Id.* Likely due to their generic and descriptive nature, all of Plaintiff's non-acronym marks[8] expressly disclaim any exclusive right to use "VIRTUAL SCHOOL"—which comprises two-thirds of the marks. *See* Doc. 1-1 at 2, 6, 15, 18.

The Eleventh Circuit has held that descriptive marks like these "are so weak that they are not valid trademarks." *Id.* However, such descriptive marks can

---

[8] *See infra* at 3-4 (Registrations No. 3,830,765, No. 5,113,225, No. 5,113,248, and No. 5,113,259).

acquire "secondary meaning" when, as a result of time and effort on behalf of the mark holder, "consumers view the mark as synonymous with the mark holder's goods or services." *Id.* If a mark has been declared "incontestable" by the PTO, "then the mark's incontestability serves to enhance its strength." *Id.* at 1336. "An incontestable mark is presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark."[9] *Sovereign Mil.*, 809 F.3d at 1183-84 (citing *Dieter v. B & H Industries of Sw. Fla., Inc.*, 880 F.2d 322, 329 (11th Cir. 1989)) (emphasis added). This presumption, however, may be rebutted with a showing of commercial weakness, or "extensive third-party use of the mark."[10] *FIU Board*, 830 F.3d at 1257; *see also FCOA LLC*, 57 F.4th at 950.

---

[9] *Cf. Soveriegn Mil.*, 809 F.3d at 1183-84 ("The law in this Circuit is almost certainly incorrect. The incontestability of a mark, by itself, says nothing about its strength. A mark becomes incontestable when the owner uses it in commerce for five consecutive years and files an affidavit with the [PTO] attesting that the mark is not generic, not subject to a prior adverse judgment, and not currently subject to litigation. *See* 15 U.S.C. § 1065. Yet, 'the test for likelihood of confusion is based on the perceptions of consumers in the marketplace, which are ordinarily unaffected by the status of a mark's registration.' Restatement § 21, reporter's note. Furthermore, 'trademark rights are not static and ... the strength of a mark may change over time.' [*Safer, Inc. v. OMS Invs., Inc.*, 94 U.S.P.Q.2d 1031, 1036 (T.T.A.B.2010)] That a mark enjoyed incontestable status in the past says very little about its current strength in the marketplace. *See* 6 McCarthy § 32:155.").

[10] While "there is no hard-and-fast rule establishing a single number that suffices to weaken a mark," the extent of third-party use "is an essential factor in determining the mark's strength." *FIU Board*, 830 F.3d at 1257.

Plaintiff's first-registered marks, "FLORIDA VIRTUALSCHOOL" and "FLVS,"[11] were accepted by the PTO as "incontestable" under Section 15 of the Lanham Act in 2016 because they had been "in continuous use for five consecutive years subsequent to the date of registration." 15 U.S.C. § 1065; Doc. 351-15 at 2; Doc. 351-18 at 2. Therefore, the Court presumes that Plaintiff's two incontestable descriptive marks are "relatively strong."[12] *Sovereign Mil.*, 809 F.3d at 1183-84. However, the Court finds that the remainder of Plaintiff's marks are simply descriptive and therefore relatively weak from a conceptual standpoint.

### b. *Commercial Strength*

"Commercial strength refers to the real-world consumer recognition of a mark, most often created by the efforts and work of the mark holder." *FCOA LLC*, 57 F.4th at 950. Courts should weigh "both circumstantial evidence of advertising and promotion and direct evidence of consumer recognition, such as by a survey."

---

[11] Registrations No. 3,830,765 & No. 3,873,393.

[12] Their incontestability status makes Plaintiff's first-registered marks stronger than their counterparts, however, the dubious circumstances under which they were registered is not lost on the Court. *See* Doc. 289 at 6-12; *see also* Doc. 234 at 18-21. Though Defendants' counterclaim for cancellation of these marks was precluded by the Settlement Agreement, Plaintiff nevertheless admits that it made at least one material misrepresentation to the PTO in its registration application. *See* Doc. 289 at 14, n. 9; Doc. 270 at 12. Moreover, there is evidence that Plaintiff made further misrepresentations in its effort to establish secondary meaning and overcome the initial rejection of its application for these marks. *See* Doc. 249 at 7-12; Doc. 250 at 15-21; Doc. 234 at 18; *see also* Doc. 155 at 37-47.

*FIU Board*, 830 F.3d at 1259. Third-party use is also commonly used as evidence of commercial weakness. *Id.*

The evidence produced at trial shows that Plaintiff's marks are commercially weak. Apart from the geographic, descriptive nature of its marks, Plaintiff's own internal materials tend to illustrate their inherent weaknesses. While multiple witnesses testified as to Plaintiff's significant marketing and advertising efforts,[13] that alone is not indicative of strength. *See* Doc. 337 at 80:22-81:15; Doc. 338 at 42:25-43:3, Doc. 351-25, Doc. 351-28; *FCOA LLC*, 57 F.4th at 950.[14] Plaintiff's Director of Marketing, Ashley Reyes ("Reyes"), testified that changing a logo and using it in different ways "can dilute a brand" in the same breath as she acknowledged that, in only twenty-five years of existence, Plaintiff has changed its logo six times. Doc. 338 at 81:22-82:12; *see also* Doc. 352-52 at 11. Indeed, in her testimony, Lysaught

---

[13] Kate Lysaught ("Lysaught"), Plaintiff's senior director of marketing and communications, described "a pretty robust marketing budget," including an advertising budget increase from $1.2 to $4.8 million for Plaintiff's 2020 *rebrand* effort for its global operations. Doc. 337 at 80:22-81:1. She testified that Plaintiff, since 2020 anyway, spends roughly $4-5 million per year on marketing. *Id.* at 29:13-21.

[14] The unrebutted nature of the plaintiff's evidence in *FCOA LLC* is distinguishable from the instant matter. 57 F.4th at 951-52. In *FCOA LLC,* evidence of the plaintiff's $7 million annual advertising budget and $2.4 billion in annual insurance premium revenue—which are substantially larger than Plaintiff's here—were sufficient to rebut the mere "list of businesses printed from Secretary of States' webpages and trademark registrations" presented by those defendants. *Id.* at 951.

discussed a nearly $5 million effort to rebrand Plaintiff's global operations as recently as 2020.[15]  Doc. 337 at 80:22-81:1.

The internal surveys that Plaintiff conducted fall short of demonstrating that its marks are commercially strong—indeed they tend to show the opposite. *See* Doc. 361 at 6. Plaintiff argues that "Florida consumers consistently recognize FLVS significantly more than they recognize K12 and other[s]." *Id.* However, upon review, the survey Plaintiff cites shows that its superiority is marginal—often within ten percentage points—and that Defendants' current brand recognition at the beginning of the 2021 school year was substantial. Doc. 351-21 at 6.

In a 2018 survey of parents with school-aged children that Plaintiff commissioned while researching its brand effectiveness, its mark had only 15% more awareness than Defendants' mark and, moreover, only 30% of respondents recognized Plaintiff's brand, even when prompted. Doc. 352-44. Similarly, in a 2020 commissioned survey, without prompting, only 1% of respondents could name Plaintiff as an online education provider. Doc. 352-55 at 2. While Plaintiff's full-name marks garnered around 36% awareness among prospective families, the acronym marks had less than 15% awareness among prospective and *current*

---

[15]  Plaintiff's rebranding of its non-Florida offerings to FlexPoint serves to further highlight the weakness of its Florida Virtual School marks. *See* Doc. 337 at 79:7-10.

families. Doc. 352-52 at 12. Indeed, in an internal marketing presentation from January 4, 2022, Plaintiff itself used words like, "plain…bored…uninspired…nondescript…[and] sterile" to describe the brand identity of its acronyms. *Id.* at 17. This is strong evidence of the commercial weakness of these marks.

Finally, as to third-party use, Defendants introduced evidence that a number of other businesses registered in this state use the terms "FLORIDA" and "VIRTUAL" in their marks.[16] *See* Doc. 352-83. Many of these businesses are listed as "inactive," though, and are associated with unrelated industries like mediation, marketing, and photography. *See id.* "Inactive businesses and marks are not relevant," nor are those operating in unrelated industries. *FCOA LLC*, 57 F.4th at 951; *see also* Doc. 342 at 113:3-15. However, unlike the defendants in *FCOA LLC*, the list of Florida businesses here was not Defendants' only evidence. 57 F.4th at 951. Of much greater import, Defendants point to Plaintiff's muddled relationship with

---

[16] A cursory internet search of one of these defunct entities—"FLORIDA VIRTUAL COLLEGE"—immediately yielded an *active* organization that had not been raised by either party: a Florida Virtual Campus, created by the Florida legislature in 2012. *See* FLORIDA VIRTUAL CAMPUS, *About FLVC*, www.flvc.org/about (last visited Dec. 14, 2023). Florida Virtual Campus—abbreviated FLVC—appears to offer educational support services to public colleges, state universities, and K-12 school districts. *Id.* The organization's mark can be seen here:



*Id.*

Florida county school districts, who often incorporate the phrase "VIRTUAL SCHOOL" into the brand for their online educational offerings. Doc. 360 at 6; *see also, e.g.*, Doc. 352-80 (website for Broward Virtual School).

Plaintiff's Corporate Representative John Schultz ("Schultz") testified that each county school district has "the *option* to have a franchise of the Florida Virtual School." Doc. 334 at 158:18-19. These county school districts adopt a version of Plaintiff's marks for these programs—for example, in Orange County, their web-based education programs are operated under the name, "Orange County Virtual School." *See id.* at 158:19-21. However, as stated on their website, Orange County Virtual School "partners with [Plaintiff] and [Defendants] to provide [educational services]." Doc. 352-81. Likewise, Broward County's "Broward Virtual School" "is a long-time franchise partner of [Plaintiff]," but also "partners with [Defendants] for [its] elementary school program." Doc. 352-80.

Plaintiff argues in its papers that the "widespread use of [the] mark by licensees would tend to support...the proposition that [Plaintiff]'s mark is a strong one." Doc. 361 at 6 (quoting *Univ. of Ga. Athletic Ass'n v. Laite*, 756 F.2d 1535, 1545 (11th Cir. 1985)). However, Lysaught testified that these school districts are "using their county name[s] to distinguish [themselves] *from us* or anyone else." Doc. 337 at 97:23-25 (emphasis added). And, there is uncontested evidence that at least some of these counties are simultaneously partnering with Defendants for significant

delivery of their online educational services. *See* Doc. 352-80; Doc. 352-81; Doc. 334 at 158:19-21. Though use of a mark by licensees supports its strength, the use of Plaintiff's hybrid marks throughout Florida's 67 counties to cover services that are actually provided by both Plaintiff and Defendants weakens Plaintiff's marks significantly. *See FIU Board*, 830 F.3d at 1257 ("[A] weak trademark is one that is often used by other parties.").

Plaintiff argues that Defendants have not provided specific numbers for these third-party uses and that, secondarily, these names are not confusingly similar to its marks. Doc. 361 at 6. However, Defendants have provided numerous examples, and it is, in part, testimony from Plaintiff's representatives that establishes the widespread nature of this arrangement. *See, e.g.*, Doc. 334 at 158:18-21; Doc. 139-5. Moreover, Plaintiff's attempt to conjure a distinction between the two words from its mark adopted by these county programs ("Virtual" & "School") and the two words deployed in Defendants' allegedly infringing mark ("Florida" & "School") approaches a new level of absurdity. *Id.* Though some of these third-party users operate as Plaintiff's franchise partners, the fact that these franchise relationships also allow Defendants to provide substantial services (e.g. an entire elementary school program) under the same marks significantly undercuts the strength of Plaintiff's marks. *See FIU Board*, 830 F.3d at 1257.

Ultimately, Defendants have rebutted the presumption of strength as to Plaintiff's incontestable marks through evidence showing the commercial weakness inherent in *all* of its marks. *See id.* at 1257-58; *see also FCOA LLC*, 57 F.4th at 950. These marks are patently descriptive and weak.

## 2. Actual Confusion

As to the most important factor, Reyes testified that she "believe[s] that the *marketplace* has confusion about [online] education in general." Doc. 338 at 80:3-5 (emphasis added). Lysaught, too, acknowledged that she was aware of marketplace confusion arising from the fact that, in order to provide their services, Defendants are required to associate with public school districts—which are overseen by the Florida Department of Education, of which Plaintiff is a subagency. Doc. 337 at 87:16-22.

Against this backdrop, it is unsurprising that Plaintiff has not presented any credible evidence of actual confusion in this case. "Evidence of confusion by actual or potential customers is, of course, the best evidence of a likelihood of confusion." *FIU Board*, 830 F.3d at 1264. Although "the quantum of evidence needed to show actual confusion is relatively small," *Caliber Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 937 (11th Cir. 2010) (quotation omitted), "[s]hort-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight…while confusion of actual customers of a business is worthy

of substantial weight." *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1167 (11th Cir. 1982).

Plaintiff's only live evidence of actual confusion was the testimony of two parents who mistakenly enrolled their children with Defendants' Florida Online School. Deposition testimony from these two parents, which the Court reviewed on the parties' cross motions for summary judgment, indicated that they were confused by the similarities between the school names. *See* Doc. 289 at 17. However, this "evidence" of confusion readily disintegrated under live cross examination.

The first, Casey Kalajian ("Kalajian"), testified on multiple occasions that her confusion stemmed from her misconception that there was only one online education provider available to her. Doc. 338 at 107:1-9 ("I just thought there was FLVS."), 111:7 ("I, again, thought there was only one option for me."), 113:9-11 ("I believed they're one in the same."). Kalajian's testimony that "[o]nline and virtual…are interchangeable" is not evidence of trademark confusion where she also testifies that she thought there was only one provider. *Id.* at 114:11-115:2. When it came to investigating online education options, Kalajian freely admitted she "wouldn't consider what [she] did [to constitute] research." *Id.* at 106:12-16, 114:11-17. Moreover, she was able to successfully unenroll her daughter from Florida Online School and attempted to enroll her with Plaintiff before the school year started. *Id.* at 110:24-111:16. It was *Plaintiff's* delay in assigning her daughter a

teacher that ultimately led to her decision to return her daughter to a brick-and-mortar school—not confusion between the parties' names. *Id.* at 111:11-20.

Plaintiff's second witness was Lisa Kornheisl ("Kornheisl"), a first-grade teacher at a brick-and-mortar school in Boynton Beach, Florida. Doc. 342 at 11:21-12:1. Alongside her devoted K-9, Chuck, Kornheisl testified that she lost most of her vision when her youngest son was born—she is now completely blind in her right eye and partially blind in her left eye. *Id.* at 13:9-16. However, apart from driving a car, Kornheisel can do most activities with the assistance of her children, Chuck, and public resources.[17] *Id.* at 14:6-16.

Kornheisl recounted that she enrolled one of her sons with Defendants' Florida Online School, "not realizing the schedule, and then immediately realized that wasn't the right thing for us as a family and put him into [Plaintiff's school]." *Id.* at 14:18-15:1; *see also* Doc. 351-39. Counsel for Plaintiff attempted to elicit confusion testimony from Kornheisl, culminating in her statement that she mistakenly enrolled in Florida Online School "because of one letter and my poor vision."[18] *Id.* at 19:15-17. However, her repetitive emphasis on her son's need for a

_____

[17] To assist with her classroom duties and for everyday activities like browsing websites and reading books, Kornheisl utilizes magnified readers, digital zooming devices, and other devices through the Division of Blind Services. *Id.* at 14:6-11.

[18] This statement carries little weight given Plaintiff's own acknowledgment that it had legibility issues with its acronym and removed it from some advertisements for that reason. Doc.

flexible schedule as the reason for unenrolling him undercuts the relevance of that guided testimony.[19] *See, e.g., id.* at 14:18-15:1, 19:22-20:2, 23:9-14. Kornheisl, too, was able to subsequently enroll her son with Plaintiff's school before classes commenced, where he presently remains. *Id.* at 16:18-19, 18:25-19:2.

In an effort to bolster its weak evidence of actual confusion, Plaintiff seeks to introduce—via bench brief—twenty-one emails[20] from the parties' employees, parents, students, and other third parties. *See* Doc. 341. Defendants question the admissibility of these out of court statements, arguing the emails are hearsay. *See* Doc. 347 at 2-6. At least portions of these emails, however, are likely admissible as statements of an opposing party. *See* Fed. R. Civ. P. 801(d)(2)(D).

In a different context, another federal court in Florida admitted evidence of social media posts to show actual confusion, finding that they "show the…social media posters' state of mind." *See, e.g., Canes Bar & Grill of S. Fla. v. Sandbar Bay, LLC*, 343 F.Supp.3d 1236, 1246 (S.D. Fla. Sept. 29, 2018). In *Canes Bar & Grill* though, the court was ruling on the plaintiff's motion for a preliminary injunction—not

---

338 at 80:12-81:8; Doc. 352-52.

[19] Kornheisl's testimony—which generally revealed a poor understanding of the market, *despite* her prior experiences with both parties—provides strong support for the existence of latent confusion in the online education services market. *See* Doc. 342 at 22:3-23:14.

[20] *See* Docs. 351-3, -5, -7, -9, -10, -11, -35, -36, -38, -40, -42, -43, -45, -47, -48, -49, -50, -51, -53, -70, and -71.

setting forth a final judgment after a bench trial. *Id.* at 1246 ("Even assuming arguendo that the foregoing social media posts or messages are hearsay, this Court finds that, at this juncture in the proceedings, it may rely on hearsay materials which would not be admissible evidence for a permanent injunction…") (internal quotations omitted).

The ultimate question, however, is whether a reasonable person could rely on these emails as trustworthy evidence of confusion. As demonstrated by the testimony of Plaintiff's two live witnesses, they could not. Was the author really confused? What was the nature of the confusion? Who caused the confusion? Was Plaintiff harmed by the confusion? The answers to these questions require cross-examination. For example, Kalajian's email—on its own—could support an inference that she was confused by the names of the parties' schools. *See* Doc. 351-37. While less conspicuous, the email from Kornheisl's son could support a similar inference. *See* Doc. 351-39. However, after hearing live testimony, it became clear that the source of confusion was not Defendants' name. *See* Doc. 342 at 22:3-23:14. Accordingly, the Court finds that, even if admitted, these out of court statements would not constitute reliable evidence of confusion. Instead, if anything, they support the fact that online educational service providers exist in a muddled marketplace replete with generically and descriptively named participants.

The paltry statements submitted by Plaintiff from two of Defendants' former employees are likewise of little weight. When asked to confirm that there were "numerous instances" of the schools getting mixed up, Defendants' former marketing director, James Dale ("Dale"), testified that he "wouldn't say numerous…maybe say a handful." Doc. 349-4. Likewise, Kimberly Kershner's ("Kershner") email, in which she states that the parties' schools "get[] mixed up all the time," provides no context whatsoever for that statement. *See* Doc. 351-47. In fact, Kershner's deposition testimony clarified that all she meant was that an out-of-state educator "clearly sent the…email to the incorrect school." Doc. 349-3 at 18:6-11. With no further evidence for Kershner's motivations—which could easily be grounded in the fact that both parties often provide services to the same school district—this isolated email and abbreviated deposition testimony do not amount to credible evidence of actual confusion. *See* Doc. 352-80. Indeed, Dale testified that the confusion highlighted in this email could very well have been occasioned by the generic terminology used across the marketplace. Doc. 349-4 at 25-27.

Finally—and inexplicably—Plaintiff presented no expert or accompanying statistical survey to show the likelihood that Defendants' Florida Online School mark would cause consumer confusion. Although survey evidence is not a necessary requirement to show actual confusion, *PlayNation Play Systems, Inc. v. Velex Corp.*, 924 F.3d 1159, 1169-70 (11th Cir. 2019), with no survey, Plaintiff has no

way to filter out latent marketplace confusion that the parties agree exists in the online education market. *See, e.g.*, Doc. 338 at 77:7-80:5; Doc. 342 at 151:22-152:6, 214:24-215:15; Doc. 352-52 at 9.[21] Nor can Plaintiff demonstrate that its miniscule evidence of potential customer confusion justifies the millions it seeks in disgorgement damages. *See, e.g.,* Doc. 361, at 24.

Ultimately, "it is up to individual courts to assess this factor in the light of the particular facts of each case." *Frehling*, 192 F.3d at 1340. Plaintiff's inability to present any credible evidence of actual confusion causes this factor to weigh heavily against its claims.[22] This is especially so "where potentially millions of consumers were exposed to the infringing mark, []thousands of consumers [enrolled in these schools], and not a single instance of actual confusion arose." *FCOA LLC*, 57 F.4th at 957 (citing *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1362-63 (11th Cir. 2019); *see also* Doc. 337 at 25:20-27:18; Doc. 351-25.

---

[21] *See also* Doc. 337 at 49:13-18.

[22] The Court acknowledges that in the limited circumstance where "there has not been an adequate period of time for actual confusion to develop among consumers," courts may discount a dearth of evidence showing actual confusion. *See FCOA LLC*, 57 F.4th at 956 (internal quotation marks omitted) (quoting *Hard Candy, LLC v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1362-63 (11th Cir. 2019)). Neither party has argued that this exception applies here and, finding the two-year period in which the Florida Online School was in operation as eminently adequate for these purposes, the Court concludes it does not.

### 3.  Intent to Infringe

"If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify the inference that there is confusing similarity." *Frehling Enters.*, 192 F.3d at 1340. To prevail on this factor, Plaintiff must show that Defendants possessed a "conscious intent to capitalize on [its] business reputation, w[ere] intentionally blind, or otherwise manifested improper intent in adopting [the Florida Online School] name and acronym." *FIU Board*, 830 F.3d at 1263 (internal quotation marks omitted).

Plaintiff's "strongest evidence" supporting its claim of nefarious intent is that Defendants continue to use the words, "Florida online school," on their website[23] — contending, incredibly, that *any* use of those words in any context constitutes trademark usage. Doc. 361 at 12. It was not enough that Defendants completely rebranded their entire online school; Plaintiff now insists that Defendants—who

---

[23] During the trial, some verbiage was altered on Defendants' website. *See* Doc. 353 at 5-14. However, after an in-camera inspection of Defendants' relevant internal communications, the Court is satisfied that there was no violation of the Rule of Sequestration. *See also* Doc. 356-2. Moreover, while Todd Goldthwaite ("Goldthwaite"), Defendants' managing director of portfolio companies, and Clark Berry ("Berry"), Defendants' executive director of schools, may have taken minor knocks to their credibility after this kerfuffle, their testimony has not been contradicted and their credibility remains intact. Indeed, this exchange strikes the Court primarily as one of ill-informed, non-attorney employees scrambling to avoid the swinging arms of a bully rather than any kind of concerted effort to alter evidence. As the Court recognized above, the fact that Defendants make non-trademark usage of the words, "Florida online school," is ultimately irrelevant to this analysis anyway. *See* Doc. 350-14 at 7.

operate an online school in Florida—must not use those words *anywhere* on their websites. *Id.* Suffice it to say, Plaintiff does not retain exclusive rights to the phrase, "Florida online school," when it is used to simply describe Defendants' available online schooling options in Florida.[24] *See* Doc. 350-14 at 3-8.

Rather than an indication of Defendants' nefarious intent, Plaintiff's argument exposes its attempt to use its weak trademarks to bully its competitors. The Settlement Agreement between the two parties prohibited Defendants from using their former Florida Virtual *Academy/Program* and FLV*A/P* marks. Doc. 350-14 at 3-8. Defendants, however, are permitted to use "Florida" or "Virtual" in a mark separately. *Id.* at 7. Indeed, the Settlement Agreement *expressly acknowledges* that Defendants may make non-trademark use of those words, even in combination. *Id.* It further states that Defendants were "not required to select a mark listed on Appendix A, and that there shall be no presumption against [Defendants'] choice of a mark not listed on Appendix A." *Id.* at 8.

The complete dearth of evidence of any ill intent on behalf of Defendants is enhanced by their testimony that the Florida Online School name was never of particular importance to Defendants or HCSD—they simply chose a descriptive

---

[24] Additionally, as Berry pointed out, other online schools like Connections Academy use such language on their websites and in their URLs. *See* Doc. 352-86; Doc. 353 at 55:14-57:5.

name that was not on the list of marks prohibited by the Settlement Agreement. Doc. 342 at 160:6-19, 215:24-217:8; Doc. 353 at 57:25-59:3; Doc. 354 at 11:19-25, 14:1-3. Moreover, when Plaintiff first complained to Defendants in August of 2020—one year after the school had begun operations as Florida Online School—Defendants began "instantly" working with HCSD to change the name. Doc. 342 at 163:6-167:11, 165:19-167:19; *see also* Doc. 353 at 51:19-52:2, 59:4-14. Defendants and HCSD executed a contractual amendment altering the school's name in February of 2021. Doc. 342 at 13:23-14:15.

Thus, within a year, "the program name [was] transitioned over to Digital Academy of Florida." *Id.* at 15:18-23. The fact that it took in excess of one year to accomplish a complete rebranding of a school name, including updating email addresses and all school literature, is not unreasonable.[25] *See* Doc. 342 at 167:12-19; *see also* Doc. 351-58. And despite Plaintiff's insinuation that Defendants would not have changed their name but for this lawsuit, filed on December 22, 2020, it is clear from the record that is not the case. Doc. 352-72; *see also* Doc. 342 at 165:19-167:19; Doc. 353 at 51:19-52:2, 59:4-14.

---

[25] Lysaught admitted that it took Plaintiff "a year and a half to two years" to rebrand its FLVS Global offerings. Doc. 337 at 79:7-11. She complained that it took longer than usual because it happened during the COVID time period. *See id.* However, the Court recognizes that Defendants announced their name change in February 2021, barely a year after COVID's emergence as a global threat. *See id.*

In sum, Plaintiff has simply offered no evidence that Defendants had any intent to trade off of Plaintiff's good will. *See FIU Board*, 830 F.3d at 1263. This factor weighs strongly against finding infringement.

### 4. Similarity Factors

#### a. *Similarity of the infringed and infringing marks*

"Two marks need not be identical to support a finding of infringement, and the key question remains whether the marks are sufficiently similar 'to deceive the public.' " *FIU Board*, 830 F.3d at 1260 (quoting *Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 33 (1900)). The manner in which the marks are used, in addition to "the appearance, sound and meaning of the marks" are relevant points of comparison. *Id.* (quoting *John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 975 (11th Cir. 1983)). However, the Court considers "the overall impression created by the marks." *Id.*

First, as Plaintiff has shown, "the textual similarity of the marks is readily apparent." Doc. 361 at 8. Two of the three words in the full word marks (Defendants' "Florida Online School" vs. Plaintiff's "Florida Virtual School") and three of the four letters in the acronyms (Defendants' "FLOS" vs. Plaintiff's "FLVS"), are identical. However, Defendants argue persuasively that, like the parties in *FIU Board*, Plaintiff "operates in a crowded field of similar marks on similar goods or services." 830 F.3d at 1260; Doc. 360 at 13-14. The state of Florida's

labeling of "virtual instruction programs"—buttressed by the fact that there is simply a very limited universe of terms to describe an online school—helps to ensure that marks in this industry will share at least some similarities. *See* Fla. Stat. § 1002.45(a)1.,3; *see also* Doc. 352-64. Plaintiff's franchising to county school districts and the muddled manner in which those districts brand their services—which, in at least some cases, are operated by both parties—creates a "crowded field" in this market. *See FIU Board*, 830 F.3d at 1260-61.

Moreover, while these marks share textual similarities, they do not share visual ones – they look nothing alike:

          

*See infra* at 4. Defendants' Florida Online School mark features a prominent Florida panther mascot and uses only grey/tan colors, with dark blue coloring on the website—FLVS has no such mascot logo and the dominant color is *bright* blue. *Id.* Defendants' mark emphasizes the word, "Florida," while Plaintiff's mark emphasizes the word, "Virtual." *Id.* Apart from the textual similarities, their

appearance is different enough to plainly distinguish the marks.[26] *See FIU Board*, 830 F.3d at 1260-61.

In *FIU Board*, the Eleventh Circuit's holding was based, in part, on its assessment that college students and their parents were sophisticated consumers, and would therefore be less influenced by marks that may look and sound the same in a crowded field of universities. *See id.* at 1261; *see also FCOA LLC*, 57 F.4th at 957. Though the expense associated with a college education is largely absent from these providers, the nature and importance of a parent's choice of where to educate their child is comparable to that decision. *See FIU Board*, 830 F.3d at 1256. The fact that Plaintiff presented two individuals who experienced confusion with this *marketplace*—one of whom freely admitted that she undertook no research while the other plainly changed her mind based on scheduling concerns unrelated to any mark confusion—does not suggest that the thousands of other customers of these parties are not sophisticated. *See, e.g.*, Doc. 352-69; Doc. 150-8.

While these marks clearly share similarities in their sound and meaning, there is little similarity in their visual appearance, and the overall impression of these

---

[26] Plaintiff's arguments about search engine optimization ("SEO") and Defendants' motivations for choosing their name bear no relevance to the Court's analysis of the similarity of the marks. As this Court has noted, the fact that Defendants would employ the use of terms like "online" or "virtual" or "school" or "academy"—in the context of SEO marketing or otherwise— is unremarkable. Again, Plaintiff's trademark does not entitle it to a monopoly on generic and descriptive terms for describing online education.

marks is insufficiently similar to deceive the sophisticated customers they serve. Therefore, this factor is, at best, neutral, not weighing in favor of either party.

>    b.  *Similarity of the goods and services the marks represent*

Here, the Court must determine "whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties." *Wreal, LLC v. Amazon.com, Inc.*, 38 F.4th 114, 132 (11th Cir. 2022). The test is whether, in the reasonable belief of an average consumer, the goods are "so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods." *FIU Board*, 830 F.3d at 1261.

The parties do not dispute that they are competitors in the K-12 online education market. *See, e.g.,* Doc. 302 at 15-17. Defendants, however, argue that they offer significantly more career readiness and special education offerings than Plaintiff. Doc. 360 at 15. Berry testified that Defendants have more robust special educational offerings that differentiate them from Plaintiff. Doc. 353 at 70:9-19. Plaintiff also has significant part-time offerings that differ from Defendants' Florida Online School—which primarily served students on a full-time basis. *Id.* at 70:3-8. However, Plaintiff's full-time program is comparable to the program Defendants offered at Florida Online School. *Id.*

Plaintiff offered credible testimony from Schultz that it also provides at least some of these services. Doc. 334 at 160:23-161:11. Ultimately, despite some distinctions, the parties here both offer online educational services for kindergarten through twelfth grade students and have similar goods and services. This factor slightly favors Plaintiff.

> c. *Similarity of the parties' trade channels, customers, and advertising media*[27]

The "similarity of the parties' trade channels and customers" factor takes into consideration where, how, and to whom the parties' products are sold. *FIU Board*, 830 F.3d at 1261. "Dissimilarities between the manner of sale and the typical customers of the parties' services lessen the possibility of confusion." *FIU Board*, 830 F.3d at 1261. Though the "parties' outlets and customer bases need not be identical, [] some degree of overlap should be present." *Frehling*, 192 F.3d at 1339. Likewise, the standard for evaluating similarities in the parties' advertising media is "whether there is likely to be significant enough overlap in the [audience of the advertisements] that a possibility of confusion could result." *FIU Board*, 830 F.3d at 1262.

---

[27] The Court combines the final similarity factors due to their overlapping analyses.

The parties are both online schools in Florida and plainly share similarities in their trade channels—primarily in that both use digital media to reach their customers and facilitate services to their end-users. *See* Doc. 338 at 33:25-34:6, 34:17-42:12, 56:24-57:11; Doc. 352-25. However, Defendants operate in a fundamentally differently way. Doc. 342 at 177:22-178:6. Defendants' customers were not individual parents and students, rather, their customer was (and is) the HCSD. *Id.* at 193:18-24, 194:10-11, 197:20-25. Defendants provide the teachers, the curriculum, and the web-based infrastructure to operate the school and are ultimately paid by HCSD based on course completions. *Id.* at 178:11-21.

Moreover, there are important distinctions in Defendants' marketing strategy. They primarily market to school districts, as opposed to individuals. *See* Doc. 342 at 177:22-178:6 ("[T]he Florida Online School does not have marketing employees, and they do not have enrollment employees…they're all part of K12."). Meanwhile, Reyes testified that "all of [Plaintiff's] paid advertising efforts focus on a consumer…either a parent or a student." Doc. 338 at 13:18-20. These efforts include social media advertising and targeted marketing strategies to reach the particular students and parents that make up their target audience. *See* Doc. 351-25.

This advertising and marketing strategy is markedly different from Defendants, who focus their digital marketing on national audiences through *only* their K12 brand and ultimately are courting school districts to partner with as

opposed to individuals. *See, e.g.*, Doc. 342 at 145:25-146:2, 193:19-24, 180:18-181:17 ("We do not market to students."). A crucial distinction in this trademark infringement case is that Defendants only market under their parent K12 brand—they do not market Florida Online School. [28] Doc. 342 at 183:15-22, 185:10-13 ("We do not market these schools. We market K12, and we do that nationally."). The fact that Defendants operate a website that promotes and facilitates their offerings does not undercut their testimony and evidence that the *Florida Online School* did not advertise directly to consumers or that Defendants primarily focus on partnering with school districts. *See* Doc. 338 at 32:17-33:24; *see also* Doc. 342 at 180:21-181:17.

Although Defendants' K12-branded website advertising and marketing may certainly reach parents and students, they also use their website to exhibit their experience and pedigree in the online education market in order to attract school district partners, who are their actual customers. Doc. 342 at 196:9-197:25. Goldthwaite explained that the Florida Online School website is the functional home location for its educational operations—not a marketing tool intended for public consumption. *Id.* at 198:6-21. Indeed, any parent who stumbles onto the

---

[28] Tellingly, Defendants' "Florida Online School" marketing materials that initially so-concerned Plaintiff actually had the parent K12 branding and only listed Florida Online School—alongside the Florida Cyber Charter Academy, Defendants' other Florida school—as an option for online school in Florida for the coming school year. Doc. 351-1; *see also* Doc. 337 at 49:13-50:18.

Florida Online School website[29] would be unable to enroll and would be directed to the main K12 website if they were interested in enrollment.[30] *Id.* As testimony elucidated, if one searched Google for "Florida Virtual School," one would not find Defendants' Florida Online School in the results—instead only K12's website. *Id.* at 207:8-15. To find the allegedly infringing Florida Online School mark, web visitors would have to go to K12's website and enter their zip code first. *Id.* at 207:16-22. This stands in stark contrast to the "funnel" marketing strategy which Plaintiff extolls. *See, e.g.*, Doc. 337 at 21:7-23:16.

While there is clearly a "degree of overlap" in the parties' customers and trade channels, *Frehling*, 192 F.3d at 1339, the fact that Defendants do not market the Florida Online School mark at all stands in stark contrast to the significant marketing that Plaintiff engages in to promote its mark. *See* Doc. 342 at 183:15-22, 185:10-13. This fact greatly reduces the likelihood that similar advertising could lead to confusion. *FIU Board*, 830 F.3d at 1262. Accordingly, these two factors do not weigh in favor of either party.

---

[29] Goldthwaite testified credibly that all of Defendants' marketing focuses on its main brand, K12, and that 98% of web traffic goes to their parent website. Doc. 342 at 151:7-12.

[30] Kalajian's testimony supports this conclusion. After counsel asked her what school she had mistakenly enrolled in, Kalajian replied: "It was Florida K12—K through 12." Doc. 338 at 108:10-15. She only confirmed counsel's follow-up question asking whether she was referring to the Florida Online School. *Id.*

### 5.  Balancing[31]

Plaintiff has presented little credible evidence that Defendants' use of the Florida Online School mark infringed on its trademarks. The most important factors all weigh strongly against Plaintiff's claim of infringement. *See FIU Board*, 830 F.3d 1255; *see also FCOA LLC*, 47 F.4th at 947. Plaintiff's mark is among the most generic, descriptive—and therefore *weak*— marks the Court has seen. Moreover, Plaintiff has presented no credible evidence of actual confusion occasioned by the similarity of these marks. And, the intent evidence supports a strong inference against *Plaintiff*, not Defendants. Finally, while one of the similarity factors may weigh slightly in Plaintiff's favor, it is grossly insufficient to overcome the dominant factors that undercut its feeble claim for trademark infringement.[32]

## IV.  Conclusion

Plaintiff's trademarks are inherently weak and Plaintiff produced no credible evidence of actual confusion. Plaintiff also inexplicably failed to perform a likelihood of confusion survey. And, the Court finds that Defendants, in adopting

---

[31] *See FCOA LLC*, 57 F.4th at 947 ("At step two, the court weighs each of the relevant circumstantial facts—independently and then together—to determine whether the ultimate fact, likelihood of confusion, can reasonably be inferred…In drawing the ultimate inference about likelihood of confusion, the two most important circumstantial facts are respectively actual confusion and the strength of the mark.").

[32] "Plaintiff's failure to establish a likelihood of confusion as to its Lanham Act claim also extinguishes its [unfair competition] claim under Florida law." *Suntree*, 693 F.3d at 1345 (quoting *Custom Mfg. and Eng'g, Inc. v. Midway Servs., Inc.*, 508 F.3d 641, 652 (11th Cir.2007)).

their Florida Online School mark, had no intent to play off the good will of Plaintiff's marks.

Accordingly, judgment for Defendants is the only reasonable outcome given the dearth of evidence supporting Plaintiff's claims.[33]  Therefore, **JUDGMENT** will be entered for the Defendants and against Plaintiff.

Now that the record is complete, Defendants may file an **Amended Motion for Sanctions**, *see* Docs. 137, 212, **on or before January 19, 2024**. Plaintiff may docket a response **within fourteen days** of Defendants' filing.

**DONE** and **ORDERED** in Orlando, Florida on January 2, 2024.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

---

[33]  Having ruled that Defendants have not infringed Plaintiff's trademarks, there is no need to consider the remedies sought by Plaintiff. However, it is notable that this case proceeded to trial after years of contentious litigation even though Plaintiff suffered no damage by reason of Defendants' conduct, and had no beneficial remedy available to it. Defendants abandoned the alleged offending mark years ago, and there is no basis to believe that they would resurrect that mark or any other offending mark in the future. *See infra* at III.A.3. Thus, injunctive relief is not available. As for the disgorgement of Defendants' profits, there were none; nor would Defendants' conduct warrant disgorgement. *See* Doc. 354 at 33:8-37:10, 76:5-77:10; Doc. 352-66; Doc. 352-67; Doc. 352-69; Doc. 352-70. Thus, Plaintiff's prosecution of this lawsuit seems more akin to a "trademark bully" harassing a competitor than a party seeking reasonable redress for any harm caused by Defendants. *See Engage Healthcare Comms., LLC v. Intellisphere, LLC*, No. 12-787 (FLW) (LHG), 2019 WL 1397387, *7 at n.5 (D.N.J. Mar. 28, 2019).

Copies furnished to:

Counsel of Record
Unrepresented Parties