# EXHIBIT H

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION
CASE NO.:  6:20-cv-02354-GAP-EJK

_____


FLORIDA VIRTUAL SCHOOL,

                    Plaintiff,

vs.

STRIDE, INC., formerly known as
K12 INC., and K12 FLORIDA LLC,

                    Defendant.
_____/


                    VIDEO RECORDED
                     DEPOSITION OF:
                     CAROL CALFEE
ON BEHALF OF:          Plaintiff
DATE:                  January 11, 2023
TIME:                  9:23 a.m. to 3:57 p.m.
LOCATION OF WITNESS:   Pensacola, Florida


_____

                    REPORTED BY:
MICHELLE SMITH, RDR, FPR, LCR, CCR, CLR, CLVS, CDVS

Page 2

A P P E A R A N C E S

For the Plaintiff:

LUTHER LAW PLLC
4767 New Broad Street, #1029
Orlando, FL 32814
407-501-7049
Stephen H. Luther, Esq.
Sluther@lutherlawgroup.com
FLORIDA VIRTUAL SCHOOL
2145 Metrocenter Blvd #100
Orlando, FL 32835
David J. D'Agata, Esq., Via Zoom
Ddagata@flvs.net

For the Defendant Stride, Inc. and K12 Florida, LLC:

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP 2099
Pennsylvania Ave., N.W., Suite 100
Washington, D.C. 20006
202-747-1941
Abraham Shanedling, Esq.
Ashanedling@sheppardmullin.com
Charles Spencer-Davis, Esq.
Cspencerdavis@sheppardmullin.com
Steve Hollman, Esq.
Shollman@sheppardmullin.com
Emily Dalessio, Esq.
Edalessio@sheppardmullin.com

For the Witness:

CARLOS F. GONZALEZ, P.A.
2332 Galiano Street, Floor 2D
Coral Gables, FL 33134
786-410-7662
Carlos F. Gonzalez, Esq.
Cfg@carlosfgonzalez.com

Also present:
Josh Mayville, Legal Videographer
Andres Gonzalez

understand you're testifying under oath, is there any reason you cannot testify today truly and accurately?

A.  No.

Q.  Okay.  I just have a few more questions I want to get out of the way, have you ever been a party to any civil litigation, any lawsuits?

A.  Yes.

Q.  Okay.  And how many?

A.  Currently one.

Q.  Okay.  And -- go ahead.

A.  Trying to think.  I don't believe any others, but I can -- I'm currently involved in one lawsuit.

Q.  You're currently involved?

A.  Correct.

Q.  And who is that against or with?

A.  FLVS.

Q.  Okay.  Have you ever testified on behalf of FLVS in any litigation?

A.  Not testified, no.

MR. LUTHER:  Can I just stop for a second?  I did want to say one preliminary thing on the record.  Mr. Shanedling mentioned that I may object to questions that

Page 12

he is asking you, and I need to preserve those objections for the record, and you should answer.  The one exception to that may be situations in which if your only knowledge of what he's asking you about comes from meetings with FLVS's attorneys, then I'm going to ask you not to answer, so if you could think about that, if you know about it independently, if not directly from discussions with the attorneys, then it's fair game.  But if your only knowledge of it is from discussions with counsel, then that should be privileged.

So that would be the one exception.  Otherwise, I'll just mostly object to the form if there is something that I don't like about the question.

BY MR. SHANEDLING:

Q.  But he'll have to, whenever that's the case or the privilege, he'll have to jump in and caution you, so you don't need to try to remember that right now.

A.  Okay.

Q.  That's his job, not yours.  So can we agree that --

Page 13

MR. GONZALEZ:  I'm sorry, Abraham, to interrupt you, I just wanted to clarify, the expectation is not that Ms. Calfee will be required to remember whether or not a conversation would fall under the attorney-client privilege.  She's a layperson, obviously, so I'm assuming that the expectation is that counsel for FLVS will assert the privilege as is his right, and then Ms. Calfee will act as instructed.  I just want to make sure it's clear, Ms. Calfee is not under any obligation to assert the privilege for FLVS.

MR. SHANEDLING:  That's my understanding, too, Carlos.

MR. LUTHER:  [Inaudible].

MR. SHANEDLING:  Thank you.

MR. D'AGATA:  This is David D'Agata, and thank you for clarifying that that was Attorney Carlos -- I'm sorry I don't have your last name, I'm just wondering as to the propriety of the attendance of an attorney not in this case.  Have the parties talked about this, do we need to go off the record?

Page 14

MR. GONZALEZ:  Ms. Calfee is entitled to the representation of counsel, and I don't see any order or any motion that has been filed to bar Ms. Calfee from having an attorney represent her during a formal legal proceeding under which she has been subpoenaed.

MR. SHANEDLING:  Right.  And FLVS, despite originally listing Ms. Calfee under its disclosures under the care of FLVS, counsel, Mr. Luther, at many times said that FLVS is not representing her.  Therefore as Mr. Gonzalez said, she is certainly entitled to have counsel, I see no reason why she can't.  So we're going to proceed.

BY MR. SHANEDLING:

Q.  Can we agree that when we say --

MR. D'AGATA:  I'm not altogether comfortable with that, I'll just go ahead and assert a standing objection to it.

MR. SHANEDLING:  Okay.  What's your basis for your objection?

MR. D'AGATA:  I don't know that it's proper under the context.

MR. SHANEDLING:  Do you have a basis that

a lay witness doesn't have a right to counsel in a deposition?

MR. D'AGATA:  This is a counsel representing the individual witness in another case where the testimony may in fact, pertain to both cases, so it's certainly [inaudible] at the very least.

MR. SHANEDLING:  Did you say ugly?

MR. D'AGATA:  [Inaudible].

MR. SHANEDLING:  I'm sorry, we don't understand what you're saying.

MR. D'AGATA:  I said that it is pugly [phonetic] to me, but we shall proceed.

MR. SHANEDLING:  Okay.  We're going to proceed and we obviously welcome you to send us any authority or file any motion which you haven't done.

BY MR. SHANEDLING:

Q.  Ms. Calfee, can we agree that when I say FLVS, I mean Florida virtual school?

A.  Yes.

Q.  Okay.  And can agree that when I use the phrase FlexPoint -- well, let me ask, are you familiar with that, the name FlexPoint?

A.  Yes.

appeared that we were a school with our name, Florida Virtual School, and that we were trying to propose curriculum products to as a blended learning option as well.

Q.   So when you say problematic, are you saying because of the use of the word "Florida" in the name?  Or can you explain that a little bit more?

A.   Sure.  In selling outside of Florida, having Florida in the name proved to be problematic because many customers assumed that it would not meet their own State's standards.  "Virtual" became problematic because we had many customers that wanted to use it in a blended environment and not necessarily a virtual school.  And then "School" became problematic because we were licensing/process curriculum, and really acting as a curriculum provider versus just a school of record, or a school.

Q.   Okay.  And so those problems that you're referring to, those you were experiencing in your time as account manager between July 2013 and August of 2015?

A.   It began becoming apparent, I -- I was new to the role, but it began becoming apparent in

Page 71

Q.    Do you have a ballpark month?

A.    August, September maybe.

Q.    When is the first time you heard discussion, and I'm not talking about the earlier litigation, of bringing or having brought a new lawsuit against K-12?

A.    Prior to it being filed.  I would say probably had discussions maybe the summer of 2020 or before that.

Q.    Okay.  Who were those conversations with, I'm not asking you to get into what those conversations said, but what individuals were in those conversations?

A.    That I had just in 2020 or after the lawsuit?

Q.    Just in '20, before the lawsuit.

A.    Before the lawsuit.  Erik Braun.

Q.    Who is he?

A.    He was my boss at the time, he was the chief administrative officer.  Sam Verghese, David D'Agata, Mike Miller, Louis Algaze.

Q.    Who was Mike Miller?

A.    He was the chief external affairs officer.  Nikki Lowrey, Kate Lysaught.  Martin Kelly, he was the curriculum director.  And Larry Banks, I

Page 76

complied with the subpoena and handed over your phone to them?

A.   I did not hand my phone to them, no.

Q.   Okay.  What did you do?

A.   After my termination I received a subpoena for a mirror imaging of my cell phone.  My attorney worked with FLVS's attorneys to get me the protections in place that I requested to make sure my personal data was protected.  And they sent me a box and had me mirror image my phone and send the box back.

Q.   "They", meaning FLVS?

A.   I sent it to a third party, I believe, for FLVS, yes.

Q.   Okay.  So you -- so you only gave your -- you sent your phone to someone only after your subpoena, and this was after you were terminated; right?

A.   Yes.

Q.   So while you were still employed at FLVS, you refused to give them your phone; right?

A.   I refused to allow them to have unrestricted mirror imaging of my phone, yes.

Q.   And you weren't the only one; correct?

A.   Correct.  They were requesting to mirror

image 13 other members of my team as well.

Q.  Do you know if any of them agreed voluntarily to give their cell phones?

A.  After I was terminated they sent a letter to those -- directing them to turn over their phones or they would be terminated for insubordination.  So I believe that I -- I know that a few sought counsel, a few were allowed to give printed pages, and a few I believe mirror imaged their phones, and a few gave passwords to a Google voice account.

Q.  So they were told that they would be terminated for insubordination if they didn't give their cell phones over?

A.  That's what I heard.

Q.  Who specifically at FLVS requested you image your phone?

A.  The attorneys.

Q.  Which attorneys?

A.  David D'Agata, Luis Guzman, I believe those were in conversations we had requested. Mike Miller, Erik, Dr. Algaze, they all had participated in conversations that I had, asking for protections for mirror image, prior to mirror imaging my phone.

Q.  Did anyone at FLVS ever explain to you

Page 112

might be the cause of it.

MR. SHANEDLING:  I'm reading the words that you wrote -- your client wrote on this page.  I am entitled to inquire as to what she was disclosed as having knowledge of, I'm literally reading it verbatim.

MR. LUTHER:  Right.  That is correspondence that is meant for the attorneys who understand all of the legal terms that are included in Rule 26 disclosures.  If you just ask a witness are you aware of any injury, do you know all of the different ways in which injury can result from trademark infringement?

BY MR. SHANEDLING:

Q.  I'm sorry, he's not the one asking questions.

MR. LUTHER:  Right.  Well, if you want me to clarify, I may need to ask the witness if she understands your question.

BY MR. SHANEDLING:

Q.  Okay.  Are you aware of FLVS having lost any money as a result of confusion between the name FLOS and FLVS?

A.  I'm not aware.

Page 131

