# EXHIBIT M

HIGHLY CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
CASE NO.:  6:20-cv-02354-GAP-EJK

FLORIDA VIRTUAL SCHOOL,

            Plaintiff,

vs.

STRIDE, INC., formerly known as
K12 INC., and K12 FLORIDA, LLC,

            Defendants.


    *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

                    HIGHLY CONFIDENTIAL

VIDEO-RECORDED
DEPOSITION OF:  DANIEL GALLOGLY, CPA, CFF

DATE:           December 6, 2022

TIME:           COMMENCED:  9:39 a.m.
                CONCLUDED:  5:24 p.m.

TAKEN BY:       Defendants

PLACE:          Rumberger, Kirk & Caldwell, PA
                300 South Orange Avenue
                Suite 1400
                Orlando, Florida 32801

REPORTED BY:    Mae Fisher, RMR, CRR

HIGHLY CONFIDENTIAL

Page 2

                    A P P E A R A N C E S:

SALLY CULLEY, ESQUIRE

Of:   Rumberger, Kirk & Caldwell, P.A.
      300 South Orange Avenue
      Suite 1400
      Orlando, Florida 32801-3380
      (407) 872-7300
      Sculley@rumberger.com

LUIS GUZMAN (via telephone)

Of:   Florida Virtual School
      5422 Carrier Drive
      Suite 201
      Orlando, Florida 32819-8323
      (407) 513-3451
      Lguzman@flvs.net
          Counsel for the PLAINTIFF

ABRAHAM SHANEDLING, ESQUIRE

CHARLES SPENCER-DAVIS, ESQUIRE (via telephone)

Of:   Sheppard Mullin, LLP
      2099 Pennsylvania Avenue NW
      Suite 100
      Washington, DC 20006
      (202) 747-1900
      Cspencerdavis@sheppardmullin.com
      Ashanedling@sheppardmullin.com
          Counsel for the DEFENDANTS

ALSO PRESENT:

TONY BARTOW

Videographer

HIGHLY CONFIDENTIAL

Page 3

I N D E X

TESTIMONY OF DANIEL GALLOGLY, CPA, CFF

DIRECT EXAMINATION BY MR. SHANEDLING ..... 5

CROSS-EXAMINATION BY MS. CULLEY .......... 294

CERTIFICATE OF OATH ........................... 297

REPORTER'S DEPOSITION CERTIFICATE .............. 298

E X H I B I T S

PLAINTIFF'S EXHIBITS

(NONE)

DEFENDANTS' EXHIBITS

Exhibit 1 - Amended Notice of Taking Videotaped
            Deposition of Daniel Gallogly ....... 8

Exhibit 2 - Supplemental Expert Report of Daniel
            Gallogly, CPA, CFF dated 7/1/22 ..... 17

Exhibit 3 - Rebuttal Expert Report of Daniel
            Gallogly, CPA, CFF dated 11/7/22 .... 18

Exhibit 4 - Damages Analysis dated 9/3/20 ....... 31

Exhibit 5 - Complaint .......................... 70

Exhibit 6 - Settlement Agreement ................ 106

Exhibit 7 - Expert Rebuttal Report of Shirley
            Webster dated 10/5/22 .............. 149

Exhibit 8 - Report of K12.com visits ........... 157

Exhibit 9 - Florida Operations ................. 207

Exhibit 10 - Excel spreadsheet .................. 266

Exhibit 11 - Excel spreadsheet .................. 267

HIGHLY CONFIDENTIAL

Page 4

P R O C E E D I N G S

THE VIDEOGRAPHER:  Good morning.  We are going on the record at 9:39 a.m. on December 6, 2022.

Please note that the microphones are sensitive and may pick up whispering and private conversations. Please mute your phones at this time.  Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit 1 of the video-recorded deposition of Daniel J. Gallogly in the matter of Florida Virtual School versus Stride, Inc., formerly known as K12 Inc., and K12 Florida, LLC.

The location of this deposition is 300 South Orange Avenue, suite 1400, Orlando, Florida.

My name is Tony Barlow, representing Veritext Legal Solutions and I'm the videographer.  The court reporter is Mae Fisher from the firm Veritext Legal Solutions.

Will the court reporter please swear in the witness and then counsel may proceed.

THE COURT REPORTER:  Can you raise your right hand, please.

Do you solemnly swear or affirm that the testimony you are about to give in this cause will be the truth, the whole truth, and nothing but the truth?

HIGHLY CONFIDENTIAL

Page 5

THE WITNESS:  Yes.

MS. CULLEY:  And I'm Sally Culley; I'm here on behalf of the plaintiff.

MR. SHANEDLING:  Good morning, I'm Abraham Shanedling; I represent the defendants in the case. K12 Inc., and K12 Florida.  I'm with the law firm Sheppard, Mullin, Richter & Hampton, LLP.

DANIEL GALLOGLY, CPA, CFF,

a witness herein, having been first duly sworn, was examined, and testified as follows:

DIRECT EXAMINATION

BY MR. SHANEDLING:

Q.  Good morning, Mr. Gallogly.  So just to make things easier today, unless I specify otherwise, I'll refer to my clients collectively as K12.  Is that okay?

A.  Yes.

Q.  I might, if we need to, and if you need to as well, feel free to differentiate and if we need to talk about Stride, we can do that, but just generally speaking, I'll use K12.  And likewise, for Plaintiff, Florida Virtual School, I'll likely refer to them as FLVS.  Is that all okay?

A.  Yes.

Q.  Okay.  Could you provide your full name and address for the record?

Page 6

A.   Yeah, Daniel James Gallogly.  And I have an office in this building, 300 South Orange Avenue, suite 1000.

Q.   And what is your current job title?

A.   I am an executive director with FairValue Advisors.

Q.   Okay.  And your current business address, is that here --

A.   Yes.

Q.   -- at this office?

Okay.  Have you had your deposition ever taken before?

A.   Yes.

Q.   And about how many times?

A.   I don't know, maybe 10 or 12.

Q.   Okay.  Well, I'll just refresh a little bit on some of the, quote/unquote, ground rules.  We have a court reporter here with us, we have a videographer here as well.  Because of that, your responses are going to need to be loud and clear, verbal, so no shaking your head or, you know, nodding.  You understand that?

A.   Yes.

Q.   Okay.  Is there any reason today that you cannot answer questions truthfully, completely and accurately?

A.   No.

HIGHLY CONFIDENTIAL
PageID 38314

Page 7

Q.  Okay.  So I'm here, obviously to ask questions.
If I ask a question that you don't understand, please
let me know.  But if you don't, I'll assume that you do
understand the question and I'll ask that you answer it,
and counsel may object and that's fine, but I will
assume that you've heard the question.  Is that -- is
that fair?

A.  Yes.

Q.  And let's, for the court reporter's sake, let's
try not to talk over each other.  There'll probably be
some times where we want to clarify things, that's fine,
but let's try to slow down, I'll let you answer a
question, if you let me ask the question and give a
second, too, for your counsel to object if she needs to.
Is that okay?

A.  Yes.

Q.  I'll try to take breaks every hour, hour and a
half.  But if you need to take a break for any reason,
just let me know.  The only thing I'd ask is that if
there's a question pending, you try to answer it first
and then we can take a break.  Is that okay?

A.  Yes.

Q.  Okay.  There are a number of documents, I think
most of the documents that we're going to be looking at
today are going to be labeled confidential or highly

Page 8

confidential.  So you're aware that there's a protective
and confidentiality order in this case?

A.  Yes.

Q.  Okay.  So we'll be designating those as
confidential and I'd ask that you maintain them
confidentially as well as the conversations here as
well.  Do you understand that?

A.  Yes.

MR. SHANEDLING:  Okay.  I'm going to mark the
first exhibit.  If I could get the sticker, that would
be great.  Thank you.

(Defendants' Exhibit No. 1 was marked for
identification.)

BY MR. SHANEDLING:

Q.  This is a deposition notice for today.  Have you
seen this before?

A.  I have.

Q.  Okay.  Is that -- is that a fair representation
of the deposition notice you have to appear today?

A.  Yes.

Q.  Okay.  You can set that aside.

Let me just ask, what have you done to prepare
for today's deposition?

A.  I have reviewed my file and had two
conversations, I guess, with the attorneys for FLVS.

HIGHLY CONFIDENTIAL

Page 9

Q.   Okay.  So when you say reviewed your file, what specific files?

A.   Well, I've issued a expert report dated July 1, 2022, I reviewed that report.

Q.   Is that your -- are you talking about your supplemental expert report?

A.   Yes.  It's a supplemental report dated July 1, 2022, and the exhibits and then I reviewed my rebuttal report to Ms. Webster's rebuttal of my report, which I think is dated November 7, 2022.

Q.   Okay.  Did you review any other documents?

A.   I looked at a couple of the underlying spreadsheets, just to refamiliarize myself with the work I had done.

Q.   And sorry -- when you say underlying spreadsheets, are you talking about those that you refer to in your two reports?

A.   Correct.

Q.   Okay.

A.   Yes.

Q.   What else did you look at?

A.   I looked at the K12 contract with Hendry County. I reviewed Ms. Webster's report.  I think that's the extent of the documents I reviewed.

Q.   Did you -- did you review any transcripts?

HIGHLY CONFIDENTIAL

Page 10

A.   Oh, yes.   I read a couple depositions.

Q.   Okay.   And which depositions were those?

A.   Mr. Graham's deposition and Mr. Johnson.

Q.   Okay.   And what about Ms. Anderson?

A.   You know, I didn't read hers.

Q.   Okay.   You're aware that was part of the same deposition?

A.   Yes.

Q.   Okay.   Could it have been in that same transcript that you looked at but you just might not remember?

A.   It was in the same transcript.

Q.   Okay.   Did you review any other transcripts?

A.   No.

Q.   Okay.   So did you review -- so you didn't review the transcript of Jeffery Stec of his deposition?

A.   No.

Q.   Okay.   Did you review any e-mails or communications?

A.   No.

Q.   Okay.   And how about written discovery responses aside from those that you refer to in your reports or Ms. Webster referred to in her report?

A.   No.

Q.   Okay.   You said you met with counsel for FLVS. Who is that?

HIGHLY CONFIDENTIAL

Page 11

A.   That would be Sally.

MS. CULLEY:  Sally Culley.

THE WITNESS:  And Suzanne Hill.

BY MR. SHANEDLING:

Q.   Okay.  And when did you meet with them?

A.   On Friday, we met for maybe like an hour and a half and then we had a brief conversation on Monday.

Q.   Okay.  And did you look at any specific documents during those conversations?

A.   I think they were phone calls, so there wasn't -- I think it was phone calls so there wasn't any documents to review.

Q.   Okay.  There was nothing put on the screen?

A.   Let me think.  I don't remember.

Q.   Was there anyone else on the phone?

A.   No.  It was just the three of us.

Q.   Okay.  Have you spoken to anybody from FLVS who works specifically for FLVS?

A.   Not recently.

Q.   Okay.  Recently, but you have in the past?

A.   Yes.

Q.   And who is that?

A.   Well, I've talked to -- I know them by their first names, David and Luis, the in-house -- in-house counsel.

HIGHLY CONFIDENTIAL

Page 12

Q.  And was -- and I should clarify.  Specifically in preparing for today's deposition?

A.  Oh, I see.  Yes.  No, I have not.

Q.  Okay.  And what did you talk about in your preparation for today's deposition in those conversations with counsel?

MS. CULLEY:  I'm sorry, what was that question again?

BY MR. SHANEDLING:

Q.  What did you discuss generally speaking?

MS. CULLEY:  I'm going to object to that.  The discussions with counsel?

MR. SHANEDLING:  I'll rephrase.  I'll strike that.

BY MR. SHANEDLING:

Q.  So just to clarify, there were no documents that you looked at during those conversations with counsel?

A.  I don't remember looking at any documents.  There was -- there was another party, though, that I did speak with, with FLVS and this was -- she's an accountant for them.  So I had a discussion with her to refresh my memory on certain spreadsheets I had received from them that were produced, I think -- I produced them to the attorneys on Friday, I believe, it may have been produced to you on Monday.

HIGHLY CONFIDENTIAL
PageID 38320

Page 13

Q.   Okay.  And was that conversation after you submitted your rebuttal report?

A.   Yes.  It was recently.

Q.   Okay.

A.   Like Friday.

Q.   And you don't remember who the name of that individual was at FLVS?

A.   Yeah, Jan, first name Janet and -- I'm good with first names, not good with last names.  I can't remember her last name.

Q.   And what did you say her position was?

A.   She's like a senior accounting person.

Q.   Okay.  And did she provide you any information?

A.   Not in that phone call but she had previously provided me information.

Q.   Okay.  So did she previously provide you information when you were preparing your initial report?  And by initial report I'm going to refer to your July 1st report.  Is that --

A.   Yes.

Q.   Okay.  And so you had spoken with her while preparing that report?

A.   Correct.

Q.   Okay.  And was it additional information that she provided within this most recent conversation?

HIGHLY CONFIDENTIAL

Page 14



A.   Not additional information.  It was just to refresh my memory on the information she did provide.

Q.   Okay.  Are you familiar with that independent of

Page 15

your work here?

A.   Yeah.  I've heard the name.  But it's a -- it's a large -- it's an accounting system that a large organization would use.

Q.   Okay.  So she provided you a summary of that -- of that -- of that data?

A.   Well, she provided me --

Q.   Or a rollup?

A.   I would say a general ledger download but it only included the ending account balances.

Q.   Okay.  So -- so a sum of those -- of the transaction level, if you took all the transaction level invoices or whatever, added them up, subtracted or netted them then you'd get that ending account balance?

A.   Yeah, the system would do that.

Q.   Okay.  Got it.

We touched on this earlier.  Are you aware that FLVS engaged an expert to opine on its claim regarding false advertising?

A.   Say that again.

Q.   Are you aware that in this litigation, and obviously you're aware that there was an earlier iteration of litigation --

A.   Yes.

Q.   -- which we'll talk about.  In this version,

HIGHLY CONFIDENTIAL
PageID 38325

Page 16

round two, FLVS has engaged an expert to opine on its claim regarding false advertising?

A.   Well, I'm familiar that they've engaged survey expert but I don't know specifically what that person was asked --

Q.   Are you sure they engaged a survey expert?

A.   I'm not sure.

Q.   If I told you that they hadn't, would you have any reason to doubt that?

A.   Once again, it's just a general understanding.

Q.   Did you ask anyone whether they engaged a survey expert before you prepared your report?

A.   Didn't specifically ask them, no.

Q.   And you've done a number of trademark infringement cases, right?

A.   Yes.

Q.   And you're generally aware of survey experts, right?

A.   Right.

Q.   But you're not aware whether or not in this case your client has actually engaged a survey expert?

A.   I know there was somebody engaged.  I just don't know specifically what their task was.

Q.   Okay.  Are you aware of the name Jeffery Stec?

A.   Sounds familiar.

Page 17

Q.   Okay.  Have you read a copy of his report?

A.   I have not.

Q.   Ever spoken with him?

A.   No.

Q.   Did you -- I know we spoke a little off record before we started.  Did you bring any documents with you today?

A.   I did.

Q.   Okay.  Can you just describe generally what they are?

A.   Right.  I brought a copy of my July 1st, 2022, report.  A copy of my rebuttal report dated November 7th.  I brought a copy of the complaint.  And I brought a copy of Ms. Webster's report.

Q.   Okay.  Anything else?  Any other documents?

A.   No.

Q.   Okay.  I'm going to mark two exhibits.  The first one is going to be hefty but you've seen that before.  I apologize that it's not stapled.  But this is -- I'm marking as Exhibit 2, here you go.  Oh, good idea.  Give that to you.

Oh, that's the second one.

I'm marking as Exhibit 2 a copy of your July 1st supplemental expert report.  Do you recognize this?

(Defendants' Exhibit No. 2 was marked for

Page 18

identification.)

THE WITNESS:  Yes.

BY MR. SHANEDLING:

Q.  Okay.  If you flip to page 36, is that your signature on there or copy of your signature?

A.  Yes.

Q.  There is a list of documents relied on.  This is in Appendix C, page 38.  Do you see that?

A.  Yes.

Q.  Okay.  There are no deposition transcripts listed in this, correct?

A.  Correct.

Q.  Okay.  So does that indicate that for purposes of this report, you were not relying on any deposition testimony to put the opinions in this specific report?

A.  Correct.

Q.  And I'll call this probably just like your opening report, if that's okay.

A.  Yes.

MR. SHANEDLING:  Okay.  All right.  I'm going to need another sticker.  Here we go.  This one I stapled, so make your life easier.

(Defendants' Exhibit No. 3 was marked for identification.)

BY MR. SHANEDLING:

HIGHLY CONFIDENTIAL
PageID 38320

Page 19

Q.  Here you go.  All right.  Do you recognize Exhibit 3 as a copy of the rebuttal expert report you prepared on November 7, 2022?

A.  Yes.

Q.  Okay.  Can you turn to page 25 and tell me if that is your signature.

A.  Yes, that's my signature.

Q.  Okay.  And there's a -- if you turn two more pages to 27, there's another list in Appendix C of documents considered.  Do you see that?

A.  Yes.

Q.  And on this one, there are also no deposition transcript listed; is that correct?

A.  That's correct.

Q.  Does this also indicate that when you prepared this rebuttal report, you did not rely on any deposition testimony in connection with the opinions set forth in the report?

A.  That's correct.

Q.  Okay.  Now, were you provided any documents apart from those that you listed in this rebuttal report and your opening report as having relied upon in connection with formulation of your opinions?

A.  The -- it all should be listed here, either in the list of documents or in footnote references.

Page 20

Q. Okay. And to clarify, I'm talking about the lists in both reports.

A. Yes.

Q. So are there any other documents you relied on that -- other than those that you listed here?

A. Like I say, I either list them in the back or there'll be footnote references to documents.

Q. Okay.

A. So I believe that they're all identified -- the reason I made a phone call to the FLVS employee was to verify or for my understanding of the spreadsheet that I had received from them that didn't get listed on the back but it's referenced in the report.

Q. Okay. So the spreadsheet you're referring to, is that which was produced by counsel on Monday, so yesterday?

A. Correct.

Q. Okay. And that, to clarify, did you rely on that report in preparing any of your two reports here?

A. Yes.

Q. Okay. Both reports or just one?

A. Well, certainly the one dated July 1st, and to the extent that any of that information was used in the rebuttal report, then I would say both. But primarily it's related to the first report.

HIGHLY CONFIDENTIAL

Page 21

Q. And are -- is that spreadsheet referenced or cited in any of these reports?

A. I think it -- it references that I collected information from their general ledger and their accounting system called Workday. But I have received that -- those spreadsheets, I incorporated it into my work product and didn't list it -- forgot to list it on the back.

Q. Okay. Why don't you turn in your -- why don't you go to Exhibit 2, your opening report. Go to your CV, your curriculum vitae, so Appendix E of your report.

Okay. And if I look at this and, also, the version that you appended to your rebuttal report, together, is that an accurate and complete, as of at least the date of your July 1st report -- or, sorry, your rebuttal report, November?

A. Yes.

Q. Okay. Have you ever served as an expert before?

A. Yes.

Q. About how many proceedings have you actually testified as an expert, either through deposition or live hearings, if you had to ballpark it?

A. 23.

Q. Over the course of how many years?

A. That would be from about 1999 to the present.

Page 22

Q.   And do you promote yourself as a damages expert?

A.   That's one of the things that I do.

Q.   Okay.  And what else do you promote yourself as?

A.   Forensic accounting, economic damages and an analyst for business valuation.

Q.   Okay.  What do you mean by business valuation?

A.   Well, there's -- many times there's questions -- business valuation related questions in litigation that I will be involved with.

Q.   Okay.  Do you promote yourself as a trademark survey expert?

A.   I do not.

Q.   Do you promote yourself as an expert in false advertising?

A.   No.

Q.   Have you ever had your deposition taken before?

A.   Yes.

Q.   About how many times?

A.   17.

Q.   Okay.  And generally speaking, what were the circumstances of those matters?  What types of cases were they?

A.   Well, the cases are listed on page 3 of my CV.

Q.   Okay.  And so when it says D, that refers to you having had your deposition taken?

Page 23

A. Right.

Q. Okay. And so you've had your deposition taken in trademark infringement cases?

A. I have.

Q. What was the last deposition you had -- you sat for?

A. The last deposition?

Q. Was that the Los Originales Pizza case?

A. No, this would have been -- the last deposition would have been Vista Clinical Diagnostics.

Q. Okay. What kind of case was that?

A. That's a -- like a contract dispute.

Q. Okay. Yeah, I'm just confused because it only says E2.

A. For that particular --

Q. Yeah, on page 4, it doesn't say D. If you look on page 4.

A. Yeah, apparently -- let's see, page 4.

Q. Oh, you know what, I apologize. In your rebuttal report, it does say D.

A. Okay.

Q. Okay. Well, that -- so when was -- what was the last case in which you provided an expert report?

A. Would have been -- most recent case would have been Didier Group, LLC. That's the top case on page 3

PageID 38351

Page 24

of my CV for my rebuttal report.

Q.   Okay.  And that's a -- that's a state court case here in Florida?

A.   Yes.

Q.   Okay.  About how many cases have you been involved in that were in federal court?

A.   I would say -- well, I'd have to add them up.  Could be three or four.

Q.   Over the course of your career?

A.   Yes.

Q.   Okay.  So are you aware of the federal rules regarding expert materials?

A.   Yes.

Q.   Okay.  Or at least the lawyers here have informed you of those rules?

A.   Yeah.

Q.   Okay.  About how many cases have you been involved in in state court?

A.   Well, the rest of them would be state court.

Q.   Okay.  About how many times have you been engaged by the attorney Stephen Luther?

A.   Stephen Luther, I think -- I think three, three or four times.

Q.   And what types of cases were those?

A.   Intellectual property dispute cases.

HIGHLY CONFIDENTIAL

Page 25

Q.   Okay.   And how about, how many times have you been engaged by the law firm RumbergerKirk?

A.   Oh, in recent years, it's only been a couple. But in earlier times -- I'd have to go back and add it up.   Could be six or seven times.

Q.   How about the law firm GrayRobinson?

A.   GrayRobinson, I have kind of a relatively new relationship with them, so could be three, three or four times.

Q.   Okay.   And how many times have you, including this current case, have you been retained as an expert for FLVS?

A.   Twice.

Q.   Okay.   In the earlier litigation, that's the one that settled in 2015?

A.   Correct.

Q.   And in that case, you prepared an expert report?

A.   I think I did.

Q.   Okay.   Did you review that expert report in preparing any of your opinions for this current version of the litigation?

A.   You know, I think I may have looked at it for any materials, you know, that would be applicable to explain trademark law and that type of thing.   But I didn't go back and do a deep dive in any particular other areas.

Page 26

Q.  Do you recall generally what the allegations were in that earlier litigation?

A.  Well, it's a copyright infringement case, it had to do with --

Q.  Did you say a copyright infringement case?

A.  I think it was copyright.

Q.  Are you sure?

A.  I'm not sure.

Q.  Okay.  Do you recall what the alleged marks were in that case?

A.  I don't.

Q.  And do you have any reason to doubt that you prepared a report on September 18, 2015?

A.  No.

Q.  Do you recall what your determination of damages was in that report for FLVS?

A.  No.

Q.  Do you recall whether you put together a disgorgement model in that case?

A.  Yeah.  I think it was a disgorgement model, disgorgement of revenues.

Q.  How about lost profits for FLVS?

A.  I'd have to go back and look at it but I don't think there was a lost profits calculation.

Q.  Now, do you do any work for FLVS outside of

Page 27

litigation?

A.   I do not.

Q.   Okay.   I want to talk a little bit about some of these cases in your CV.   Well, let me actually -- strike that.

Let me ask, have you ever had your expert testimony excluded or limited by a court or an adjudicatory body?

A.   It's never been -- what was the word, excluded. There was one case where there was a question as to whether I could testify to the word materiality.   And the Court said to the extent that it relates to accounting matters, yes, I could.

Q.   Do you recall what case that was?

A.   I can look it up.

Q.   Go for it.

A.   It's on page -- well, page 10 of my CV and my July 1st report.

Q.   Okay.

A.   It was Central Buick GMC.

Q.   Okay.   This was in the Middle District of Florida?

A.   Yes.

Q.   Okay.   Do you know who the judge was in that case?

HIGHLY CONFIDENTIAL
PageID 38355

Page 28

A.   I don't.

Q.   Okay.  Do you recall whether that was a Daubert motion?  Are you familiar with what those are?

A.   Yes.

Q.   Okay.

A.   I don't know if it was a Daubert motion or not.

Q.   How many times have you or your expert opinions or reports been subject to a Daubert motion or a motion to limit or exclude?

A.   You know, I don't keep track of how many.  It's not -- it's common.

Q.   It's common?

A.   It's common.

Q.   So would you say in most of your cases you've been subject to a motion to exclude or a Daubert motion?

A.   No.  I would -- I wouldn't say most.

Q.   So what do you mean by it's common?

A.   Well, it has happened, so it's -- and it's not rare in the sense it's happened more than once.  But it doesn't happen every time.

Q.   When was the last Daubert motion that you've faced?  What case?

A.   I think it was -- it's on page 6 of that CV. David Wishinsky versus Rashid Choufani.

Q.   Okay.  That's also in the Middle District of

Page 29

Florida?

A.   Yes.

Q.   Okay.  Do you know if that motion was granted?

A.   It was not.

Q.   And what were the -- I see you list here fraud and breach of contract.  Is that right?

A.   Yes.

Q.   Okay.  And your -- your report opined on what in that case?

A.   Well, there's a question -- it was a rebuttal report that I did and I was questioning -- raising issues with their -- a business valuation that was done to establish damages and the other side was complaining, if you will, that I wasn't qualified as a business valuation expert.

Q.   Are you familiar with the case Greater Orlando Aviation Authority versus Melbourne Airport Authority?

A.   Yes.

Q.   Okay.  That's listed on page 7 of your opening report in Appendix E.  Do you see that?

A.   Yes.

Q.   Okay.  That's case number 6:19-CV 00540-ORL.  Do you see that?

A.   Yes.

Q.   You were retained by the plaintiff in that case?

Page 30

A.   Yes.

Q.   Okay.  And the attorney in that one was also Stephen Luther?

A.   Yes.

Q.   Okay.  And what about Suzanne Hill?

A.   I think Suzanne Hill covered -- covered the deposition for some reason.  But I was engaged by Steve Luther.

Q.   Okay.  And what were the claims in that case?

A.   It was a claim where the Melbourne Airport Authority included the name Orlando-Melbourne Airport Authority or Melbourne-Orlando Airport Authority, one of the two.  So the Greater Orlando Aviation Authority was suing them over inappropriate use of that name.

Q.   Okay.  When you say inappropriate use, what specific counts were alleged in that -- in that case by the plaintiff?

A.   I don't remember.

Q.   Was it false advertising?

A.   I don't remember.  I'd have to look at the documents.

Q.   How about trademark infringement?

A.   Once again I'd have to look at the documents.

Q.   Do you have any reason to doubt that they're the same types of claims asserted in this case?

Page 31

A.  It could be.

Q.  Did you prepare an expert report in that case?

A.  I did.

MR. SHANEDLING:  Can I get a sticker?  I don't know why I only have one copy of this.  So, Sally, I'll let you take a look at it first.  I'm sorry.  Oh, here it is.

MS. CULLEY:  You got it?

MR. SHANEDLING:  Yes.

(Defendants' Exhibit No. 4 was marked for identification.)

MR. SHANEDLING:  Can I just see that really quick?

MS. CULLEY:  This feels thinner than that one.

MR. SHANEDLING:  Yeah.  Oh.  It's because it's stapled -- this is our case.  Here, wrong sticker. Here we go.  Here.  Use that one.  You've already seen this one.

BY MR. SHANEDLING:

Q.  Are we looking at the same one, says Damages Analysis in Greater Aviation Authority versus Melbourne Airport Authority?

A.  Yes.

Q.  You see that it's dated September 3rd --

A.  Yes.

Page 32

Q.   -- 2020?  Is there a copy of that expert report from that case?

A.   It is.

Q.   Okay.  Does this refresh your recollection at all about what the claims were in that litigation?

Why don't you turn to 7, starting at page 7, flip through it.

A.   Yes.  So it lists four counts.

Q.   Okay.  So false and deceptive advertising, page 7, do you see that?

A.   Yes.

Q.   Okay.  Page 8, federal trademark infringement?

A.   Yes.

Q.   You agree?

And common law trademark infringement; is that right?

A.   Yes.

Q.   Okay.  And then common law unfair competition, right?

A.   Right.

Q.   Do you -- does this refresh your recollection about the nature of your expert opinions in that case?

A.   Yes.

Q.   Okay.  And am I correct that in this airport case, what I'll call it, you were asked to offer

HIGHLY CONFIDENTIAL
PageID 38340

Page 33

opinions on damages?

A.  Yes.

Q.  Okay.  Why don't you look at page 6.  Go to that last bullet.

A.  Page 6?

Q.  Okay.  It says:  During its November 2, 2015, MLB -- I take it to mean MLB as, refers to one of the parties in the case?

A.  Yes.

Q.  Okay.

-- board meeting, MLB admitted its intent to confuse non, quote, savvy customers in that falsely identifying the Melbourne International Airport as the Orlando Melbourne International Airport had a material effect on interstate commerce and consumers' purchasing decisions.

Do you see that?

A.  Yes.

Q.  Okay.  Now, am I correct that you haven't seen any similar evidence of any intent in this case by K12 to confuse nonsavvy customers?

MS. CULLEY:  Object to the form.

THE WITNESS:  I don't think that's an allegation in their complaint.

BY MR. SHANEDLING:

HIGHLY CONFIDENTIAL

Page 34

Q.   Okay.  And you haven't seen any evidence of it?

A.   I haven't looked.

Q.   And you also haven't seen any evidence?

A.   Because I haven't looked.

Q.   So the answer is yes?

A.   Yes.

Q.   Okay.  Page 9, section 2.3.  Factual assumptions applied in the calculation of damages.  Do you see that?

A.   Yes.

Q.   Okay.  The first sentence:  I have assumed the statements and allegations in the complaint are true and correct for purposes of calculating damages.

Do you see that?

A.   Yes.

Q.   Am I correct that you have a similar statement in your -- in your reports for this case?

A.   Yes.

Q.   So you just assumed in this case what was alleged in FLVS's complaint were true and correct?

A.   Say again.

Q.   So for purposes of your expert opinions in this case, you assumed --

A.   This case being --

Q.   The FLVS versus K12 case.

A.   Okay.

Page 35

Q.  You assumed that the allegations brought by FLVS were true?

A.  Correct.

Q.  Now, on page 14 of this airport report, if you look at the section 3.3.  You write:  I considered the weight of the evidence and determined there was adequate basis to calculate damages under the scenario set forth above with a reasonable degree of economic certainty.

Do you see that?

A.  Yes.

Q.  Am I correct that in neither of your reports in this case, do you have a similar statement?

A.  That's correct.

Q.  Is that because you did not consider the weight of the evidence in this case, the FLVS versus K12 case?

A.  What specific weight?

Q.  You used that phrase.  So what do you mean by weight of the evidence?  You considered the weight of the evidence, what does that mean to you?

A.  Well, in that case, it would be the weight of the evidence I was considering in doing calculations for this report.

Q.  This report meaning the airport report?

A.  Yeah.

Q.  And you wrote, there was adequate basis to

Page 36

calculate damages.

A.   Right.

Q.   But you don't have the statement in either of your reports in this case, right?

A.   Right.

Q.   Is that because you did not consider the weight of the evidence to determine whether there was an adequate basis to calculate damages?

A.   Well, when we say this case, we're referring --

Q.   The K12 case.

A.   Okay.  So I don't want to get confused.  So when we talk about this case, my -- I was asked to calculate the revenues, not -- not the damages relative to disgorgement.  And I was asked to calculate total potential damages from a lost profits perspective, total possible damages, not an apportionment or some other calculations.

So I wasn't trying to use evidence of causation to do a calculation of -- of damages in this case.

Q.   Okay.  So I think that last sentence answered my question.  The point is, you didn't look at what evidence existed out there of -- about liability one way or the other and considered what -- the weight of that in determining whether or not to apportion any of your models; is that correct?

HIGHLY CONFIDENTIAL
PageID 38344

Page 37

A.   That's correct.

Q.   Okay.  So go back in the airport report to page 9 at the bottom, the last sentence.  You write:  I'm not offering any legal, causation or technological opinions.

Do you see that?

A.   Yes.

Q.   What does causation mean?

A.   Causation is an act that causes damage.

Q.   Well, what does cause mean to you?

MS. CULLEY:  Object to the form.

BY MR. SHANEDLING:

Q.   Well, you just used the word cause in your definition of causation.  So what does it mean, what does causation mean?

MS. CULLEY:  Object to the form.

BY MR. SHANEDLING:

Q.   You used the word in your report.

A.   I realize that.

Q.   Yeah.

A.   So I need to figure out a different way to explain it to you, right?  So causation would be events that lead to an outcome.

Q.   So would you agree that it means a nexus between an act and an outcome?

A.   Well, I'm not sure how you define nexus.  I'm

Page 38

familiar with an accounting term called nexus but --

Q.   Do you know what but for causation means?

A.   Yes.

Q.   What does that mean?

A.   Without using the word "but for"?

Q.   You can use it.  Go ahead and explain it to me.

A.   Yeah.  Well, it's -- you know, what would this scenario be but for or without this certain event occurring, what would have occurred, what would the outcome have been.

Q.   So in this Greater Orlando Airport case, you're aware that the plaintiff, your client, Greater Orlando Airport, engaged an expert, Sarah Butler, to conduct a survey to assess likelihood of confusion associated with the use of the name Orlando Melbourne International Airport?

A.   Yes.

Q.   So you know who Sarah Butler is?

A.   I know of the name.

Q.   And you reference her in this airport report, right?

A.   Yes.

Q.   And you looked at her report in this case, in the airport case?

A.   I did, yes.

HIGHLY CONFIDENTIAL

Page 39

Q.  Right?

And you repeatedly reference her report in your airport expert report, right?

A.  Yes.

Q.  And on page 17, that third -- second and third paragraph, you write -- well, you state that you considered her findings and then inferred a 22 percent confusion rate based on her findings.  Is that right?

A.  Right.

Q.  So you used Ms. Butler's findings as assumption in your damages report in this airport case?

A.  I did, yes.

Q.  Did you meet with Ms. Butler when you prepared this report?

A.  I don't think I did.

Q.  Okay.  And you've done a number of trademark confusion cases, right?

A.  Well, I've done a number of trademark cases.

Q.  Trademark infringement cases?

A.  Infringement cases.

Q.  Okay.  And so in this report, where you considered the weight of the evidence, you found Ms. Butler's findings reliable enough to use them as assumptions in your report?

A.  Yeah, I did rely on hers, her numbers.

Page 40

Q.   Had you worked with Ms. Butler before this report?

A.   No.

Q.   Have you worked with her since?

A.   No.

Q.   Are you aware that in this case, FLVS unsuccessfully attempted to retain Ms. Butler?

A.   I don't think I know that.

Q.   Did you know that she was too expensive for them?

MS. CULLEY:  Object to the form.

THE WITNESS:  I did not know that.

BY MR. SHANEDLING:

Q.   What rate are you being compensated?

A.   Two rates.  I think it was $275 an hour initially and then it got raised to $280 an hour.

Q.   Are you aware that in this case, this case being the K12 case not the airport case, Ms. Butler has prepared a report on behalf of K12?

A.   I think maybe I -- yeah, I think I know that.

Q.   How do you know that?

A.   Because it would have been in Ms. Webster's report.

Q.   Have you reviewed Ms. Butler's report in the K12 case?

A.   I think it was attached as an exhibit.  I may

HIGHLY CONFIDENTIAL

Page 41

have flipped back and referenced some numbers that Ms. Webster referenced.

Q.  So did you review Ms. Butler's report in any detail?

A.  Not in any detail.

Q.  But you did in the airport case?

A.  Yes.

Q.  Why didn't you do that in this case?

A.  Because I wasn't asked to -- I'm not opining on causation.

Q.  But you said the same thing in the airport case, didn't you?

A.  I did.

Q.  And yet you reviewed Ms. Butler's report in that case, when she was on the plaintiff's side, your side.

A.  Let's go back.  I'd like to readdress my testimony.

Q.  Okay.

A.  So would you ask your initial question again?

Q.  Sure.  So in the airport case, when Ms. Butler was on your side, you referenced, relied on her report as assumptions in your report.  Correct?

A.  Correct.

Q.  In this case, when Ms. Butler is on the other side, not on your client's side, you didn't review her

Page 42

report in any detail, correct?

A.   Correct.

Q.   Why not?

A.   Well, because as stated in my report, I wasn't -- wasn't engaged to -- to apportion revenues based on some finding -- my finding or anybody else's finding of causation.

Q.   Same -- same claims, though, in the airport case as in this case.  We walked through them, right?

MS. CULLEY:  Object to the form.

THE WITNESS:  What --

BY MR. SHANEDLING:

Q.   Same counts?

A.   Same general area of the law.

Q.   Trademark infringement?

A.   Yes.

Q.   False advertising?

A.   Yes.

Q.   Both are -- there's a disgorgement model, correct?

A.   Correct.

Q.   And in the airport case just like in your case you have the statement that you were asked to assume liability?

A.   Yes.

Q.   Right?

A.   Right.

Q.   And you -- and yet you apportioned your findings in the airport case, right, using Ms. Butler's findings or no?

A.   Well, in the airport case, I think it was a lost profits case.

Q.   And we have lost profits --

A.   Yeah.

Q.   -- in ours as well, correct?

A.   We do, yes.

Q.   Were you asked not to look at Ms. Butler's report in the K12 case?

A.   I was not.

Q.   Did any of Ms. Butler's survey findings in the K12 case cause you to change any of your original opinions in your July 2022 report?

A.   No.

Q.   But you didn't review her report in any detail, correct?

A.   I didn't.

Q.   Did not?

A.   I did not.

Q.   Now, in the airport case, do you recall that your reports were subject of a Daubert motion by the

Page 44

defendant on December 1, 2020?

A.   Yes, I have since learned that.

Q.   You've since learned that?  What does that mean?

A.   I guess it means I didn't -- I didn't know about it until we -- until we started working on this case or I was in the midst of working on this case.

Q.   So how did you become aware of that?

A.   I think it may -- I think Mr. Luther may have mentioned that in a call that we had.

Q.   He mentioned that you were subject to a Daubert motion?

A.   Right.

Q.   Now was that call in the context of the K12 case or in your retention in the airport case?

A.   That would be the K12 case.

Q.   Now in the Daubert motion, the airport case, are you aware that the defendant took issue with you merely assuming that the plaintiff had sustained -- the plaintiff being the Greater Orlando Airport, had sustained actual damages resulting from passengers mistakenly flying into Orlando Melbourne International Airport when they intended to fly into Orlando International Airport?

A.   Once again, it's been a while since I've read that.  I don't remember the specifics.

Page 45

Q.  And in that case, in the airport case, you didn't have any evidence that there was that type of confusion by passengers, correct?  You state that in your report, right?

MS. CULLEY:  Object to the form.

THE WITNESS:  Once again, say the -- ask the question again.

BY MR. SHANEDLING:

Q.  In the airport case you didn't have before you any evidence that any given passenger flew into the wrong airport because of the name, right?

A.  I didn't have any evidence, no.

Q.  Did you revise any of your findings as a result of that Daubert motion, your findings in the airport case?

A.  Well, I didn't even know about the Daubert motion until after the case was settled.  So --

Q.  So you answered my second question, so the case resolved itself through a settlement?

A.  Yes.

Q.  Have you been retained by a publicly traded company as part of your expert work?

A.  I would need to take a look.

Q.  Well, do you remember any offhand?

A.  Like I say, I'd need to take a look.

HIGHLY CONFIDENTIAL

Page 46

Q.   But has it -- have you, yes or no?

MS. CULLEY:   Object to the form.

THE WITNESS:   Can I take a look?

BY MR. SHANEDLING:

Q.   Sure.  Go for it.

MR. SHANEDLING:   They're saying that the conference line is muted.

MS. CULLEY:   Oh, really?

THE COURT REPORTER:   Should I go off the record?

MR. SHANEDLING:   Yeah, let's go off the record.

THE VIDEOGRAPHER:   We are going off the record. The time is 10:30 a.m.

(A brief recess was taken.)

THE VIDEOGRAPHER:   We are back on the record. The time is 10:34 a.m.

MR. SHANEDLING:   And who do -- we have Luis Guzman, Guzman, from FLVS on the phone.

MS. CULLEY:   And, also, Charles --

MR. SHANEDLING:   And also Charlie Spencer-Davis.

BY MR. SHANEDLING:

Q.   All right.  So before we just went on the break, I had a question pending about if whether you've been retained by any publicly traded company for your expert

HIGHLY CONFIDENTIAL

Page 47

work.  Do you have an answer?

A.  Yes.

Q.  Okay.  Is the answer yes?

A.  Answer's yes.

Q.  Okay.  About how many times?

A.  Could be four or five times.

Q.  Okay.  And were any of those trademark infringement or false advertising cases?  Why don't you point me to which ones you're referring to.

A.  Yeah.  Page -- this is in my supplemental report.

Q.  Okay.

A.  Page 9 of my CV.  Page 9.

Q.  Okay.

A.  Very top, Adacel systems was a public company.

Q.  Okay.  That's a trade secrets case?

A.  Yes.

Q.  Okay.  What else?

A.  And I'm not sure if, on that same page, the second from the bottom, New American Funding, I don't know if they were public or not.  It's a large organization.

Q.  And you were retained on behalf of them, the defendant in that case?

A.  Yeah.  Correct.

Q.  Okay.  Did that case -- it's trademark

Page 48

infringement?

A.   Right.

Q.   Okay.  Was the plaintiff claiming lost profits?

A.   Yes.

Q.   And disgorgement?

A.   They were claiming disgorgement.

Q.   Okay.  And do you recall what -- were you engaged as a rebuttal expert in that case?

A.   I was -- I did my own like forensic analysis.

Q.   Okay.  Tell me a little bit about that.  Did you -- what -- what were your findings?

A.   Well, this was a case where this RP Funding had used paperclip advertising where they used New American Funding's name or trademarks and they were, you know, trying to generate clicks to their website and they were using a -- the name of a competitor to drive those clicks.

Q.   Okay.  And what was the nature of your opinions in that report?

A.   I think -- I'm trying to think if I even did a report.  Yes.  I did do a report.  I don't remember specifically what my opinions were.

Q.   Did you engage in any apportionment of the -- or let me rephrase.  Strike that.

Did the plaintiff engage a damages report in that

HIGHLY CONFIDENTIAL

Page 49

case or engage a damages expert?

A.  I don't think that they -- I don't remember them doing that, no.

Q.  Okay.  And in your report, did you conduct any apportionment of any damages model?

A.  This would -- this would have been -- I just don't remember.

Q.  Okay.  Do you recall looking at any accounting information on behalf of your client in that case?

A.  I just don't remember.

Q.  Okay.  Do you recall what the outcome of that case was?

A.  I think it settled.

Q.  Okay.  Were you subject to a Daubert motion?

A.  No.  Not that I know of.

Q.  What other publicly traded companies do we have on here?

A.  On page 11, I was engaged by General Motors.

Q.  Yes.  And that's a RumbergerKirk case?

A.  Yes.

Q.  Okay.

A.  And the next page, page 12, I was engaged by Ford Motor, second case from the bottom.

Q.  Okay.  And so that one was a trademark infringement as well?

Page 50

A.   Yes.

Q.   Okay.  In that case, do you recall what your opinions were?

A.   It was a decade ago.

Q.   Okay.  Any other publicly traded clients?

A.   On page 15, second one from the top, Bonefish v. -- FishBones v. Bonefish Grill, Bonefish Grill is owned by Darden, they're a public company.

Q.   Okay.  And that one was before Judge Presnell?

A.   Apparently, yes.

Q.   Okay.  Do you recall what the outcome was?

A.   I think -- I think the case settled.

Q.   Okay.  Were you subject to a Daubert motion?

A.   Not that I know of.

Q.   Okay.  Any others, any other publicly traded clients on here?

A.   I think that's it.

Q.   I just want to ask about a couple more.  You reference in your CV, and you can look at it, there's a case Los Originales Pizza and Monte Pizza versus Batababo Group?

A.   Right.

Q.   Do you recall that engagement?

A.   Yes.

Q.   Is that still ongoing or is it done?

HIGHLY CONFIDENTIAL
PageID 33356

Page 51

A.   It settled.

Q.   Okay.  So you were retained by the -- well, who were you retained by in this one?

A.   By the defendant.

Q.   Okay.  And I see that you list that it was intellectual property infringement claims, disgorgement of profits damages analysis.

You see that?

A.   Yes.

Q.   Okay.  So the plaintiff claimed disgorgement of profits?

A.   Correct.

Q.   And what were your opinions on that?

A.   Well, I don't think that the plaintiff had a -- they didn't have an expert so I was working with the defendant to calculate what they -- what they would say their profits were from their business activities.

Q.   What the defendant's profits were?

A.   Right.

Q.   Okay.  And what did you do for that analysis?

A.   What did I do for that analysis?

Q.   Yeah, what kind of -- what did you look at, what type of documents?

A.   I looked at tax returns, I think -- tax returns.

Q.   Okay.  Anything else?

A.   I don't know that we got -- I don't know that we received the -- we tried to get the financial statements and the general ledgers from their bookkeeper.  I don't know that we ever received those prior to the case settling.

Q.   Okay.  When you've been retained on behalf of defendants in trademark infringement cases, have you in any of your cases conducted an apportionment analysis?

A.   Well, I'm not sure.  The -- the pizza case was -- the entire business would have been themed infringing so there would be no apportionment beyond just 100 percent of revenues.

In the case of the mortgage company, that was related to specific instances of click-throughs and potential revenue that would have been derived from those click-throughs so we weren't apportioning like 50 percent of the company's revenues, it was based on, you know, specific transactions and there would be a certain profit associated with individual transactions. So there wasn't a situation we were trying to calculate, you know, 40 percent of their overall revenues were infringing.

Q.   When you say click through, was that like a website?

A.   Yeah.  It was -- yeah, they were using the

HIGHLY CONFIDENTIAL

Page 53

plaintiff's name to derive revenues to their website for mortgages.

Q. So you -- so when you calculated -- when you did your opinions, when you prepared your opinions in that case, you looked at any revenue generated specifically from use of -- or clicks on that specific website?

A. Right. And the same thing with the Ford Motor case. That was a case where I think it had to do with hub caps or wheel treatments. And we were looking specifically at certain SKUs or product -- product numbers so we had --

Q. SKUs?

A. Yeah. So we had a very defined group of transactions we were looking at.

Q. And on those websites did you look at like website analytics or any of that type of stuff about like showing how many people actually clicked on the website?

A. Yeah, I think that was part of it. Yeah. How many people clicked on the website, what the conversion rate was of the -- yeah, what the conversion rate was for the plaintiffs if they had gotten those clicks, what that would have been.

Q. Oh, okay. So if they actually got the clicks, then you use that to determine whether there could have

Page 54

been lost profits or something like that?

    A.    Right.

    Q.    Okay.  Why don't you turn to -- this is your opening report, why don't you go to page -- this is your CV, Appendix E.  Page 1.

    A.    Do you need this anymore?

    Q.    The -- sorry, we're done with the airport case.

    A.    I'll just -- I'll set it over here.

    Q.    So go to your K12 report, opening report. Page -- the one with your lovely picture on it.

    A.    Um-hmm.

    Q.    There you go.  All right.  I want to talk a little bit about this here.  Paragraph 2, you write: You -- or Dan, you -- utilizes his experience as an independent auditor to understand the back story of cases, drill down on allegations, evaluate evidence, assess financial conditions and performance and communicate findings in a clear and concise manner.

        Is that right?

    A.    Correct.

    Q.    That you wrote that?

    A.    Yeah.

    Q.    What does independent auditor mean?

    A.    Oh, I was a -- I was employed as a CPA with BDO Seidman and then subsequently with a firm that we spun

HIGHLY CONFIDENTIAL

Page 55

out of that organization.  And I was a -- spent my career there, so I developed from being a staff accountant to an audit partner, concurring reviewer, managing partner, but we were independent auditors.

Q.   What do you mean by independent in that context, the word independent?

A.   Oh, independent would be in the CPA industry, you have to be independent from your clients in order to perform audits.

Q.   Okay.  So does that mean like no biases?

A.   That means that there's kind of a whole litany of things that you make sure that you're independent of. You have no financial interest, you know, you don't have any other types of, you know, family connections or -- that's really what it's focused on.

Q.   What does drill down on allegations mean?

A.   That means, you know, understand -- understand what the allegations are and be able to -- understand what they are and look at, you know, a company's situation, because of my background, you know, I spent many years auditing companies and understanding systems and understanding business models and that type of thing.  So drill down means just being able to look at a wide body of information.

Q.   So does it mean more than just read an

HIGHLY CONFIDENTIAL

Page 56

allegation?

A. Could.

Q. Okay. But --

A. Depending on what I'm asked to do.

Q. Okay. So -- but it means that you're capable of doing more than just parroting an allegation, right?

MS. CULLEY: Object to the form.

BY MR. SHANEDLING:

Q. Or copy and pasting one? You can drill down, right?

A. Well, it means that, you know, if it's within my skill set that I can read the allegation, understand it and probably go to accounting records and do research and analysis.

Q. Okay. So then the next thing, what does it mean by evaluate evidence?

A. Evaluate evidence, well, that's what I did as an auditor. We looked at client information, we evaluated -- evaluated the information, determined, you know, how it would be addressed in audits and that type of thing.

So the same thing applies to the work I do now. You're looking at financial information, you're making assessments as to whether it's relevant or not and how it may be incorporated into a report or into findings.

HIGHLY CONFIDENTIAL

Page 57

Q. So like in the airport case, weighing the evidence?

MS. CULLEY: Object to the form.

THE WITNESS: I don't know, weighing the evidence?

BY MR. SHANEDLING:

Q. Well, in the airport case you wrote that you considered and weighed the evidence.

A. Yeah. Based on the weight of the evidence, right.

Q. Right. So you looked at the evidence?

A. Yes.

Q. Right? Underlying the allegations?

A. Right.

Q. Okay. So besides the degrees listed on your resume, do you hold any certificates or licenses?

A. I have a CPA and I am certified in financial forensics. I think those are the only two listed here.

Q. Where are you licensed as a CPA?

A. In the state of Florida.

Q. Are all your licenses active?

A. Yes.

Q. Okay. Where did you work after college?

A. My first real job was with the state of Iowa.

Q. That's the auditor general position for a year?

Page 58

A.   Yes.

Q.   And then you went to BDO; is that right?

A.   Correct.

Q.   What kind of clients did you have at BDO?

A.   Well, I worked out of the Orlando office so we had Orlando-based or, you know, Florida-based clients. They ranged from small entrepreneurial companies to small publicly traded companies, nonprofit organizations.  And then we had individual clients but I was primarily focused on corporate work.

Q.   Did you do any -- I see you list your expert witness for a number of years while you were at BDO?

A.   Yeah, I did that in addition to being an audit partner.

Q.   Okay.  Was any of that expert work in trademark infringement cases or would that match up with your CV if I were to look?

A.   Well, the CV I think stops in 1999.  So --

Q.   There's like a year overlap?

A.   Yeah.

Q.   Okay.  All right.  So then you left BDO, started your own firm; is that right?

A.   Yeah.  We bought that practice --

Q.   Okay.

A.   -- from BDO.

Page 59

Q.  And tell me a little bit about that, the firm that you started.

A.  Yeah.  Gallogly, Fernandez & Riley, LLP, it's a Florida CPA firm, we acquired the practice, that practice from BDO in 2000 and I and two other partners were the founders, we added several other partners, and so I ran that practice for four years.

Q.  Okay.  And then from there, what did you do?

A.  From there, I left there and I formed a little LLC called Gallogly Auditing Consulting and I did a variety of things within -- within that entity.  Did some auditing, some tax work and then gravitated more towards the litigation type work.

And then sometime in like 2017 or '18, several people I worked with at BDO wanted me to join them with FairValue Advisors so I did that in I think 2017 or '18.

Q.  Okay.  And do you belong to any professional associations?

A.  The American Institute of CPAs.

Q.  Okay.  You're current in that?

A.  Yes.

Q.  Any other associations?

A.  I'm a member of the Orange County Bar Association as a nonattorney member.

Q.  Okay.  How long have you been a member of that

HIGHLY CONFIDENTIAL

Page 60

association?

A.  Couple years, I think.

Q.  Okay.  Is that primarily because of your expert work in litigation?

A.  Yeah, it's networking.

Q.  You state in your report that you have not authored any formal publications in the last ten years. Is that right?

A.  Correct.

Q.  Okay.  How about have you given any presentations or lectures?

A.  No, not really.

Page 61



HIGHLY CONFIDENTIAL

Page 62



Page 63



HIGHLY CONFIDENTIAL

Page 64



HIGHLY CONFIDENTIAL

Page 65





HIGHLY CONFIDENTIAL

Page 67





Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

HIGHLY CONFIDENTIAL

Page 69



Page 70



Q.   Okay.  All right.  I'm going to shift gears just a little bit here.  Why don't we turn to page 3 of your opening report.

MR. SHANEDLING:  Can I get a sticker?

(Defendants' Exhibit No. 5 was marked for identification.)

BY MR. SHANEDLING:

Q.   All right.  I'm going to just hand this to you so you have it.

A.   Um-hmm.

Q.   It's a copy of -- marked as Exhibit 5.  It's a copy of the complaint in this case.

Do you recognize this?

A.   Yes.

Q.   Filed December 22, 2020?

HIGHLY CONFIDENTIAL

Page 71

A.   Yes.

Q.   Okay.  You can just put that aside.

Go back to page 3 of your opening report,



HIGHLY CONFIDENTIAL

Page 72





HIGHLY CONFIDENTIAL
PageID 38361

Page 74



Q.  So did you review that agreement?

A.  I may -- I may have read it early on.

Q.  Okay.  Did you review it in preparation for today's deposition?

HIGHLY CONFIDENTIAL

Page 75

A.  I did not.

Q.  Did you review it in preparing your rebuttal report?

A.  I don't think I did.

Q.  Did you review it when you were initially engaged in this version of this litigation?

A.  Yes.



Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

HIGHLY CONFIDENTIAL

Page 77



Page 78



in the complaint but once again, I didn't do an



HIGHLY CONFIDENTIAL

Page 80

Q.  And do you understand that a claim for false advertising is a separate type of claim than for trademark infringement?

A.  Yes, it is a separate claim.

Q.  In your opinion, does confusion or likelihood of confusion apply to a claim for false advertising?

A.  I'm not sure what the legal standard is.

Q.  So you don't know one way or the other whether evidence regarding confusion or likelihood of confusion factors into establishing a claim for false advertising?

A.  Correct.

HIGHLY CONFIDENTIAL

Page 81

Q.  And are you aware that FLVS has only retained an expert in this case on false advertising and not on trademark confusion?

MS. CULLEY:  Object to the form.

THE WITNESS:  Once again, I don't know who they've hired.

BY MR. SHANEDLING:

HIGHLY CONFIDENTIAL

Page 82



HIGHLY CONFIDENTIAL
PageID 38390



HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL





your model, I'm not talking about anything else.

HIGHLY CONFIDENTIAL

Page 86



Page 87



Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

HIGHLY CONFIDENTIAL

Page 88



about consumers, who are you referring to?

HIGHLY CONFIDENTIAL

Page 89



Q.   What does irreparable harm mean?

Page 90

MS. CULLEY:  Object to the form.

MR. SHANEDLING:  What's your objection?

MS. CULLEY:  It's a legal conclusion.

MR. SHANEDLING:  He wrote it in his report.

MS. CULLEY:  It comes from the complaint.  He's already testified he's not an attorney.

MR. SHANEDLING:  He put it in his report.

BY MR. SHANEDLING:

Q.  Okay.  Well, let me ask you.  What do you think the phrase irreparable harm -- you typed it out here.

A.  Yeah.  I typed it out because I'm summarizing what the report -- what the complaint says.

Q.  Okay.  Well, you've done a number of cases.  Tell me what you think irreparable harm is.

MS. CULLEY:  Object to the form.

THE WITNESS:  Once again, it calls for a legal conclusion.

BY MR. SHANEDLING:

Q.  You're not objecting here.  I'm asking you for your answer.  What does irreparable harm mean?

MS. CULLEY:  Object to the form.

THE WITNESS:  You know, I'm not familiar with the official legal definition of that term.

BY MR. SHANEDLING:

Q.  Okay.  And what is your layman's understanding of

Page 91

what it means?

A.   Irreparable would be things that couldn't be rectified.

Q.   Okay.  And now were you asked to consider as part of your calculations any actions that FLVS took to mitigate any of its harm?

MS. CULLEY:  Object to the form.

THE WITNESS:  I was not asked to specifically look at any actions they took to mitigate.

BY MR. SHANEDLING:

Q.   And you know what mitigation is, generally speaking?

A.   Yes.

Q.   And again, you'd agree that the harm we're talking about here, at least insofar as the use of the name FLOS, began in June or August of 2019 --

A.   Right.

Q.   -- with the launch of that program, right?

A.   Correct.

Q.   Okay.  And yet, FLVS filed suit more than a year later?

A.   They did, yes.

Q.   Okay.  Were you contacted by FLVS at any point between that, between the launch of FLOS when they filed the lawsuit?

Page 92

A.   Yes.

Q.   When?

A.   You know, I don't remember specifically.  I don't know if it was like maybe the September of 2020, I was on vacation when I got a call.

Q.   By who?

A.   By Steve Luther.

Q.   Okay.  And it was about -- well, did you -- so again, maybe I asked this, and apologies if I did, but you don't know one way or the other why FLVS waited more than a year to file the lawsuit?

A.   I don't.

Q.   And you didn't ask anyone at FLVS?

A.   No.

Q.   Did you consider that at all in your report, the time difference?

A.   No.

Q.   Let me just ask, because you've -- you know, you worked for BDO and worked for a number of companies in the financial sector.  If you were being -- if you or a client is being irreparably harmed by something to the tune of millions of dollars, would you advise them to wait more than a year to do something about it?

         MS. CULLEY:  Object to the form.

         THE WITNESS:  Well, I'm not an attorney and I

Page 93

don't advise people regarding filing claims.

BY MR. SHANEDLING:

Q. Okay. But do you think, you know, your sense, if you're in financial, in the financial sector, if you're losing allegedly millions of dollars, do you think it's prudent to take some action to stop that loss?

MS. CULLEY: Object to the form.

THE WITNESS: You know, once again, I'm not them. You know, what I may do may be different than they do. I don't know what their reasoning is.

BY MR. SHANEDLING:

Q. Would you advise a client to wait a year and a half and continue to suffer millions of dollars before taking a single step?

MS. CULLEY: Object to the form.

THE WITNESS: Once again, I don't advise clients on that type of thing.

BY MR. SHANEDLING:

Q. You don't know if it's reasonable or not?

A. I think some people may act sooner. I just don't know why they waited or -- or when they would have known more about what was happening. I just don't know. I don't know the facts.

Q. From your damages model, can you calculate how much money they would have saved, in other words, not

Page 94

lost FLVS had they filed suit say in August of 2019?

          MS. CULLEY:  Object to the form.

BY MR. SHANEDLING:

    Q.  Is it possible through your calculations to figure out that difference?

          MS. CULLEY:  Object to the form.

          THE WITNESS:  Well, I'd need a calculation of what the damage -- damages were after that point. Lost profits were after that point.  So if it -- if the school just didn't open, then -- if the school didn't open, then there would be calculations -- there may be other types of damages that occurred through -- because of advertising that took place and so forth because --

BY MR. SHANEDLING:

    Q.  I'm not talking about that.

    A.  I'm just saying that if they never opened, then there would be no students at that school.

    Q.  Okay.  So -- all right.  So if it -- there's no damages before it opened, right?

    A.  Right.

    Q.  Okay.  But if the Court determines that for some reason, that you need that damages cannot be -- for the trademark infringement claim, I'm not talking about the false advertising and unfair competition but

HIGHLY CONFIDENTIAL
PageID 38402

Page 95

specifically the trademark infringement claim, that you need to deduct any -- any amounts of lost profits that FLVS incurred from the launch of FLOS to December 22, 2020, is that something you'd be able to do?

A.  Well, you know, I like doing calculations but I don't know what other information I would need to look at but, yeah, there's a calculation that could be done.

Q.  Okay.  So you could apportion it like say on a monthly basis?

A.  Don't know about monthly because it's -- they're paid on completions.  So the question would be, if they didn't complete the students, would they have not gotten any revenues or would you allocate it by month going back, so there's a lot of unanswered questions you would need to have answered to do the calculations.

Q.  Okay.  So let me -- let me ask this at a higher level.  So we're talking about maybe, what, a year and a half between when it opened and when they filed the lawsuit?

A.  Yes.

Q.  If you take your model for lost profits and average it on an annual basis, ballpark, how much money are we talking about that FLVS suffered from your model, for that year, for a year and a half period?

        MS. CULLEY:  Object to the form.

HIGHLY CONFIDENTIAL

Page 96

THE WITNESS:  Well, I have it -- I'm not being difficult.  I just have it on an annual basis.  We know what it is for --

BY MR. SHANEDLING:

Q.  Okay.  What's on an annual basis?

A.  Oh, I'll just take a look at the report.

Q.  Sure, please.  I'm not trying to -- I'm not trying to have you guess here, so, please, you know.

MS. CULLEY:  While he's looking that up, can we take a break soon after?

MR. SHANEDLING:  Yeah.  This will be the last one.



HIGHLY CONFIDENTIAL

Page 98



Page 99



Q. Okay. Can you tell me and the jury which of your -- specifically which of your damage models corresponds to which count in FLVS's complaint?

A. No. I think I testified earlier, I didn't allocate it between counts.

Q. So do you think it's appropriate to award recovery for the same loss more than once?

A. I think I testified earlier that there wouldn't be -- it's not appropriate to have duplicate damages.

Q. Okay. So...

HIGHLY CONFIDENTIAL

Page 100

A.   Wouldn't be a double recovery.

Q.   So you agree there cannot be double recovery?

A.   That's my understanding.

Q.   Okay.  If the jury believes everything that FLVS and you say, what in your opinion should be awarded to FLVS for which count?

MS. CULLEY:  Object to the form.

THE WITNESS:  Like I said, I didn't allocate the revenue by count.

BY MR. SHANEDLING:

Q.   Would you be able to do that if ordered to do so?

A.   Well, I think I would provided I had the information for the jury's findings on the question of causation and confusion and to the extent -- what extent they say it occurred.

Q.   Okay.  And so just to clarify what you mean there, so it's important -- so for your -- for there to be a determination, you need to know exactly what the factfinder determines as far as how much causation there was for a particular misconduct, act of misconduct?

A.   I think that's correct.

Q.   Okay.  So if the jury determines, and I'll just use this as an example that, you know, there was only 50 percent causation, is that what you're talking about, then you would -- you'd kind of tweak your calculations

Page 101

accordingly?

A.   Well, it's an apportionment, as I understand, the apportionment of revenue based on -- based on the causation.

Q.   Okay.  So since you've submitted your rebuttal report, and aside from the -- that spreadsheet or two that you sent to counsel to be produced yesterday, are you doing any further work on any of your damages calculations?

A.   Only work we've done in addition is to further try to understand FLOS's revenues for school year 2020 -- '20 and '21.

Q.   The offset is referring to what?

A.   Refers to an emergency funding reduction.

Q.   Is that the --

HIGHLY CONFIDENTIAL

Page 102

A.   Revenue.

Q.   -- quote/unquote, executive order?

A.   Yes.

Q.   Okay.  And FLVS also sustained significant reduction --

A.   Right.  45 million or some large amount.

Q.   Right.  You were aware of that -- of that order?

A.   I became aware of it.

Q.   After your initial report?

A.   Yes.

Q.   Okay.  Why did you not -- why were you not aware of that when you conducted your initial report?

MS. CULLEY:  Object to the form.

BY MR. SHANEDLING:

Q.   Or how did you become aware of it?

Q.   And by been doing, but that -- am I correct that

Page 103

what you're talking about was work you did between Ms. Webster's report and your rebuttal report? Have you been doing anything since --

A. Yeah, so --

Q. Let me just --

A. Sorry. Go ahead.

Q. Let me just finish. Since your -- the date of your November 7, 2022, report?

A. Yes.

Q. And is that what you've been doing, what you were just describing?

A. Right.

Q. Okay.

A. Because we got the depositions in and the depositions talk about how that 5.7 million was derived and it's -- it's not as simple as Ms. Webster indicates. And Mr. Graham talked about an adjustment that was made in that year, 2020 -- 2021 that related to the first year that lowered the revenue for 2021 and a similar -- or another entry was made in 2021 that got reversed, he says reversed or fixed in the subsequent year, that also reduced the amount of revenue that was recorded to derive the 5.7.

Q. So based off of that information, have you prepared any supplemental or amended opinions or do you

HIGHLY CONFIDENTIAL

Page 104

intend to issue a supplemental report in any way?

A.  I haven't talked to any of the attorneys about whether there would be a supplemental report.  I was just basically doing fact finding at this point.

Q.  Have you taken any of that additional information and -- apologies for the word, but plugged it into your models?

A.  I have not.



Q.  What is your understanding of the settlement agreement?

A.  As a whole?

Q.  Sure.

A.  My understanding that the parties settled their disputes and that K12 agreed to not use certain terms with future advertising names, how they're going to use their trademarks and so forth, possibly related to, you

HIGHLY CONFIDENTIAL

Page 105

know, coloration and those types of things but that they were not going to do certain things.  And there was actually a list, I think, of names that they couldn't use or words they couldn't use.

Q.  Okay.  And you reviewed that list?

A.  I've seen the list, yes.

Q.  Okay.  And again, I think you answered this but I just want to be sure.  What damages did you calculate specifically tied to FLVS's claim for breach of that settlement agreement?

A.  So again, I haven't specifically allocated the revenue.  I haven't apportioned the revenues to those -- to counts.

Q.  Okay.  Are you aware of any provision in the settlement agreement that specifically prescribes damages?

A.  You know, I don't recall anything -- I don't recall.

Q.  Okay.  From your experience with contracts, when you're asked to calculate damages for breach of contract case, do you typically look to see whether there is a remedy of damages provision in the relevant contract that would prescribe the -- whatever the --

A.  In some cases, I may.

Q.  Okay.  And did you endeavor to do that here?

HIGHLY CONFIDENTIAL

Page 106

A.   No.

Q.   Why not?

A.   Because I was looking at the allegations of the complaint only.

Q.   Okay.  But the allegation you'd agree was breach of the settlement agreement?

A.   Right.

Q.   Okay.  So you're saying that despite knowing that, you didn't look in the agreement to see if it says or spells out how to calculate damages?

A.   I didn't specifically look for that provision, no.

Q.   Okay.  Well, let's look at the settlement agreement.  I'm going to mark it as Exhibit 6.

(Defendants' Exhibit No. 6 was marked for identification.)

BY MR. SHANEDLING:

Q.   All right.  Do you recognize this as a copy of the 2015 agreement we've been talking about for a little bit?

A.   Well, I'm not that familiar with this agreement. So I will -- all I can say is I assume it's the agreement.

Q.   Okay.  Do you have any reason to doubt that this agreement was mutually negotiated and executed by the

HIGHLY CONFIDENTIAL

Page 107

parties?

A.  I wasn't involved with -- no, I have no reason to doubt it but I was not involved in that process.

Q.  Okay.  Okay.  Why don't you turn to page 7.  That's -- so this, for the record, this settlement agreement here is Bates labeled FLVS00135353.  Marked as highly confidential by FLVS.  So we're going to turn to page FLVS0035359.  Okay?  Are you with me?

A.  Yes, I'm there.

Q.  And --

MS. CULLEY:  For the record, because it's marked highly confidential any testimony about it in the deposition will also be marked confidential.

MR. SHANEDLING:  Yes, no objection.

BY MR. SHANEDLING:

Q.  Okay.  So section E.  Okay.  Because the agreement set forth herein is not intended to address every dispute that might arise between FLVS and K12 regarding K12's selection of a new mark or marks.

Are you with me?

A.  Yes.

Q.  The parties have agreed that the marks listed under the heading, quote, Approved Marks, set forth on Appendix A, are approved for K12's usage and shall not form the basis for any future cause of action against

HIGHLY CONFIDENTIAL

Page 108

K12.

You see that?

A.   I do.

Q.   Okay.  And number 1, for any mark and/or acronym adopted by K12 prior to the cessation date.

Do you see that?

A.   Right.  What's the cessation date?

Q.   The cessation date.  It's a defined term.  Are you aware of how that's defined in here?

A.   No.

Q.   Okay.  Did you look at that when you were preparing your report?

A.   I did not.

Q.   Okay.  Why don't you turn to page 3 of the agreement.  Does paragraph 5A refresh your recollection?

A.   Yes.

Q.   Okay.  And what is it?

A.   June 30, 2016.

Q.   Okay.  So let's turn to Appendix A, which is FLVS 135368.

A.   I'm there.

Q.   Okay.  Are you familiar with this page?

A.   I have seen this page before.

Q.   Okay.  When did you see this page before?

A.   Well, would have been during this engagement.

Page 109

Q.   This engagement, meaning round two of the litigation?

A.   Yes.

Q.   Do you see the word online used a number of times on this page?

A.   Looks like it's used four times.

Q.   Okay.  And do you agree with me that there are only four prohibited marks under that heading?

A.   Yes.

Q.   Can you show me where on this page the name Florida Online School is?

A.   It's not listed on this page.

Q.   Now, would you agree with me that the words Florida, online and school were not invented after the year 2015?

        MS. CULLEY:  Object to the form.

        THE WITNESS:  I don't even know what that means.

BY MR. SHANEDLING:

Q.   Well, were you using those words in the year 2015?

        MS. CULLEY:  Object to the form.

        THE WITNESS:  Why would I be using those words?

BY MR. SHANEDLING:

Q.   Were those words in the English language in 2015?

Page 110

A.  Oh, yes, I would assume those words were in the -- yes.

Q.  At the time of execution of this agreement?

A.  I'm familiar with them being around then, yes.

Q.  Okay.  Not a hard question.

Are you aware that the Florida Department of Education -- well, let me ask you this:  Have you ever visited the Florida Department of Education's website?

A.  Yes.

Q.  Okay.  Are you aware that their website uses the words Florida, virtual, online and school, lower case throughout its website and in the same paragraphs?

A.  I've never looked for that, no.

Q.  Okay.  Now, go to page -- let's flip back to page 8 of this agreement.  It's FLVS 00135360.  With me?

A.  Yes.  Page 8?

Q.  Yes.  Okay.  Go to the top, that first kind of incomplete paragraph.

A.  Yes.

Q.  Okay.  See the last sentence, that's beginning:  The parties further agree?

A.  Yes.

Q.  Okay.  Can you read that last sentence?

A.  The parties further agree that K12 is not required to select a mark listed on Appendix A and

HIGHLY CONFIDENTIAL
PageID 38418

Page 111

there -- and that there shall be no presumption against

K12's choice of a mark not listed on Appendix A.

    Q.  Did you consider this at all when you were

assessing damages in your reports?

    A.  No.

    Q.  And you'd agree with me from what we've looked at

that this settlement agreement does not expressly state

that K12 could not use the mark Florida Online School or

FLOS?

            MS. CULLEY:  Object to the form.

            THE WITNESS:  Well, it's not listed as one of

    the items on that -- in that appendix, under marks not

    to be used.

BY MR. SHANEDLING:

    Q.  Okay.  And would you also agree that this

settlement agreement says nothing about the name Florida

Cyber Charter Academy being a prohibited mark?

    A.  Once again, I haven't read the entire agreement

to --

    Q.  Why don't you go back to --

    A.  -- to make that determination.

    Q.  Sure.  Sorry to interrupt you.

        Why don't you go back to 15, back to that

appendix.  Look at number 4.  What -- what section does

number 4 fall under?

Page 112

A.   Approved marks.

Q.   Right.  And can you read the name, number 4?

A.   Florida Cyber Charter Academy-FCCA.

Q.   Right.  And yet in your report, you assess damages for use of Florida Cyber Charter Academy, don't you?

MS. CULLEY:  Object to the form.

THE WITNESS:  Well, it's included as -- I think the complaint basically says that they have not raised an issue with the use of this name.

BY MR. SHANEDLING:

Q.   This name being --

A.   This name being Florida Cyber Charter Academy.

Q.   In fact, they couldn't, correct, because it was approved, right?

A.   Once again, I'm not an attorney.  I'm not going to make a legal determination here.

Q.   Okay.

A.   But I think the complaint says that they didn't -- they didn't complain about that name but there was other potentially infringing activities that would -- had potentially directed students to this school.

Q.   By infringing you're not talking about trademark infringement, are you?

Page 113

A.  Well, once again, I'm out of my lane here.

Q.  Well, there is --

A.  I'm not an attorney.  So --

Q.  Okay.  But you'd agree with me that there is not a count for trademark infringement against the mark Florida Cyber Charter Academy?

A.  I don't think there is, no.

Q.  You don't think there is or are you sure?

MS. CULLEY:  Object to the form.

BY MR. SHANEDLING:

Q.  You can look in the complaint.

A.  Yeah, let's do that.

Q.  Why don't you do that.  But I think you know the answer.

A.  What is the best place to look here?

Q.  Why don't you go to counts.

A.  So -- I thought I had it right here.

Q.  Exhibit 5.  Go to page 8.

A.  It does not look like there's an account.

Q.  You mean a count?

A.  A count, for infringement of -- on the name Florida Cyber Charter Academy.

Q.  Right.  And paragraph 42 says:  FLVS did not object to these marks, meaning Florida Cyber Charter Academy.  And it had reason to hope there would be no

HIGHLY CONFIDENTIAL

Page 114

further confusion between FLVS and defendants, right?

A.   Yes.

Q.   Okay.  All right.  You can set that aside.



HIGHLY CONFIDENTIAL

Page 115



          MS. CULLEY:  Object to the form.

BY MR. SHANEDLING:

     Q.  What's your understanding of a statute of

limitations?

Page 116

MS. CULLEY:  Object to the form.

THE WITNESS:  My general understanding?

BY MR. SHANEDLING:

Q.  Yes.

A.  Is that's how far back someone can go to claim damages.

Q.  Well, do you understand that just because there's a statute of limitations doesn't mean that the offending conduct at issue actually began at the earliest date of that limitations period?

A.  Yes.

Q.  Okay.  So let's use a very simple example.  Let's say there's a four-year statute of limitations in Florida for personal injury claims, well, if the injury happened two years ago, would you agree you can't claim damages for the two years prior to when that injury even occurred?

A.  Correct.

Q.  Right.  And that's -- we were talking about causation, right?

A.  Right.

Q.  Okay.  But you're aware that K12 didn't even start using the FLOS name until the spring of 2019, right?

A.  Right.

HIGHLY CONFIDENTIAL

Page 117



HIGHLY CONFIDENTIAL

Page 118



through current.

Q.  What --

HIGHLY CONFIDENTIAL

Page 119



Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 120



Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

HIGHLY CONFIDENTIAL



Page 121

Page 122



HIGHLY CONFIDENTIAL



Page 123

Page 124



Page 125



HIGHLY CONFIDENTIAL

Page 126



HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL

Page 128





Page 129

Page 130



HIGHLY CONFIDENTIAL

Page 131



HIGHLY CONFIDENTIAL

Page 132



HIGHLY CONFIDENTIAL

Page 133



HIGHLY CONFIDENTIAL

Page 134



MR. SHANEDLING:  Okay.  All right.  Why don't we break for lunch.

HIGHLY CONFIDENTIAL

Page 135

THE VIDEOGRAPHER:  We are going off the record. The time is 12:39 p.m.

(Luncheon recess was taken.)

THE VIDEOGRAPHER:  We are back on the record. The time is 1:40 p.m.

BY MR. SHANEDLING:

HIGHLY CONFIDENTIAL

Page 136



HIGHLY CONFIDENTIAL

Page 137



HIGHLY CONFIDENTIAL

Page 138



HIGHLY CONFIDENTIAL

Page 139



HIGHLY CONFIDENTIAL

Page 140



HIGHLY CONFIDENTIAL

Page 141



HIGHLY CONFIDENTIAL

Page 142



HIGHLY CONFIDENTIAL

Page 143



HIGHLY CONFIDENTIAL

Page 144



Page 145



HIGHLY CONFIDENTIAL

Page 146



Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

HIGHLY CONFIDENTIAL

Page 147



HIGHLY CONFIDENTIAL

Page 148



Page 149



HIGHLY CONFIDENTIAL

Page 150



Page 151



Page 152



HIGHLY CONFIDENTIAL

Page 153





HIGHLY CONFIDENTIAL

Page 155



Page 156



HIGHLY CONFIDENTIAL

Page 157



Page 158



Page 159



BY MR. SHANEDLING:

Q.   Right.  So why don't you take a look at Exhibit 8.

HIGHLY CONFIDENTIAL

Page 160

A.   I can barely read mine, so --

Q.   Yeah, I'm sorry, it's small.

A.   I have a magnifying glass here.

Q.   So look in the top row is -- you can see where it says the K12 -- WWW.K12.com.  You see that?

A.   Yeah.

Q.   And we're seeing numbers, you know, January 2022, 1.9 million?

A.   Yes.

Q.   Okay.  Now go down to the next row.  This is that URL, About-K12.  I'll represent to you this is the checklist URL.

A.   Okay.

Q.   Okay.  And notice what the numbers are underneath?

A.   Yes.

Q.   Do you see them, 31, 31, 24 and 13?

A.   Right.

Q.   Okay.  And you recognize that this Bates down

HIGHLY CONFIDENTIAL

Page 161



Q.   Okay.  So staying on this paragraph 17, you state

HIGHLY CONFIDENTIAL

Page 162



Q.  Now, you'd agree that Ms. Webster's approach assumed that 100 percent of people who actually reached or viewed that comparison checklist, so that 31 number, were, in fact, deceived by it?

MS. CULLEY:  Object to the form.

THE WITNESS:  I'm not sure if I -- can you say that again.

BY MR. SHANEDLING:

Q.  Let's back up.  Claim in this case is false advertising, correct?

A.  Yes.

Q.  The allegation about false advertising, attached

to the complaint, is that this checklist is false and

deceiving.  Do you understand?

A.  Um-hmm.

Q.  Yeah?

A.  Correct.

Q.  Okay.  Would you agree with me that Ms. Webster

in her methodology when she ran this apportionment

assumed that 100 percent of those 31 people who actually

got to this website were, in fact, deceived by it and

therefore, caused harm to FLVS?

A.  Relative to Florida Online Schools.

Q.  Okay.

A.  Right?

Q.  Can I ask --

A.  Is that your question?

Q.  Yes.

A.  Okay.  So --

Q.  I'm just asking -- I just want to be sure that

we're on the same page as far as reading what

Ms. Webster did.

A.  Sure.  I think the -- go ahead.  Do you want to

ask a question?

Q.  No.  I mean, do you have any reason to doubt that

her assumption that the 31 people were, in fact,

deceived?

Page 164

A.   I think that's what she's saying.

Q.   Okay.

A.   That she's dividing that into a big number, rather than just taking the 32 and doing the math to see what that would equate to in revenue.  She's -- she's calculating -- my calculations show she's assuming that only, you know, one person for one month was enrolled in that program.

Q.   Now, what is wrong, let me ask, with simply using the -- assuming that 100 percent of those 31 people were deceived?  Don't you do essentially the same thing but on the other way, you just assume that everyone, you know, 100 percent of the revenue was as a result of liability, so is she not doing the same thing at least with regard to that 31?

A.   Yes, she is.

Q.   Okay.  Now, what -- aside from the -- this ratio, right, between those who visited the checklist and those who generally visited the K12.com website, what other data should Ms. Webster have relied on to conduct her apportionment that she did not in your opinion?

A.   Well, first off, I don't think it was her job to calculate an apportionment.  That's the trier of fact's job.  So she's inserted herself into there being a causation expert.

HIGHLY CONFIDENTIAL

Page 165

Q.   Weighing the evidence?

          MS. CULLEY:   Object to the form.

          THE WITNESS:   Well, has she weighed all the

evidence?

BY MR. SHANEDLING:

Q.   Well, you wouldn't know, would you, because you

didn't look at the evidence?

A.   Well, I would suggest to you that there's lots of

depositions that haven't been taken --

Q.   You didn't look at --

A.   A trial has not been conducted so she certainly

hasn't looked at all the evidence.

Q.   Well --

A.   And even if she did she's not qualified as an

expert.   She's not the jury either.

Q.   Do you think it's reasonable to look at all the

evidence that's available at the time of putting out a

report?

A.   If you're qualified.

Q.   Okay.   And so do you take issue with her

qualification -- any of her qualifications?   Have you

looked at her CV?

A.   I have looked at her CV.

Q.   Okay.   Answer my question.   Do you have any

issues with her qualifications?

HIGHLY CONFIDENTIAL

Page 166

A.   Well, she's an economist, she's not a market survey expert, she's not a branding expert.  Those are the type of people that would do this type of work.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

HIGHLY CONFIDENTIAL

Page 167



Page 168





HIGHLY CONFIDENTIAL

Page 170



BY MR. SHANEDLING:

Q.   Right.  So if the jury agrees that the way to apportion it is by taking a ratio of those who actually visited the website, that 31, assume that they are deceived and taking that as a ratio compared to the total site visits to K12.com, taking that percentage, if that's what the factfinder or the Court determines, would you agree it's appropriate then to take that percentage, I think it's .002 percent, and then apply that to your damages model?

A.   Once again, I disagree with the premise that that's the appropriate way to calculate it.  But that --

Page 171

I think what you're describing is the way you would do the math.

Q.   Okay.

MS. CULLEY:  Just for the record, I want to make clear, I mean, we are talking about 31 but I don't think 31 was the total number of visitors that she's had on this report.  Just want to note that for the record.

MR. SHANEDLING:  Where are you looking?

MS. CULLEY:  Well, it's 31 but I think just for that initial period.

THE WITNESS:  Just for that month.

MS. CULLEY:  And then there were three more periods listed on there, additional people.

MR. SHANEDLING:  Right, and then it goes down, 31, 31, 24, 13?

MS. CULLEY:  Right.

THE WITNESS:  I guess --

MS. CULLEY:  Right.  So then -- anyway.  You would add all those up, right, to get to the total number of occurrences that are on this document.  I just wanted to make that clear.

MR. SHANEDLING:  I think, that's your testimony, but...

MS. CULLEY:  Well --

HIGHLY CONFIDENTIAL

Page 172

BY MR. SHANEDLING:



HIGHLY CONFIDENTIAL

Page 173





Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830





Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

HIGHLY CONFIDENTIAL

Page 177



Page 178



HIGHLY CONFIDENTIAL

Page 179





Page 181



HIGHLY CONFIDENTIAL

Page 182



Q.   Okay.  So you're saying you still do not have this information?

A.   Correct.

Q.   What information in your mind do you need to answer this question?

HIGHLY CONFIDENTIAL

Page 183



Q.  Okay.  So am I correct that what you need -- what you claim you need are these invoices?

HIGHLY CONFIDENTIAL

Page 184

Q.   How do you know that they can do that?

A.   Well, because Graham described their ledgers as being just like any other ledger I've ever looked at.

Q.   Did Graham's, to your knowledge, actually say that they could print out the Hendry County revenue like the way you described it?

A.   Well, he was being deposed about what type of information was in their ledgers and what he described is what I'm familiar with.  So it's a matter of running the -- running the report that would, you know, produce the information.  So it's -- it's got to be available.

HIGHLY CONFIDENTIAL

Page 185

There can't be hundreds of transactions because they probably billed them once a month and then they had, you know, probably a handful of journal entries at the end of the year to true-up.  So we're not talking about, you know, an enormous amount of information here.

Q.  Okay.  So the invoices and a GL printout, that's what you need?

A.  I would suggest that you get the invoices, the GL printout, and there's probably a spreadsheet that matches up with the invoices that would tell us what -- you know, what the revenue categories were.

Q.  And that -- to your knowledge, you don't think that's been produced already?

A.  I certainly haven't seen it.  Once again, I think there's been more put into this than needs to.  It's not -- can't be that voluminous.

Q.  So you assume, correct?

A.  Well, I've been doing this a long time and this is -- based on what he said, it's not -- it can't be voluminous.

Q.  Yeah, but nothing else besides those two, three things?

A.  Right.  And I would suggest we get that for each of the years, not just 2020 to '21 because there's entries made in the year before and the year after that

Page 186

impact, so why not just get all those, all the closed years?

Q. Would you agree that K12's compensation per FTE for FLOS is not equal to the Florida Department of Education's FEFP for Hendry County?

A. That's correct. It's not.

Q. Is the reported FEFP for the Florida Department of Education for Hendry County a combined calculation for both virtual and brick and mortar students?

A. Yeah. I refer to that as a blended -- the blended amount.

Q. Okay. And you're aware that the Florida Department of Education calculates FEFP by county, which necessarily has some brick and mortar and some virtual?

A. Right.

Q. Okay. Are there categories of compensation applicable to brick and mortar students that are not applicable to virtual students?

A. There is. And it's my understanding that the difference is about 1200 bucks a year.

Q. What's your understanding based on?

A. Well, conversation with, I guess, the former CFO of FLVS.

Q. Who?

A. Judith -- can't remember what her last name is.

HIGHLY CONFIDENTIAL

Page 187

First name is Judith.  But we originally worked with her on, you know, on the cost -- program cost report, and then I've talked to the -- to Corey Wheeler about it as well.

And there are -- there are specific categories that a virtual student doesn't get credit for, that a brick and mortar student does, like bussing, for example, would be one thing.  There would be other categories as well.  But what they tell me is, it adds up to be around $1,200 a year, give or take.

Q.  Did you do anything to actually verify that number yourself?

A.  I didn't do like a written analysis.  I did take a look at what FLVS's reimburse -- or funding rate was relative to other schools.  And it certainly was less.

Page 188





Page 189

HIGHLY CONFIDENTIAL

Page 190



Page 191



Page 192



Page 193



HIGHLY CONFIDENTIAL

Page 194



HIGHLY CONFIDENTIAL

Page 195



Page 196

Q. Are you aware of any testimony by FLVS to date providing that information?

A. I don't even know who's testified to date.

Q. So you -- and again, you didn't look at the testimony of FLVS's own corporate witness?

A. I didn't.

Q. But you looked at the testimony of K12's corporate witness?

A. I did.

Q. Okay. Why one, not the other?

A. Well, because I asked specifically for -- I think I heard -- I heard that their corporate witness was providing testimony. So I said, hey, if it's accounting related, I'd like to have it. I'd like to review it.

Q. But you didn't get it?

A. I did get it.

Q. But you didn't review it?

Page 197

A. No, I asked for --

MS. CULLEY: Object to the form.

THE WITNESS: -- K12's corporate deposition.

BY MR. SHANEDLING:

Q. Oh, K12?

A. Yeah.

Q. But I'm talking about FLVS.

A. Right. I didn't.

Q. Did you ask for it?

A. No, I didn't ask for it.

Q. Okay. Did anything in Mr. Graham's deposition testimony change any of your opinions?

A. I'd have to go back and look.

Q. And do you know --

A. Well, change my opinions --

Q. Well --

A. Like to modify my report?

Q. Yes.

A. No.

Q. Okay. Do you have any reason to doubt that the expenses reported by K12 in the spreadsheets its produced in this litigation are derived from K12's accounting system?

A. You know, I'm pretty unclear on where those numbers came from, even after reading Mr. Graham's

HIGHLY CONFIDENTIAL

Page 198

deposition.

Q.   Okay.  And you testified earlier you're generally familiar with, you know, large accounting databases, right?  I forget the name of the one we mentioned earlier.

A.   NetSuite or Oracle.

Q.   Yeah.  Have you worked with those programs before?

A.   NetSuite.

HIGHLY CONFIDENTIAL
PageID 38506

Page 199

████████████████████████████████████████ ████

████████████████████████████████ ██████

██████████████████████ ████████████████

████████████████████████████████████

████████████████████████████████████████

█████████████ ████████████████████

██████████████████.

Q. How about operating expenses?

A. I don't think I've seen anything in operating expenses.

Q. Are you sure about that?

A. Yeah.

Q. Well, we'll take a look at some of that.

A. Yeah.

Q. Are you aware -- you're aware K12 Stride is publicly traded, right?

A. Yes.

Q. And you're aware that it's regularly audited for purposes of its report to the SCC?

A. Yes.

Q. Okay. Are you saying it's necessary to reaudit any of K12's financial records for the purpose of this litigation?

A. Reaudit?

Q. Correct.

Page 200

A.   No, there's -- we wouldn't reaudit it.

Q.   Okay.  Go to your opening report now.  Page 36.

MS. CULLEY:  And while we're turning to that, can I just say, when you get to a good stopping point, could we take a break?

MR. SHANEDLING:  Why don't we do it right now.

MS. CULLEY:  Great.

MR. SHANEDLING:  Let's take five minutes.

MS. CULLEY:  Yes.  Thank you.

THE VIDEOGRAPHER:  We are going off the record.  The time is 3:07 p.m.

(A brief recess was taken.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 3:12 p.m.

BY MR. SHANEDLING:

Q.   All right, Mr. Gallogly.  During our break, was there anything that you needed to refresh or clarify?

A.   Yeah.  Right before we broke, I made the comment, we wouldn't reaudit the financial information.  Audit is a technical term, meaning like issue an audit opinion.  So in that sense, there wouldn't be a reauditing of those numbers.  But I know that they want me to look at the underlying information.  So that would be more of a, you know, a special analysis of a special group of numbers, as opposed to what we commonly refer to as an

Page 201

audit.

Q.  Okay.  That's something -- the underlying data, that's something you would also do -- well, let me strike that.

HIGHLY CONFIDENTIAL

Page 202



HIGHLY CONFIDENTIAL

Page 203



Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 204



HIGHLY CONFIDENTIAL

Page 205





Page 207



MR. SHANEDLING:  I'm going to need an exhibit sticker.  Thank you.

(Defendants' Exhibit No. 9 was marked for identification.)

BY MR. SHANEDLING:

Page 208



HIGHLY CONFIDENTIAL

Page 209



Page 210



Page 211



Page 212







Page 215

Q.   Okay.  We touched on this point earlier, you're aware that both FLVS and K12 and other virtual schools in Florida sustained millions of dollars in reductions, losses --

A.   Emergency funding, yes.

Q.   Right.  So produced money for the 2020 to '21 school year due to the Florida executive order?

A.   Yes.

Q.   Okay.  Have you reviewed that executive order?

A.   I have read it.

Q.   When did you read it?

A.   Before I issued this rebuttal report.

Q.   Okay.  So you didn't look at it before the first report?

A.   Correct.

Q.   Okay.  Do you know how much approximately K12 lost for its Hendry County virtual program due to that order?

Page 216

A.  I don't -- I haven't been provided the evidence because K12 hasn't produced it.  And if they produced the information that we talked about earlier, I would have the specific number.  However, I know that the FEFP reports show, I think it's $9.2 million in reduction.  So I'm assuming it all relates to virtual schools.  But once again, I don't have the documentation to verify it.

Q.  So you think that line could relate to some other school than FLOS?

A.  Don't know.  Well, hold on.  Well, once again, it's just a number in that column and I assume it relates to the virtual program, but like I say, I don't have the specific backup that we talked about earlier that would show it's all 100 percent virtual school.

Q.  Okay.  So ignoring that any testimony explaining what that is, you're not -- you're not basing your statement here on that testimony, you just want to see the actual data; is that what you're saying?

A.  Well, you asked me, I forget what even the question was.  My point was, I can see it on the report and I guess we did get testimony from Mr. Graham, I'd forgotten about that.

Q.  And Mr. Graham explained what it is, right?

A.  Yeah.  There was a brief explanation.

Q.  Okay.  But, and you didn't factor -- you haven't

Page 217

factored that in yet to your opinions?

A. I have.

Q. Okay. Well, let me ask this: If it was $9.2 million --

A. Yes.

Q. -- for the FLOS now Digital Academy program, how would that change your findings?

A. It wouldn't.

Q. It wouldn't at all?

A. No.

Q. Zero reduction?

A. No, it's already in the number.

Q. What number?

Q. Okay. So --

A. We're just trying to prove that -- we're just trying to prove out what the right number is.

Q. And FLVS sustained, what, 45 and a half million dollars as a result of that?

A. Sounds right.

HIGHLY CONFIDENTIAL

Page 218



Page 219



Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

HIGHLY CONFIDENTIAL

Page 220



HIGHLY CONFIDENTIAL

Page 221



HIGHLY CONFIDENTIAL

Page 222



HIGHLY CONFIDENTIAL

Page 223





HIGHLY CONFIDENTIAL

Page 225



Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

HIGHLY CONFIDENTIAL

Page 226



Page 227



Page 228



HIGHLY CONFIDENTIAL

Page 229



HIGHLY CONFIDENTIAL

Page 230



HIGHLY CONFIDENTIAL

Page 231



Page 232



HIGHLY CONFIDENTIAL

Page 233



Page 234



HIGHLY CONFIDENTIAL

Page 235



Page 236



Page 237



Page 238



HIGHLY CONFIDENTIAL

Page 239



HIGHLY CONFIDENTIAL

Page 240



HIGHLY CONFIDENTIAL

Page 241



HIGHLY CONFIDENTIAL

Page 242



HIGHLY CONFIDENTIAL

Page 243



Page 244



HIGHLY CONFIDENTIAL

Page 245



HIGHLY CONFIDENTIAL

Page 246



HIGHLY CONFIDENTIAL

Page 247



HIGHLY CONFIDENTIAL

Page 248



HIGHLY CONFIDENTIAL

Page 249



HIGHLY CONFIDENTIAL

Page 250



HIGHLY CONFIDENTIAL

Page 251



Page 252



HIGHLY CONFIDENTIAL

Page 253



HIGHLY CONFIDENTIAL

Page 254



Page 255



HIGHLY CONFIDENTIAL

Page 256



Page 257



Page 258



Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

HIGHLY CONFIDENTIAL

Page 259



Page 260



HIGHLY CONFIDENTIAL

Page 261

Q.   Okay.  So Florida Cyber Charter Academy, we've already pointed out that it's an approved mark, right, under the settlement agreement?

A.   Yes.

Q.   Okay.  Are you aware that -- of a single allegation stemming from the Florida Cyber Charter Academy name tied to any false advertising count in the complaint?

A.   I'm not aware.

Q.   Or any allegation that use of -- or operation of the Florida Cyber Charter Academy was a breach of contract?

        MS. CULLEY:  Object to the form.

        THE WITNESS:  I'm trying to --

BY MR. SHANEDLING:

Q.   Breach of the settlement agreement, the one that said it was approved?

A.   So --

        MS. CULLEY:  Same objection.

        THE WITNESS:  Can you say the question again,

Page 262

please?

BY MR. SHANEDLING:

Q.  Okay.  Are you aware of any allegation that K12 breached the settlement agreement saying that Florida Cyber Charter Academy was an approved mark?

A.  No.

Q.  Okay.  And you've seen no evidence of any confusion between the name Florida Cyber Charter Academy and FLVS, correct?

A.  Right.  I'm not looking at causation.

Q.  Right.  And you've never seen any evidence of any false advertising regarding Florida Cyber Charter Academy either, right?

MS. CULLEY:  Object to the form.

THE WITNESS:  Once again, I've not -- I've not done an analysis.  I wasn't asked to within the scope of the project.

BY MR. SHANEDLING:

Q.  Would you agree that when you apply a disgorgement model, the defendant is permitted to deduct certain costs from its gross sales?

A.  Yes.

Q.  Do you know what -- can you explain to me what costs can be included?

A.  Well, it depends on the facts and circumstances

Page 263

of the case.

Q.  Okay.  Generally speaking?

A.  Well, generally speaking, if it's -- generally speaking it would be direct -- incremental or direct costs that you would deduct.  To the extent that it -- the revenues represent, you know, like a large percentage of the business's revenue or all the revenues, then you would deduct all the legitimate business costs from that to arrive at the damage.

Q.  Okay.  And we talked about this earlier, but you agree that in at least in this 11th Circuit, the one that comprises the Court, the Middle District, deductions for losses are also allowable, correct?

A.  Deduction for --

Q.  A loss sustained.  So an offset --

A.  What does that mean?

Q.  An offset of unprofitable years.

A.  You mean like an aggregation?

Q.  Right.

A.  Yeah, I think it is.

Q.  Right.  The Burger King case, did you look at that one?

A.  I didn't.

Q.  Okay.  And we've talked about this but a loss can be from, you know, less funding for a certain year?

HIGHLY CONFIDENTIAL

Page 264

A. Usually happens that way.

Q. Right. And we talked about the Florida executive order, right?

A. Yes.

Q. Okay. And you'd agree with me that if costs and losses were greater than revenue, that would result in a net loss?

A. Yes.

Q. And that in such a situation if there's a net loss, there's no profit to disgorge?

A. I think that's how it works.

Page 265



HIGHLY CONFIDENTIAL

Page 266



Q.  All right.  Now, when you reviewed those two schedules, how did you open them?  On a computer?

A.  I may have had a -- yeah, on a computer.  I think I had the spreadsheet and I had the PDF.

Q.  Okay.  Well, why don't we look at them.  I'm not going to look at them on a computer, but I've got them all printed out just for you.  Okay?

MR. SHANEDLING:  Can I get a couple stickers?

(Defendants' Exhibit No. 10 was marked for identification.)

BY MR. SHANEDLING:

Q.  I'm going to hand you -- that one is Exhibit 10. Okay.  So Exhibit 10, and I -- just because it was

HIGHLY CONFIDENTIAL

Page 267

produced in native, this, I'll represent to you is a printout of Stride0029408.  Okay?  And that one was marked confidential or highly confidential under the protective order, I'm sure.

A.  Yes.

Q.  Okay.  Now, hold on to that one.

A.  Thank you for blowing these up, by the way.

Q.  Oh, I'll have to thank the good folks at Carlton Fields for doing that.

(Defendants' Exhibit No. 11 was marked for identification.)

BY MR. SHANEDLING:

HIGHLY CONFIDENTIAL

Page 268



HIGHLY CONFIDENTIAL

Page 269



HIGHLY CONFIDENTIAL

Page 270



Page 271



Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

HIGHLY CONFIDENTIAL

Page 272



HIGHLY CONFIDENTIAL

Page 273



HIGHLY CONFIDENTIAL

Page 274



HIGHLY CONFIDENTIAL

Page 275



HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL

Page 276



adjustment that you show in the 2020 to 2021?

HIGHLY CONFIDENTIAL

Page 277



Page 278



Page 279



Page 280



Page 281



HIGHLY CONFIDENTIAL

Page 282



HIGHLY CONFIDENTIAL

Page 283



HIGHLY CONFIDENTIAL

Page 284



HIGHLY CONFIDENTIAL

Page 285



Page 286



Page 287



HIGHLY CONFIDENTIAL



HIGHLY CONFIDENTIAL

Page 289



HIGHLY CONFIDENTIAL

Page 290



Page 291



Page 292

BY MR. SHANEDLING:

Q.   All right, Mr. Gallogly, apart from the opinions expressed in your initial expert report of July 1, 2022, and your rebuttal report of November 7, 2022, which have been subject of my deposition questioning today, are you intending to offer any other opinions for purposes of this matter?

A.   Possibly.

Q.   And what would those be?

A.   Those would be relative to K12's revenues for 2020, '21, and my review of this information you provided.

Q.   Okay.  And what about any -- any supplemental or amended opinions based on any additional production by your own client, FLVS?

A.   It's always possible.

Q.   Okay.  And what about deposition testimony forthcoming?

A.   It's possible.

Q.   Are you aware that Ms. Webster is going to be deposed in this case?

Page 293

A.   Yes.

Q.   Do you intend to review her deposition transcript?

A.   I don't have it on my schedule, but I would likely review it.

Q.   Okay.  Do you intend to revise -- and this is, I think, similar to the last question, but do you intend to revise your reports in this matter for any reason?

A.   Right now, I'm not scheduled to review -- revise it.

Q.   Okay.  And you see no other reason to revise any of your reports?

A.   Only for the additional information that we've talked about.

Q.   Okay.  And any additional information from deposition testimony?

A.   That I've already -- that I've already read?

Q.   Either that you've read, that's occurred or that will -- or that will occur.

A.   Well, you know, it's really up to the attorneys to instruct me if I'm supposed to issue an amended -- amended report.  So they haven't asked me to amend the report yet.  And I most likely will either attend the deposition or read the deposition transcripts.

MR. SHANEDLING:  Okay.  I don't have any

HIGHLY CONFIDENTIAL

Page 294

further questions.

MS. CULLEY:  All right.  I have just one quick clarification I wanted to ask you about.

CROSS-EXAMINATION

BY MS. CULLEY:

Q.  You were talking earlier today about the documents that you would like to see relating to revenue.  And you mentioned the invoices and general ledger entries and any supporting spreadsheets.  Would it -- would it also be helpful for you to see any reconciliation documents?

MR. SHANEDLING:  Object to the form.

THE WITNESS:  Reconciliations relative to --

BY MS. CULLEY:

Q.  Relative to the accrual of revenue and then the application of deductions, that I think you talked about that the deduction was -- or that there were amounts that were applied to different years than the year in which they would have actually occurred and if there were any reconciliation documents that kind of reconciled that, would that be helpful to you as well?

A.  Yeah --

MR. SHANEDLING:  Object to the form.

THE WITNESS:  I think that the description I gave of the documents would include those types of

Page 295

reconciliations.

BY MS. CULLEY:

Q.  Okay.  So would it -- is it fair to say that what you would like to see are documents that reflect the negotiations between FLOS or Digital Academy of Florida and Hendry County regarding the student count, the amount to be paid per student and then ultimately, the full amount of the -- of the revenue that was going to be paid?

        MR. SHANEDLING:  Object to the form.

HIGHLY CONFIDENTIAL

Page 296

MS. CULLEY:  Okay.  All right.  Thank you.  I don't have anything further.

MR. SHANEDLING:  All right.

THE VIDEOGRAPHER:  You all done?  Okay.  So we are off the record at 5:24 p.m. and this concludes today's deposition.

MR. SHANEDLING:  Thank you very much.

MS. CULLEY:  Thank you, everyone.

THE COURT REPORTER:  Defense counsel has a standing order of three-day expedite and rough draft. Would you like to order this as well?

MS. CULLEY:  Yes, the same.

(The deposition was concluded at 5:24 p.m.)

HIGHLY CONFIDENTIAL

CERTIFICATE OF OATH

STATE OF FLORIDA)

COUNTY OF ORANGE)

I, MAE FISHER, Registered Merit Reporter, Certified Realtime Reporter and Notary Public, State of Florida, certify that DANIEL GALLOGLY, CPA, CFF personally appeared before me on December 6, 2022, and was duly sworn/affirmed and produced a driver's license as identification.

WITNESS my hand and official seal this 8th day of December, 2022.

MAE FISHER, RMR, CRR

Notary Public - State of Florida

Commission GG 913201

Expires:  January 8, 2024

HIGHLY CONFIDENTIAL
PageID 33605

Page 298

TRANSCRIPT CERTIFICATE

STATE OF FLORIDA)

COUNTY OF ORANGE)

I, MAE FISHER, Registered Merit Reporter, Certified Realtime Reporter and Notary Public, State of Florida, certify that I was authorized to and did stenographically report the deposition of Daniel Gallogly, CPA, CFF; that a review of the transcript was not requested; and the foregoing transcript, pages 4 through 296, is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.

DATED this 8th day of December, 2022, at Orlando, Orange County, Florida.

MAE FISHER, Notary Public
State of Florida

## ERRATA SHEET

### DEPOSITION OF DANIEL GALLOGLY, CPA, CFF, DATED DECEMBER 6, 2022

### FLORIDA VIRTUAL SCHOOL v. K12 INC., and K12 FLORIDA LLC
#### Case No. 6:20-cv-02354-GAP-EJK

| Page | Line | Change | Reason |
|---|---|---|---|
| 6 | 15 | I had my deposition taken 17 times. | To state the exact number. |
| 36 | 18-19 | Add the following: "as I was asked to assume the facts in the complaint were true and liability had been established. | To clarify my testimony. |
| 45 | 12 | Add the following: "because I was not engaged to investigate and/or evaluate instances of actual confusion (ie. given passengers that flew into the wrong airport because of the name). | To clarify my testimony. |
| 48 | 13 | Change the word "paperclip" to "pay-per-click." | To correct the record. |
| 52 | 10 | Change the word "themed" to "deemed." | To correct the record. |
| 66 | 16 | Add the following: "because I did not need it for purposes of my analysis. I relied on the summary information which I was able to tie back to audited financial statements. | To clarify my testimony. |
| 66 | 25 | Add the following: "because I did not need it for purposes of my analysis. I relied on the summary information which I was able to tie back to audited financial statements. | To clarify my testimony. |
| 124 | 23 | Add the following: "because only students that were enrolled and completed the year were considered in measuring K12's revenues from FLOS or in my calculation of FLVS's lost profits associated with FLOS." | To clarify my testimony. |
| 152 | 10 | Change the words "complaints" to "claims." | To clarify my testimony. |

1

17485715.v1

| 212 | 22 | Delete the word "Right." Insert the following statement which was made at page 213:5-6, "I am not guessing. I am using historical information from FLVS's system." | To clarify my testimony. |
|-----|----|----|----|
| 213 | 13 | Add the following: "because I was asked to assume all the revenue generated by K12 from FLOS was deemed infringing. Therefore, I calculated FLVS's lost profits based on revenues it would have generated, but for K12's actions, from FTEs FLOS reported to the Florida Department of Education." | To clarify my testimony. |
| 213 | 21 | Change the "260" to "160." | To correct the calculation. |
| 229 | 22 | Change the "2.4" to "0.24" | To correct the record. |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

I, the undersigned, declare under penalty of perjury, that I have read the foregoing document and the facts stated in it are true.

Dated: _1-6-2023_

Daniel Gallogly

2