# EXHIBIT P

Page 1

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
CASE NO.:  6:20-cv-02354-GAP-EJK

FLORIDA VIRTUAL SCHOOL,

      Plaintiff,

vs.

STRIDE, INC., formerly known as
K12 INC., and K12 FLORIDA LLC,

      Defendants.


* * * * * * * * * * * * * * * * * *


VIDEO-RECORDED
DEPOSITION OF:  SAMUEL VERGHESE

DATE:           November 1, 2022

TIME:           COMMENCED:  9:12 a.m.
                CONCLUDED:  6:24 p.m.

TAKEN BY:       Defendants

PLACE:          Rumberger, Kirk & Caldwell, PA
                300 South Orange Avenue
                Suite 1400
                Orlando, Florida 32801

REPORTED BY:    Mae Fisher, RMR, CRR

Page 2

A P P E A R A N C E S:

STEPHEN LUTHER, ESQUIRE
Of:   Luther Law PLLC
      4767 New Broad Street
      Suite 1029
      Orlando, Florida 32814-6405
      (407) 501-7049
      Sluther@lutherlawgroup.com
SUZANNE BARTO HILL, ESQUIRE
SALLY CULLEY, ESQUIRE
Of:   Rumberger, Kirk & Caldwell, P.A.
      300 South Orange Avenue
      Suite 1400
      Orlando, Florida 32801-3380
      (407) 872-7300
      Sculley@rumberger.com
      Shill@rumberger.com
DAVID D'AGATA, ESQUIRE
LUIS GUZMAN (via telephone)
Of:   Florida Virtual School
      5422 Carrier Drive
      Suite 201
      Orlando, Florida 32819-8323
      (407) 513-3451
      Ddagata@flvs.net
      Lguzman@flvs.net
         Counsel for the PLAINTIFF
STEVEN HOLLMAN, ESQUIRE
CHARLES SPENCER-DAVIS, ESQUIRE
Of:   Sheppard Mullin, LLP
      2099 Pennsylvania Avenue NW
      Suite 100
      Washington DC, 20006
      (202) 747-1900
      Shollman@sheppardmullin.com
      Cspencerdavis@sheppardmullin.com
         Counsel for the DEFENDANTS
ALSO PRESENT:
TONY BARTOW
Videographer

Page 21

A.    That's correct.  It was -- it was very quick.

Q.    What have you done to prepare for today's deposition?

A.    As I mentioned briefly before, had several meetings with our counsel, general counsel, our outside counsel, represented here as well.  Just to go through the documents that I verified earlier, just briefly. And just going through, making sure that everything I've attested to that I've had a chance to spend time with that today, to be able to answer these questions.

Q.    On how many occasions did you meet with your counsel in preparation for your deposition?

A.    It was a myriad of times.  Sometimes a full day, depending on -- depending on the need and topics that we were going through.  But I would say -- I would say many, many hours and over the stretch of many days.

Q.    And how long ago did the preparation start?

A.    Um-hmm.  I would think the matter -- a matter of weeks, months.  It's been ongoing.  Keep in mind we were ready initially to go through and I know there was a delay in time, an extension was asked at some point, which delayed my deposition.  So I prepped even before this most recent and then had to come back and do this again essentially.

Q.    And when you came back again, when did that

Page 22

preparation start?

A.    Um-hmm.  I would say an intensive preparation, especially a few weeks ago, but there was also several. It all depends on how you define preparation in this. But it was a lot of time going through these documents and spending time making sure that I was familiar with everything that I've attested to and what we were attesting to here in these documents.

Q.    Would you identify the counsel with whom you prepared for your deposition testimony by name?

A.    Absolutely.  Stephen Luther, our main counsel, of course.  We have Suzanne Hill, Sally Culley and Dr. David D'Agata, and of course we have Luis Guzman, who is also on the line listening in.

Q.    Any other attorneys?

A.    Not that I can recall at the moment but I will let you know if someone else pops in mind later.

Q.    You referred to both general counsel and outside counsel.  Is Mr. Guzman the general counsel's representative with whom you met?

A.    So Dr. David D'Agata is our general counsel --

Q.    Right.

A.    -- at Florida Virtual School.  Luis Guzman is a deputy general counsel for Florida Virtual as well.

Q.    Did you meet with anyone other than counsel in

Page 23

preparation for your testimony?

A.   The main meetings were with counsel in preparation for this.  There may have been other deponents at a time that were in the room as well or in a conversation in addition.  They would be listed in Rule 26, you know, as far as that disclosure.

Q.   Can you identify them, please?

A.   Sure.  Kate Lysaught was one such person.

Q.   Anyone else?

A.   Not that I can remember.

Q.   Did you meet with Tania Clow in preparation for your deposition testimony?

A.   I did not.

Q.   With Marissa Draeger?

A.   I didn't.

Q.   Have you met or spoken with Courtney Calfee in preparation for your deposition testimony?

A.   I did not.

Q.   Have you met or spoken with Dhyana Ziegler?

A.   I did not.

Q.   Who reports to you as the COO at FLVS?

A.   So I have technology under me.  So we have our senior director of IT.  We have HR.  Those are some of the direct reports.  And there's, you know, many downlines associated with those things as well.  Risk

Page 24

management also.  And that's the kind of generic structure of that.

Q.  Is the marketing communications function a direct report to you?

A.  It is not.

Q.  Did you meet with Holly Sagues in preparation for your deposition today?

A.  No.

Q.  Did you meet with Cheryl Heddlesten in preparation for your deposition testimony?

A.  No.

Q.  What did you discuss with Kate Lysaught in preparation for your deposition testimony?

A.  So this was -- this was a -- this was a meeting with general counsel and I -- you know, depending on what is confidential or not in that conversation, I think, you know, what I can say is discovery documents, the things that I went through.  That, I can say in relation to that.

Q.  Discovery documents that were authored or received by Kate Lysaught?

A.  No.  Not necessarily -- not necessarily that.  I think situations that were related to market confusion. It was -- it was a broad generic look at what that pretty much looked like and the documents that you would

Page 25

see in discovery.

Q.  What did you discuss with Kate Lysaught?

MR. LUTHER:  Mr. Hollman, to the extent that you're inquiring into what he discussed with Ms. Lysaught during preparation with the attorneys, we're objecting to that on the grounds of attorney-client privilege.  There were no independent discussions in preparation for this that were just with Ms. Lysaught to my knowledge.  All meetings were with counsel and would be protected by the attorney-client work product privileges.  So to the extent that you're inquiring into what specific discussions we had with the lawyers during preparation, that's privileged.  I'm going to instruct the witness not to answer.

MR. HOLLMAN:  So information from a witness that informs his testimony in preparation for the deposition, you're asserting qualifies for privilege protection?  We'll certify that question.

BY MR. HOLLMAN:

Q.  I take it that you will honor your attorney's direction not to answer that question; is that so?

A.  I will honor my attorney's direction.

Q.  And Ms. Lysaught is not an attorney, correct?

A.  To my knowledge, she's not.

Page 26

Q.   And she's not a current employee of FLVS, correct?

A.   That's correct.

Q.   And she doesn't participate with you or the company in making decisions that operationalize advice from counsel, correct?

A.   Not today.  Keep in mind she was an employee when the subject of all of this was going on and the issues at hand with the complaint.

Q.   Right.  The question is whether her presence at a discussion involving attorney-client privilege communication qualifies for the privilege.

MR. D'AGATA:  Object to the form.

MR. HOLLMAN:  You're not objecting here.  We have one attorney objecting.

MR. LUTHER:  I'll object to the form of the question as well.

MR. D'AGATA:  I'll object when I want.

MR. HOLLMAN:  Yeah.  No.  We have one attorney objecting.  Those are the rules.

MR. D'AGATA:  I'm going to object to form.  Here's what I'm suggesting, Mr. Hollman.  If you would like to take one question at a time, I'm not hearing a blanket attorney-client privilege objection.

BY MR. HOLLMAN:

Page 49

Q.  Exhibit 1.

A.  Okay.

Q.  The attachment which lists the topics for the deposition and it's Topic No. 1.

A.  Just give me a moment, please.

Would you repeat the question, please?

Q.  Do you see that topic request?

A.  Topic 1?

Q.  Yes.

A.  Yes.

Q.  What individual or individuals at FLVS were responsible for implementing and executing the terms of the settlement agreement upon its execution?

A.  Well, when it came to the performance, we have -- of course, Dr. D'Agata was in the mix with that, of course, he was a part of that when it came to the performance of the agreement and the concerns there.

Q.  Dr. D'Agata, you're referring to FLVS's general counsel had responsibility in that regard?

A.  That is correct.  There was the demand letters sent at the time in addition to that.

Q.  Now, the settlement agreement was signed by Dhyana Ziegler on page 14, who's a PhD and identified as the chair of FLVS's board of trustees.  Correct?

A.  Correct.  Or the previous board of trustees

Page 61

Q.   Who at FLVS was responsible for the ownership rights assigned to it under the trademark quitclaim assignment which is Exhibit 3 to the settlement agreement?

MR. LUTHER:  Object to form.

THE WITNESS:  So I mentioned before was when a concern came about, with the performance of the settlement agreement, that was something that Dr. D'Agata, why he sent a letter when it came to the two letters that were sent in August, the demand letters, in relation to that.

BY MR. HOLLMAN:

Q.   I'm sorry, August of...

A.   Would have been 2020.

Q.   Right.  Who was responsible for the ownership rights assigned to FLVS under the trademark quitclaim assignment as of January 1, 2017, the day after the URL safe harbor expired?

MR. LUTHER:  Object to form.

THE WITNESS:  Yeah.  For me, I wouldn't have direct knowledge of that.  You know, at that time. Keeping in mind as I shared, I wasn't there until 2019 myself, when it came to that.

BY MR. HOLLMAN:

Q.   But you're testifying as a representative for

Page 115

clarify that would probably be good to ask Ms. Lysaught

as well.  She would have probably a better idea of a

full list.

Q.  By the way, is it your expectation that

Ms. Lysaught is returning to employment at FLVS?

A.  I think that is a -- that is an ongoing

situation.  I don't know if we can speak about personnel

matters related to that.

Q.  Is she a current employee?

A.  She's not a current -- she's not a current

employee.

Q.  Is she --

A.  That's what I can tell you right now.  She's not

a current employee.

Q.  Is she on sabbatical with the expectation that

she'll return after a sabbatical?

A.  She actually --

MR. LUTHER:  Object to form.

THE WITNESS:  -- resigned.  And I'll --

MR. LUTHER:  You can answer.

THE WITNESS:  Yeah.  She resigned.

BY MR. HOLLMAN:

Q.  And when did that occur?

A.  Roughly six months ago.

Q.  Did she say why?

Page 116

A.   I believe -- you know, I believe that's a personal matter.

Q.   Did she say why?

MR. LUTHER:   Object to form.

BY MR. HOLLMAN:

Q.   It's a yes or no question.

A.   It's a personal matter that I don't have direct knowledge of.

Q.   Well, did she say or did she not?   It's yes or no.

MR. LUTHER:   Object to the form.

BY MR. HOLLMAN:

Q.   I'm not asking you for substance.   Just, did she say?

A.   Did she say why?   I don't see how that's relevant in this situation.

Q.   Your attorney will explain the rules, but you don't get to object and withhold information based on your sense of what's relevant or not.

A.   I know -- and you've got to remember, I'm over HR, you know, as well in my downline, so we're not putting anything in there.   We just know she was resigning.   That's what I'm -- that's what I'm referring to.

Q.   Did she say why?

Page 117

MR. LUTHER:  Object to the form.

THE WITNESS:  There's probably knowledge of that somewhere but I -- she didn't put on record with us why she was resigning.

BY MR. HOLLMAN:

Q.  Do you have knowledge as to why she resigned?

MR. D'AGATA:  I'm having trouble how this relates to the topics listed, Mr. Hollman, for a corporate rep.

BY MR. HOLLMAN:

Q.  Do you have knowledge?

MR. D'AGATA:  You can go ahead and answer on the objection that this is outside the scope.

THE WITNESS:  I do know why but that was something confidential she was sharing with me and it wasn't work related.

BY MR. HOLLMAN:

Q.  Will you tell me why?

MR. LUTHER:  Object to the form.

THE WITNESS:  She wanted to hike the Appalachian Trail.

BY MR. HOLLMAN:

Q.  Give any other reason than that?

A.  That's the reason I know.

MR. D'AGATA:  Is it a good time to break or --

Page 198

Do you see that language?

A.  I do see that.  I think it's important to note again FLVS used to be on there in previous web pages.

Q.  And now as this is configured in Exhibit 44, the website doesn't once mention Florida Virtual School, does it?

A.  I don't see it in this document today.

Q.  And you would agree with me that this document shows features that K12-powered schools claim to have, right?

A.  I would say they're claiming that they have these features from what I see.

Q.  Mr. Verghese, what statements in the K12 pages relating to the checklist we've just reviewed does FLVS contend are literally false?

MR. LUTHER:  Object to form.

THE WITNESS:  So I think what's important, it has to be, yet again, taken in its entirety.  We're talking about the website, we're talking about a color scheme that's similar to Florida Virtual School, we're talking about language that's used, Florida Virtual Schooling, Florida Virtual School powered by K12.

Florida Virtual School used to be on this until recently and then after that broad-brush customer experience, digital experience that a potential parent

Page 199

is brought down, then with FLVS being seen as a less-than entity, according to the way this website was constructed, you get to these decision points below.  I think that context has to be remembered when a parent or someone involved is thinking about what options to choose for their children.

And even though I'm not the marketing expert, I know enough what it means just from common sense to think through as I've gotten down that whole process and now I'm here.  You know, FLVS is not contending on just any individual issue.  It's in the entirety of the conversation and the way this is presented and the concern that arises from that.

So when it looks at this, I don't know every form and facet of what K12 offers or doesn't offer to that extent.  I don't have specific direct knowledge of that.  But what I did do just a moment ago, Mr. Hollman, is I took time to look at some of those broader categories and I said that I attest that FLVS does provide those.

BY MR. HOLLMAN:

Q.  Can you as FLVS's corporate representative for this purpose point me to any language in this document that FLVS considers to be literally false?

MR. LUTHER:  Object to form.

Page 200

THE WITNESS:  So another way to talk about it as -- earlier, as I stated, I think the other concern is that when this is presented, potentially to a parent, in that format, and if FLVS is listed as having no checkmarks associated with them, and that's what their initial assumption is, and I'm not the exact marketing expert, which Dr. Stec will speak to that and he has it in his report, that it does have an effect, you know, on a potential consumer, potential customer in this case just a parent who's trying to figure out what's best for their child and to try to get them taken care of.

If all those boxes aren't checked, there is an effect.  There is a problem with the way in this whole presentation and just everything in the way this is laid out with that whole journey that began at the beginning with FLVS in the color scheme being used at the top of the web page to the end where these boxes are unchecked and FLVS is essentially not listed as having anything prechecked, there is an effect of that, which Dr. Stec lays out.

BY MR. HOLLMAN:

Q.  All due respect, Mr. Verghese, you're not answering my question, which is a very simple no -- yes or no question.  As we sit here today, is FLVS able to

Page 201

identify any specific language in this document that's

literally false, yes or no?

          MR. LUTHER:  Object to form.

          THE WITNESS:  I appreciate what you're trying

     to say, Mr. Hollman.  I really do.  But when you

     object to a whole form and facet of everything that's

     in there that leads to this checklist, that's the

     concern here.  That's what we're talking about here.

BY MR. HOLLMAN:

     Q.  I'm entitled to a yes or no answer to my

question.  I'm going to ask you again.  As we sit here

today, is FLVS able to identify any language in this

document that it claims is literally false, yes or no?

          MR. LUTHER:  Object to form and asked and

     answered.

          MR. HOLLMAN:  It hasn't been answered.

          THE WITNESS:  I'm given the benefit of the

     doubt to just take a third or fourth or fifth look.

     But nothing in here's changing my opinion on that,

     Mr. Hollman.  It is the way it was presented was a

     real problem with this.  And that's a situation we're

     running into here.  This is very confusing for a

     parent, someone trying to find a way to get to this

     situation.

          Now, the specifics, what I can say, I don't

Page 202

believe -- here's what I'm going to say.  I don't believe that anything K12 is attesting to of what they're doing is false, of what their checkmarks say. I don't have specific knowledge of that.  I'm not going to attest that that's false.  I'm not going to attest that that's untrue of what they're saying. That hasn't been the case.  So if that's what you're asking me, I have no reason to believe K12 is saying something that is false in relation to them.

What's false and what's concerning is that -- and you'll see in Dr. Stec's report -- there is -- there's an assumption that it's not being provided by other providers and Florida Virtual is part of that.

BY MR. HOLLMAN:

Q.  I know you're not a lawyer, Mr. Verghese, I'm just going to ask you this to get a context for your answer.  You understand that there is a difference both in what's required to be shown and in the proof that is necessary between an advertisement that's claimed to be literally false and one that's claimed to be impliedly false; are you aware of that distinction?

MR. LUTHER:  Object to the form.

THE WITNESS:  I appreciate you saying that, that I'm not a lawyer.  I don't understand all the nuances of law when it comes to that.  That's why I